**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| *IN RE EXTENDED STAY HOTEL ANTITRUST LITIGATION* | Case No. 1:24-cv-6324 Honorable Georgia N. Alexakis |
| This Document Relates to All Actions | **CONSOLIDATED AMENDED <u>CLASS ACTION COMPLAINT</u>** |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. PARTIES .............................................................................................................. 10

    A. Plaintiffs .................................................................................................... 10

    B. Defendants ................................................................................................. 18

    C. Co-Conspirators ........................................................................................ 26

III. JURISDICTION AND VENUE ............................................................................ 27

IV. FACTUAL ALLEGATIONS ................................................................................ 28

    A. The Relevant Markets Are Extended Stay Hotel Guest Room Rentals in
        Specific Metropolitan Statistical Areas Within the United States ................. 28

        1. The Relevant Product Market Is Extended Stay Hotel Guest Room Rentals.
                .............................................................................................................. 29

        2. The Relevant Geographic Markets Are Metropolitan Statistical Areas. ........ 41

        3. Extended Stay Hotel Defendants Historically Priced Guest Rooms
           Independently Under a "Heads in Beds" Business Model. ........................... 46

    B. IDeaS Enters the Revenue Management Field and Begins Developing and
        Selling Software to Hospitality Industry Clients in 2003. ........................... 48

    C. SAS Acquires IDeaS in 2008, and They Jointly Develop and Refine the G3
        RMS. ........................................................................................................ 50

    D. The G3 RMS Makes Automated Pricing and Occupancy "Decisions" for
        Extended Stay Hotel Defendants Using Their Current, Non-Public Business
        Data. ......................................................................................................... 52

        1. The "Revolutionary" G3 RMS Is an "Analytics and Pricing Breakthrough."
                .............................................................................................................. 52

        2. The G3 RMS Produces Fully Automated Pricing and Occupancy
           "Decisions" for Extended Stay Hotel Defendants. ..................................... 56

        3. The G3 RMS Uses Each Extended Stay Hotel Defendants' Non-Public and
           Competitively Sensitive Business Data to Generate Pricing and Occupancy
           "Decisions." ............................................................................................. 63

        4. The G3 RMS Uses Extended Stay Hotel Defendants' STR Reporting Data,
           Which Incorporates Non-Public and Sensitive Competitor Data, to Generate
           Pricing and Occupancy "Decisions," ....................................................... 74

        5. The G3 RMS Uses Extended Stay Hotel Defendants' Demand360 Data,
           Which Incorporates Competitors' Non-Public Demand Forecasts, to
           Generate Pricing and Occupancy "Decisions." ......................................... 78

        6. The G3 RMS Applies "Groundbreaking" AI to "Comprehensive Datasets"
           to Reach "Optimal Results" for Extended Stay Hotel Defendants. ............... 84

E.    Defendants Form and Operate an Anticompetitive Scheme Based on Their Coordinated Use of the G3 RMS to Set Guest Room Rates and Occupancy Levels.............................................................................................91

    1.    Pricing Algorithm Defendants and Hilton Conduct an Exclusive Pilot Program in 2012, and Hilton Implements the G3 RMS in 2013 and 2014....93

    2.    Extended Stay America and Sonesta Implement the G3 RMS in 2014 and 2015.............................................................................................97

    3.    IDeaS Confirms That Hilton, Extended Stay America, and Sonesta Are the G3 RMS's "Charter Clients." ...........................................................104

    4.    Choice and Wyndham Implement the G3 RMS and Revenue Management Platforms Based on the G3 RMS between 2021 and 2022...........................106

    5.    Hyatt Implements the G3 RMS in 2022.............................................37

    6.    Extended Stay Hotel Defendants, Enabled and Facilitated by Pricing Algorithm Defendants, Knowingly and Intentionally Have Deployed the Same Pricing Algorithm that Collects and Uses Their Sensitive Business Data to Set Guest Room Rates and Occupancy Levels.............................................40

    7.    Extended Stay Hotel Defendants and Their Co-Conspirators Have Accepted the G3 RMS' Pricing and Occupancy "Decisions" Consistently and Continuously...............................................................................47

    8.    Extended Stay Hotel Defendants Possess Market Power Nationally and in the Relevant Markets..................................................................53

    9.    Defendants' Scheme Has Artificially Raised Guest Room Rates and Artificially Suppressed Occupancy Levels Nationally and in the Relevant Markets. ....................................................................................73

F.    Defendants' Conspiracy Has Produced Anticompetitive Effects. ............................ 107

G.    Defendants' Conspiracy Has Produced No Pro-Competitive Benefits. .................. 111

H.    Government Regulators, Academics, and Economists Recognize That Defendants' Conduct Is Blatantly Anticompetitive......................................................... 112

I.    Defendants' Anticompetitive Scheme Constitutes Parallel Conduct That Is Facially Anticompetitive. ..................................................................................... 119

J.    The Relevant Markets Possess Characteristics That Make Them Susceptible to the Effective Collusion That Has Occurred. ........................................................... 119

    1.    Defendants Had the Motive to Conspire.........................................120

    2.    Defendants Acted Against Their Independent Self-Interests. ......................127

    3.    Multiple Forms of Traditional Conspiracy Evidence Exist............................128

V.    FRAUDULENT CONCEALMENT AND TOLLING ....................................................... 143

VI.    CONTINUING VIOLATION ................................................................................. 147

VII.    CLASS ACTION ALLEGATIONS ........................................................................... 148

VIII.    ANTITRUST INJURY ................................................................................................ 151

IX.    CAUSES OF ACTION ................................................................................................ 152

COUNT ONE ................................................................................................................... 152

COUNT TWO ................................................................................................................... 154

COUNT THREE ............................................................................................................... 157

REQUEST FOR RELIEF .................................................................................................. 160

JURY TRIAL DEMAND ................................................................................................... 161

Plaintiffs Karen Austin, Mignon Bacon, Sha-Quwana Boyd, Kimbily Boyd, Charlotte Daniels, Jacqueline Duncan, Simone Edmond, Christina Gonzalez, Regis Moeller, Trista McRae, Nadia Moreno, Kendal Morgan, Andrew Rivers, Salimu Scott, Elizabeth Suriano, William Wachter, Matthias Will, and Cynthia Wright (collectively, "Plaintiffs") bring this action individually and on behalf of a Class (defined below) of all others similarly situated against Defendants[1] under the antitrust laws of the United States and demand a jury trial.

## I.    INTRODUCTION

1.    Defendants have engaged in an ongoing anticompetitive scheme to fix, raise, or stabilize the prices of extended stay hotel guest room rentals across the United States, including in the Metropolitan Statistical Areas ("MSAs") specifically listed and alleged herein (the "Relevant Markets"), in violation of Section 1 of the Sherman Act from no later than January 1, 2016 to the present ("class period").

2.    Extended Stay Hotel Defendants, enabled and facilitated by Pricing Algorithm Defendants, knowingly and intentionally have used the same pricing algorithm product, called the G3 RMS, to set guest room rates and occupancy levels at their respective extended stay hotels. The G3 RMS continuously receives, pools, and digests various categories of relevant data—including Extended Stay Hotel Defendants' current, non-public pricing and occupancy data as well as confidential performance and demand forecasting data provided by IDeaS' "technology partners"—

---

[1] "Defendants" collectively reference "Pricing Algorithm Defendants" and "Extended Stay Hotel Defendants." "Pricing Algorithm Defendants" are Integrated Decisions and Systems, Inc. d/b/a IDeaS and IDeaS Revenue Solutions ("IDeaS") and parent company SAS Institute Inc. ("SAS"). "Extended Stay Hotel Defendants" are Hilton Domestic Operating Company, Inc. ("Hilton"), ESA Management, LLC ("Extended Stay America"), Sonesta International Hotels Corporation ("Sonesta"), Wyndham Hotels & Resorts, Inc. ("Wyndham"), and Hyatt Corporation ("Hyatt"), and their respective extended stay hotel branded properties. Choice Hotels International Inc. ("Choice"), along with its respective extended stay hotel branded properties, is a non-Defendant co-conspirator. Unless specifically stated to the contrary or the surrounding context otherwise makes clear, "Defendants" and "Extended Stay Hotel Defendants" includes and references co-conspirators.

to create a "complete picture of unconstrained demand and market conditions." The G3 RMS then continuously applies advanced artificial intelligence and predictive analytics to this "comprehensive database" to generate "optimal" pricing and occupancy "decisions" for each Extended Stay Hotel Defendant's guest rooms.

3.      Extended Stay Hotel Defendants each have submitted their own sensitive business information for use in a common pricing algorithm knowing that the other Extended Stay Hotel Defendants have done the same thing. They also knowingly have deployed the same pricing algorithm to set guest room rates and occupancy levels for the common purpose of achieving supra-competitive room rates and revenues.

4.      Defendants' anticompetitive scheme has been implemented, maintained, and enforced through high-ranking IDeaS and SAS personnel and Extended Stay Hotel Defendants' respective executives, managers, and employees responsible for revenue management, including the individuals specifically identified in this Complaint.

5.      The relevant antitrust market, to the extent one must be defined, is extended stay hotel guest room rentals in the United States, including the specific MSAs alleged herein ("Relevant Markets"). Extended stay hotels constitute the proper product market based on their unique set of amenities that distinguish them from other types of lodging, and the Relevant Markets are the proper geographic markets given the limiting factors that constrain the areas where individuals can choose to stay when searching for an extended stay hotel guest room.

6.      Extended Stay Hotel Defendants collectively have possessed market power for guest room rentals in the extended stay hotel market as a whole, and within at least its mid-price segment, nationwide and within each Relevant Market during the class period. This fact is demonstrated both by Extended Stay Hotel Defendants' ability to significantly raise guest room rates for sustained periods of time as well as by their high collective market shares nationally and in the Relevant Markets and the

existence of structural characteristics that make this market particularly susceptible to the collusion that has occurred here.

7.      Extended Stay Hotel Defendants did not always collectively rely on a shared hi-tech brain to price their extended stay hotel guest rooms in the coordinated manner alleged herein. They historically set their guest room rates independently from each other in response to ordinary market forces under a "heads in beds" business model. This widely utilized pricing approach prioritized high occupancy levels pursuant to long-recognized financial realities of the hospitality industry. This approach and underlying considerations applied with particular force to extended stay hotels, which have lower capital costs than traditional hotels and depend on filling their rooms at higher occupancy levels than traditional hotels to become and remain profitable.

8.      But this long-standing independent, pro-competitive approach to guest room pricing would shift following an unprecedented stretch of financial hardship that incentivized Extended Stay Hotel Defendants, with the critical assistance of Pricing Algorithm Defendants, to significantly change the way they would do business.

9.      During the multi-year period of the Great Recession and its immediate aftermath, Extended Stay Hotel Defendants' profits materially declined, and they were desperate for a reversal of fortune. At the nadir of this stretch, Pricing Algorithm Defendants began working on a "revolutionary" solution. In mid-2008, SAS, a leading provider of business analytics software and services to big corporations, acquired IDeaS. Soon after, the two companies began to jointly create and refine IDeaS' "revolutionary" next-generation revenue management system that would be known as the G3 RMS. With initial development of the new product complete, Pricing Algorithm Defendants and long-time IDeaS client Hilton embarked on an exclusive, year-long developmental program in early 2012 that would serve as the foundation for Defendants' anticompetitive scheme.

10.    In mid-2013, IDeaS and Hilton jointly announced to an audience of large hotel companies the results of this program and what it portended for the industry. The announcement stated that Hilton had deployed the G3 RMS across its limited-service portfolio, including its extended stay hotels, and would finish doing so at its remaining hotels the next year, and that the G3 RMS soon would be widely available to other companies for deployment. The announcement also declared that Hilton was "taking the guesswork out of revenue management and pricing" by using the G3 RMS, that both Pricing Algorithm Defendants were "proud to partner with Hilton Worldwide to bring innovations in pricing to the hospitality industry," and that the announcement itself represented "an important milestone in bringing [the] next-generation G3 RMS to IDeaS clients and other leading brands pursuing enhanced revenue performance."

11.    When the IDeaS-Hilton press release was issued, two "other leading brands pursuing enhanced revenue performance"—Extended Stay America and Sonesta—were in talks with IDeaS about deploying the G3 RMS at their extended stay hotels. Both Defendants did so soon thereafter at nearly the same time and issued press releases in coordination with IDeaS announcing these developments to the industry. In June 2014, IDeaS and Extended Stay America announced that Extended Stay America would deploy the G3 RMS at its extended stay hotels between mid-2014 and early 2016. And in February 2015, IDeaS and long-time partner Sonesta announced that Sonesta already had implemented the G3 RMS across its portfolio including its extended stay hotels.

12.    The G3 RMS's near-simultaneous adoption by Hilton, Extended Stay America, and Sonesta marked the inception of Defendants' anticompetitive scheme, and the significance of this milestone cannot be overstated. As IDeaS noted in a July 2014 press release launching the G3 RMS for the broader hospitality industry, these three Extended Stay Hotel Defendants agreed to serve as the self-proclaimed "charter clients for IDeaS G3 RMS" and formed the "major partnerships" that enabled the product's development and wide-scale release.

13.    By 2016, the critical mass of Extended Stay Hotel Defendants comprised of Hilton, Extended Stay America, and Sonesta—enabled and facilitated by Pricing Algorithm Defendants—had fully deployed the G3 RMS at their extended stay hotels while knowing that they each were doing so and why they each were doing so: to price rooms and obtain revenues at rates they could not have achieved independently under the prior business model.

14.    Also, by 2016, the G3 RMS had begun using sensitive benchmarking performance and demand forecasting data that clients like Extended Stay Hotel Defendants received from IDeaS' data "technology partners," Smith Travel Research (now owned by CoStar Group) and TravelClick (now owned by Amadeus Group). With these additional non-public datasets, Pricing Algorithm Defendants were able to further optimize the pricing and occupancy "decisions" for Extended Stay Hotel Defendants' collective benefit.

15.    The room rate and revenue increases the "charter" group of Extended Stay Hotel Defendants initially experienced caused them to renew their G3 RMS contracts with Pricing Algorithm Defendants each subsequent year.

16.    News of these significant, sustained rate and revenue increases would bring the other Extended Stay Hotel Defendants and co-conspirator Choice to the same table. Between 2021 and 2022, Hyatt deployed the G3 RMS, Wyndham deployed the G3 RMS and RevIQ (an IDeaS-developed in-house revenue management system based on the G3 RMS), and Choice deployed ChoiceMAX (another IDeaS-developed in-house revenue management system based on the G3 RMS). Two of these companies implemented the product within two months of each other, and all three companies announced their deployments in coordination with IDeaS within a four-month period.

17.    The effectiveness of Defendant's anticompetitive scheme lies in its simplicity. Extended Stay Hotel Defendants have delegated the hard work of setting their guest room rates and

occupancy levels across properties on a daily basis to a single decisionmaker possessing unparalleled information and intelligence. All Extended Stay Hotel Defendants have had to do is implement the superior "decisions" that the pricing algorithm hands them.

18.     Extended Stay Hotel Defendants have done so at an overwhelmingly high rate. For example, Extended Stay America has conceded in regulatory filings that the G3 RMS lets it "automatically price" its guest rooms. Similarly, Choice confirmed that its hotels had begun adopting ChoiceMAX's's pricing "decisions" 93% of the time soon after deploying this G3 RMS-based system. Further demonstrating Extended Stay Hotel Defendants' high acceptance rate is the "fully automated" way the G3 RMS works, its accompanying "manage-by-exception" approach that discourages and minimizes manual overrides, and specific features designed to reinforce consistent adherence to its "decisions."

19.     While the technology underpinning Defendants' scheme may be complicated, the scheme's fundamental purpose and effect is not. Defendants' coordinated use of the same pricing algorithm to set their guest room rates, after digesting, pooling, and analyzing a trove of non-public competitive data unavailable to the broader marketplace, constitutes a common plan and course of action that unreasonably restrains competition and harms consumers. Defendants' knowing entry and continued participation in this scheme constitutes parallel conduct that is anticompetitive on its face.

20.     Nevertheless, to the extent necessary, additional categories of facts confirm the plausibility of Defendants' anticompetitive scheme. These "plus factors," discussed immediately below, render the extended stay hotel market particularly susceptible to the kind of sustained effective collusion alleged here. And when these "plus factors" are considered together with Defendants' parallel conduct, the plausibility of Defendants' anticompetitive scheme is further demonstrated.

21.     In particular, there is substantial evidence of (a) motive to conspire and (b) actions against interest, and there also are (c) various forms of traditional conspiracy evidence. *First*,

Defendants had the motive to conspire given the structural features of the market and Extended Stay Hotel Defendants' disappointing financial performance in the years immediately preceding the class period. *Second*, by raising guest room rental prices and restricting supply pursuant to the pricing algorithm's fully automated "decisions," Extended Stay Hotel Defendants acted in ways that would have been against their individual economic self-interests in the absence of coordination. *Finally*, various forms of traditional conspiracy evidence exist, including each Extended Stay Hotel Defendants' departure from a long-standing business model, Defendants' ample opportunities to conspire during relevant industry events and meetings, and Extended Stay Hotel Defendants' exchange and use of non-public, competitively sensitive information to set guest room prices and occupancy levels by and through the G3 RMS.

22.    Regulators, like numerous economists and academics before, have condemned as anticompetitive the type of conduct at issue here. Discussing the scenario of "a group of competitors sub-contracting their pricing decisions to a common, outside agent" who "program[s] its algorithm to maximize industry-wide pricing, " a former Federal Trade Commission Chair recognized that this behavior constitutes a "hub-and-spoke conspiracy" that "is fairly familiar territory for antitrust lawyers." Following this Chair's lead, the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") recently have filed statements of interest supporting plaintiffs in several pending class actions alleging collusion through competitors' collective use of pricing algorithms to set prices and restrict supply in the lodging industry. In addition, the DOJ and eight state attorneys general recently filed a civil lawsuit against real estate software company RealPage under Section 1 of the Sherman Act. That suit alleges RealPage's revenue management software has allowed landlords in certain metropolitan areas to artificially raise prices and restrict supply of apartment unit rentals in coordinated fashion through their common use of this software. Like the G3 RMS here, the pricing algorithm software there generates recommended prices to each participant that are based in part on

non-public, competitively sensitive information, including rental rates and occupancy levels, that the software receives from each participant.

23.    Defendants' misconduct—centered on the knowing coordinated setting of "optimal" prices and occupancy rates through a centralized decisionmaker that receives and uses each participant's current, confidential business data in setting these prices—amounts to a modern-day hub-and-spoke price-fixing conspiracy. Because this conduct is facially anticompetitive, *i.e.*, it produces clear anticompetitive effects and offers no procompetitive benefits, it is a naked restraint on trade that should be deemed illegal *per se*. But even if this conduct somehow benefitted competition and furthered consumer welfare in some minimal way (it does not), the anticompetitive effects would vastly outweigh any benefits and should be condemned under the rule of reason.

24.    To make matters worse, Defendants' misconduct has harmed some of the more financially vulnerable segments of the population who have little to no practical choice but to rent extended stay hotel guest rooms. These individuals include workers whose jobs require them to travel away from home for extended periods of time, like travelling nurses, construction workers, and military personnel. These individuals also include people whose permanent housing arrangements have become less predictable or stable, like those whose homes have been damaged or destroyed by natural disasters or who have been forced to escape serious personal strife at home.

25.    Defendants' scheme also has adversely impacted individuals who have been priced out of the increasingly expensive apartment unit rental markets. Not coincidentally, apartment rental prices across the country have risen significantly during the same period at issue here, allegedly due to conduct that is substantially similar to that alleged here and is also the subject of governmental and private lawsuits. Defendants know that this unfortunate interplay has further benefitted their bottom lines. According to Extended Stay America's CEO, for example, the facts that "apartment rents have

been very high" and that "many people are looking for a new place to hang their head for a minute until they get a new home" "has been a tailwind for us."

26.    Defendants' anticompetitive scheme has had the purpose and effect of artificially raising rental rates and artificially suppressing occupancy levels for extended stay hotel guest room nationwide, including in the Relevant Markets, during the class period.

27.    Relevant pricing and occupancy data, among other categories of information, demonstrates that Extended Stay Hotel Defendants' guest room rental rates have increased substantially while their occupancy levels have remained stable nationally, including in the Relevant Markets, during the class period. This data also demonstrates that Extended Stay Hotel Defendants' guest room rental rates and occupancy levels have moved similarly to one another nationally, including in the Relevant Markets, during the same period.

28.    Defendants' anticompetitive scheme has caused Plaintiffs and the other members of the Class to pay supra-competitive prices for guest room rentals they purchased directly from Extended Stay Hotel Defendants or their co-conspirators during the class period.

29.    Plaintiffs bring this suit on behalf of themselves and the Class against Defendants to recover all monetary and injunctive relief available under federal antitrust law.

30.    Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have access to the underlying facts relating to Defendants' unlawful conduct. Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct. Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

## II.    PARTIES

### A.    Plaintiffs

31.    **Karen Austin.** Plaintiff Karen Austin ("Plaintiff") is a citizen and resident of the State of Texas.

32.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an Extended Stay America Suites in Austin, Texas (Austin, TX MSA) from May 17, 2019 through July 22, 2019. She also directly rented a guest room from and stayed at an Extended Stay America Suites in Houston, Texas (Houston, TX MSA) in November 2024.

33.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

34.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

35.    **Mignon Bacon.** Plaintiff Mignon Bacon ("Plaintiff") is a citizen and resident of the State of Michigan.

36.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented guest rooms from and stayed at an Extended Stay America Suites in Auburn Hills, Michigan (Detroit, MI MSA) from March 2024 through May 2024.

37.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

38.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

39.    **Kimbily Boyd**. Plaintiff Kimbily Boyd ("Plaintiff") is a citizen and resident of the state of Maryland.

40.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff began directly renting a guest room from and stayed at an Extended Stay America Suites in Linthicum Heights, Maryland (Baltimore, MD MSA) in October 5, 2023. As of the filing of this Complaint, Plaintiff still directly rents a guest room from and stays at that Extended Stay America Suites.

41.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

42.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

43.    **Sha-Quwana Boyd.** Plaintiff Sha-Quwana Boyd ("Plaintiff") is a citizen and resident of the State of Arizona.

44.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at a Hilton Homewood Suites in Phoenix, Arizona (Phoenix, AZ MSA) from October 1, 2020 through October 3, 2020. She also directly rented a guest room from and stayed at a Hilton Homewood Suites in Chesapeake, Virginia (Virginia Beach-Norfolk, VA MSA) from August 28, 2021 through August 29, 2021.

45.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

46.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

47. **Charlotte Daniels.** Plaintiff Charlotte Daniels ("Plaintiff") is a citizen and resident of the State of Florida.

48. Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an Extended Stay America Suites in Clearwater, Florida (Tampa, FL MSA) from September 2019 through February 2020. She also directly rented a guest room from and stayed at an Extended Stay America Suites in Chesapeake, Virginia (Virginia Beach-Norfolk, VA MSA)from April 2019 through July 2019.

49. Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

50. Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

51. **Jacqueline Duncan.** Plaintiff Jacqueline Duncan ("Plaintiff") is a citizen and resident of the Commonwealth of Pennsylvania.

52. Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at a Hilton Homewood Suites in Audubon, Pennsylvania (Philadelphia, PA MSA) from August 18, 2023, through August 20, 2023.

53. Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

54. Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

55. **Simone Edmond**. Plaintiff Simone Edmond ("Plaintiff") is a citizen and resident of the State of Ohio.

56.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at a Sonesta ES Suites in Cincinnati, Ohio (Cincinnati, OH MSA) multiple times from 2019 to 2022, including December 31, 2019–January 1, 2020, July 3–5, 2020, December 31, 2020–January 1, 2021, December 31, 2021–January 1, 2022, and April 17–18, 2022.

57.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

58.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

59.     **Christina Gonzalez**. Plaintiff Christina Gonzalez ("Plaintiff") is a citizen and resident of the State of California.

60.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at a Home2 Suites in San Bernardino, California (Riverside, CA MSA) twice in September 2023. She also directly rented a guest room from and stayed at a Home2 Suites in Palmdale, California (Los Angeles, CA MSA) from July 20, 2024, through July 21, 2024.

61.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

62.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

63.     **Regis Moeller.** Plaintiff Regis Moeller ("Plaintiff") is a citizen and resident of the Commonwealth of Pennsylvania.

64.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest

room from and stayed at a Home2 Suites in Pittsburgh, Pennsylvania (Pittsburgh, PA MSA) in November 2018. He also directly rented a guest room from and stayed at a Homewood Suites in Long Beach, California (Los Angeles, CA MSA) in December 2018.

65.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

66.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

67.     **Trista McRae.** Plaintiff Trista McRae ("Plaintiff") is a citizen and resident of the State of Maryland.

68.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an Extended Stay America Suites in Germantown, Maryland (Washington, DC MSA) from October 2023 through June 2024.

69.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

70.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

71.     **Nadia Moreno.** Plaintiff Nadia Moreno ("Plaintiff") is a citizen and resident of the State of California.

72.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an Extended Stay America Suites in Sacramento, California (Sacramento, CA MSA) from January 27, 2024 through February 8, 2024.

73.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

74.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

75.     **Kendal Morgan.** Plaintiff Kendal Morgan ("Plaintiff") is a citizen and resident of the State of Delaware.

76.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an Extended Stay America Suites in Newark, Delaware (Philadelphia, PA MSA) from December 2023 through August 2024.

77.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

78.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

79.     **Andrew Rivers.** Plaintiff Andrew Rivers ("Plaintiff") is a citizen and resident of the State of Montana.

80.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at a Hyatt House in Seattle, Washington (Seattle, WA MSA) from May 20, 2021 through May 23, 2021. He also directly rented a guest room from and stayed at a Homewood Suites in Cincinnati, Ohio (Cincinnati, OH MSA) from May through August 2017.

81.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

82.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

83.     **Salimu Scott.** Plaintiff Salimu Scott ("Plaintiff") is a citizen and resident of the State of Nevada.

84.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room for her daughter's and her daughter's then-boyfriend's stay from an Extended Stay America Suites in San Mateo, California (San Francisco, CA MSA) from September 2023 through April 2024.

85.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

86.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

87.     **Elizabeth Suriano.** Plaintiff Elizabeth Suriano ("Plaintiff") is a citizen and resident of the State of Illinois.

88.     Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room for an unhoused veteran's stay from a Choice WoodSpring Suites in Addison, Illinois (Chicago, IL MSA) from January 24, 2023 through February 28, 2023. She also directly rented a guest room for an unhoused veteran's stay from an Extended Stay America Suites in Downers Grove, Illinois (Chicago, IL MSA) on multiple occasions during 2023.

89.     Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

90.     Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

91.    **William Wachter.** Plaintiff William Wachter ("Plaintiff") is a citizen and resident of the Commonwealth of Pennsylvania.

92.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an a Homewood Suites in Arlington, Massachusetts (Boston, MA MSA) from June 28–29, 2019, and in Brookline, Massachusetts (Boston, MA MSA) from May8–10, 2021.

93.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

94.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

95.    **Matthias Will.** Plaintiff Matthias Will ("Plaintiff") is a legal permanent resident of the State of Florida.

96.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented a guest room from and stayed at an Extended Stay America Suites in Aurora, Colorado (Denver, CO MSA) from December 9, 2023 through December 16, 2023.

97.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

98.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

99.    **Cynthia Wright.** Plaintiff Cynthia Wright ("Plaintiff") is a citizen and resident of the State of Washington.

100.    Plaintiff directly purchased a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels during the class period. For example, Plaintiff directly rented guest

rooms from and stayed at a Choice WoodSpring Suites in Houston, Texas (Houston, TX MSA) from October 14, 2023 through at least October 21, 2023.

101.    Plaintiff paid higher prices for these guest room rentals by reason of the antitrust violation alleged in this Complaint.

102.    Plaintiff may directly purchase a guest room rental at one or more of Extended Stay Hotel Defendants' extended stay hotels in the future.

B.  **Defendants**

103.    **IDeaS.** Defendant Integrated Decisions and Systems, Inc., d/b/a IDeaS and IDeaS Revenue Solutions ("IDeaS"), is a Delaware corporation headquartered in Bloomington, Minnesota.

104.    IDeaS is a leading system software company that offers pricing and revenue management software, services, and consulting to clients in the hospitality and travel industries.

105.    IDeaS developed, markets and sells the G3 RMS to clients in the hospitality industry, including Extended Stay Hotel Defendants. In 2021, an industry publication described IDeaS as "in a class of its own" and "the clear leader amongst third-party [revenue management system] vendors."

106.    **SAS.** Defendant SAS Institute Inc. ("SAS") is a North Carolina corporation headquartered in Cary, North Carolina.

107.    SAS is one of the world's largest privately held providers of business intelligence and analytics solutions in the world. It develops and markets a suite of analytics and artificial intelligence software that helps access, manage, analyze and report on data to aid in decision-making for its corporate clients.

108.    IDeaS has been a wholly-owned subsidiary of SAS since 2008.

109.    SAS and IDeaS have collaborated closely in developing, upgrading, and marketing the G3 RMS.

110. **Hilton.** Defendant Hilton Domestic Operating Company, Inc. is a Delaware corporation headquartered in McLean, Virginia. Incorporated in 2016, it is a direct subsidiary of Hilton Worldwide Finance LLC and an indirect wholly owned subsidiary of Hilton Worldwide Holdings Inc. Hilton Domestic Operating Company Inc. and Hilton Worldwide Holdings Inc. collectively are referenced as "Hilton" unless expressly stated otherwise.

111. Hilton is one of the world's largest hospitality companies. At year-end 2023, Hilton had a portfolio of 22 brands comprising 7,530 properties and nearly 1.2 million rooms in 126 countries and territories, including the United States.

112. Based on the content and statements contained in Hilton Worldwide Holdings Inc.'s filings with the U.S. Securities and Exchange Commission, news releases and other statements found on its website, and other information, Hilton Worldwide Holdings Inc. and Hilton Domestic Operating Company, Inc. both play material roles in the strategy, performance, management, and operation of Hilton branded properties, including its extended stay hotels, and the company's business relationships and agreements with third parties. Hilton Domestic Operating Company, Inc. retains primary responsibility for managing Hilton properties, including their extended stay brands. That said, per Hilton Worldwide Holdings Inc.'s most recent Form 10-K, it manages eight Homewood Suites and two Home2Suites. And in that same filing, Hilton Worldwide Holdings Inc. identifies its "core management services" as "operating hotels under management contracts for the benefit of third parties who either own or lease the hotels and the associated personal property." Hilton Worldwide Holdings Inc. often employs the people working at those locations.

113. Hilton operates its hotel business through a management and franchise segment and an ownership segment, with most of its branded properties, including all its extended stay brand hotels, falling into the former segments.

114.    Hilton's extended stay hotel brands are Homewood Suites and Home2 Suites. These brands use the following logos:

 

115.    Homewood Suites and Home2 Suites both have offered guest rooms for rent throughout the class period.

116.    Hilton currently has about 520 owned and operated, managed, or franchised Homewood Suites in the United States, with locations in 49 states, and about 640 owned and operated, managed, or franchised Home2Suites in the United States, with locations in 49 states.

117.    During the class period, Hilton and its extended stay hotel brands Homewood Suites and Home2 Suites have used the G3 RMS to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

118.    **Extended Stay America.** Defendant ESA Management, LLC, is a Delaware corporation headquartered in Charlotte, North Carolina.

119.    Extended Stay America, Inc., a Delaware corporation headquartered in Charlotte, North Carolina, was publicly traded from 2013 until June 16, 2021, when a 50/50 joint venture fund owned by Blackstone Real Estate Partners and StarwoodCapital Group acquired the company and its paired-share real estate investment trust ("REIT"), ESH Hospitality, Inc., for $6 billion.

120.    Extended Stay America, Inc., through its subsidiaries ESA Management, LLC, and ESH Hospitality, Inc., is the largest owner and operator of company-branded hotels in North America and boasts the largest extended stay hotel chain in the United States.

121.    According to Extended Stay America Premier Suites' 2023 Franchise Disclosure Document, ESA Management, LLC is the entity that "manages the owned properties that operate

under [Extended Stay America's] various Extended Stay America brands as well as a limited number of franchisee-owned hotels." ESA Management, LLC has contracted with Pricing Algorithm Defendants regarding the provision and use of the G3 RMS at Extended Stay America branded hotels.

122.    ESH Hospitality, Inc., is an REIT that owns real property and operating lessee entities associated with the Extended Stay America brands. ESH Hospitality, Inc. is the largest lodging REIT in North America by unit and room count, with over 560 hotels and about 62,500 rooms in the United States as of 2021. According to Extended Stay America Premier Suites' 2023 Franchise Disclosure Document, ESH Hospitality, Inc. owned and operated 663 hotels (25 Extended Stay America Premier Suites, 550 Extended Stay America Suites, and 87 Extended Stay America Select Suites) as of March 1, 2023. Extended Stay America owns and operates the vast majority of its extended stay hotels while franchising a small portion of these hotels. According to the last annual report that Extended Stay America filed with the U.S. Securities and Exchange Commission before being taken private in mid-2021, the company's earnings derived from the operation of owned properties accounted for more than 98% of total revenues.

123.    Franchisees of Extended Stay America branded hotels must agree to the terms contained in a Hotel Technology Agreement. The counterparty to that agreement is ESH Strategies Franchise LLC. The Hotel Technology agreement gives Extended Stay America "the right to oversee and manage the installation and delivery of" the IDeaS RMS.

124.    ESA Management, LLC, Extended Stay America, Inc., ESH Hospitality, Inc., and ESH Strategies Franchise LLC collectively are referenced as "Extended Stay America" unless expressly stated otherwise.

125.    Extended Stay America's extended stay hotel brands are Extended Stay America Suites, Extended Stay America Select Suites, and Extended Stay America Premier Suites. These brands use the following logos:

  

126.    A significant majority of Extended Stay America's extended stay hotels and guest rooms have been housed under its flagship Extended Stay America brand, which the company rebranded as Extended Stay America Suites in 2021, throughout the class period. Extended Stay America Suites currently has about 630 owned and operated or franchised hotels with about 70,000 guest rooms.

127.    Extended Stay America introduced Extended Stay America Premier Suites in June 2021. This brand currently has about 30 owned and operated or franchised hotels with about 3,000 guest rooms.

128.    Extended Stay America introduced Extended Stay America Select Suites in September 2022. This brand currently has about 100 owned and operated or franchised hotels with about 12,000 guest rooms.

129.    During the class period, Extended Stay America and its extended stay hotel brands Extended Stay America Suites, Extended Stay America Select Suites, and Extended Stay America Premier Suites have used the G3 RMS to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

130.    **Sonesta.** Defendant Sonesta International Hotels Corporation ("Sonesta") is a Maryland corporation headquartered in Newton, Massachusetts.

131.    Sonesta is the eight largest hotel company in the world, with about 1,200 properties totaling 100,000 guest rooms across 17 brands in eight countries, including the United States. It is an owner, operator and franchisor of hotels and resorts in the United States and abroad.

132.     Sonesta was publicly traded until 2011, when Service Properties Trust ("SVC"), a publicly held REIT, acquired a controlling stake in the company and took it private. SVC owns many of the United States hotels that Sonesta operates. The RMR Group LLC ("RMR LLC"), a majority-owned subsidiary of publicly traded The RMR Group Inc., acts as the manager of SVC and provides management services to Sonesta owned, operated, and franchised hotels, including its extended stay brands. These services include implementing investment strategies and managing day to operations, subject to supervision and oversight by SVC's board of trustees. SVC has no employees, and RMR LLC provides the personnel and services necessary for SVC to conduct its business.

133.     Sonesta's extended stay hotel brands are Sonesta ES Suites and Sonesta Simply Suites. These brands use the following logos:

 

134.     Sonesta ES Suites launched in 2012 and has offered guest rooms for rent throughout the class period.

135.     Sonesta Simply Suites launched in late 2020 with more than 60 properties that previously operated under InterContinental Hotels Group brands. This was one of the largest ever U.S. hotel brand launches.

136.     In 2021, Sonesta began offering hotel franchising for the Sonesta ES Suites and Sonesta Simply Suites brands. Now there are about 21 franchised Sonesta ES Suites and 14 franchised Sonesta Simply Suites in the United States.

137.     Currently there are about 87 owned, operated, managed, and franchised Sonesta ES Suites in the United States, with locations in 28 states and nearly 70 cities, and about 65 owned,

operated, managed, and franchised Sonesta Simply Suites in the United States, with locations in 28 states and over 60 cities.

138.    During the class period, Sonesta and its extended stay hotel brands Sonesta ES Suites and Sonesta Simply Suites have used the G3 RMS to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

139.    **Wyndham.** Defendant Wyndham Hotels & Resorts, Inc. ("Wyndham") is a Delaware corporation headquartered in Parsippany, New Jersey.

140.    Publicly held Wyndham is the world's largest hotel franchising company by number of hotels. It has a portfolio of 24 hotel brands, with approximately 9,200 hotels containing about 872,000 rooms located in over 95 countries, including the United States.

141.    To help increase revenues for its hotel franchisees and, in turn, boost its own profits, Wyndham widely deploys state-of-the-art technology solutions, including those incorporating artificial intelligence, across its franchise base. The company contractually requires franchisees of its hotels, including its extended stay brands, to use the same revenue management system.

142.    Wyndham's extended stay hotel brand is Hawthorn Suites. Also called Hawthorn Extended Stay, this brand has the following logo:



143.    As of Currently, there are about 60 primarily franchised Hawthorn Suites in the United States dispersed across 23 states.

144.    During the class period, Wyndham and its extended stay hotel brand Hawthorne Suites have used the G3 RMS to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

145.    During the class period, Wyndham and its extended stay hotel brand Hawthorne Suites also have used, separately or combined with the G3 RMS, RevIQ, an IDeaS-developed in-house revenue management system based on and possessing key attributes of the G3 RMS, to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

146.    **Hyatt.** Defendant Hyatt Corporation is a Delaware corporation headquartered in Chicago, Illinois. It is a wholly owned subsidiary of Hyatt Hotels Corporation, a publicly traded global hospitality company that has a portfolio of 30 brands, comprising over 1,330 hotels and resorts and over 320,000 rooms.

147.    Based on the content and statements contained in Hyatt Hotels Corporation's filings with the U.S. Securities and Exchange Commission, news releases and other statements found on its website, and other information, Hyatt Hotels Corporation and Hyatt Corporation (collectively, "Hyatt" unless expressly stated otherwise) both play material roles in the strategy, performance, management, and operation of Hyatt branded properties, including its extended stay hotels, and the company's business relationships and agreements with third parties.

148.    Hyatt derives its revenue primarily from hotel management services, licensing of its brands to franchisees, and owned and leased hotel operations. Across the hotels that Hyatt owns, operates, manages, or franchises, the company states that its management team selects and deploys best-in-class revenue management services and software that rely on increased automation.

149.    Hyatt's extended stay hotel brand is Hyatt House. This brand uses the following logo:



150.    Currently there are about 120 owned, operated, managed, and franchised Hyatt House locations in the United States, dispersed among 32 states.

151.     During the class period, Hyatt and its extended stay hotel brand Hyatt House have used the G3 RMS to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

### C.  Co-Conspirators

152.     **Choice.** Co-conspirator Choice Hotels International Inc. ("Choice") is a Delaware corporation headquartered in North Bethesda, Maryland.

153.     Publicly held Choice has a portfolio of 22 brands, consisting of 7,500 hotels and more than 630,000 rooms, located in 46 countries and territories, including the United States.

154.     As one of the world's largest lodging franchisors, Choice relies on a combination of services and technology-based offerings to help its franchisees improve performance and profitability. As Choice indicated in its 2023 Form 10-K filed with the United States Securities and Exchange Commission, "we provide our franchisees with education and training programs as well as revenue management technology and services designed to improve property-level performance," which "promote revenue gains for franchisees" and "translate into both higher royalties for the Company and improved returns for owners[.]"

155.     Choice's extended stay hotel brands are WoodSpring Suites, MainStay Suites, and Suburban Studios. The brands use the following logos:

  

156.     Currently there are about 244 primarily franchised WoodSpring Suites in the United States dispersed across 35 states, 125 primarily franchised MainStay Suites dispersed across 40 states, and 105 primarily franchised Suburban Studios in the United States dispersed across 30 states.

157.     During the class period, Choice and its extended stay hotel brands WoodSpring Suites, MainStay Suites, and Suburban Studios have used ChoiceMAX, an IDeaS-developed in-house revenue management system based on and possessing key attributes of the G3 RMS, to set rates and occupancy levels for their guest room rentals in the United States, including the Relevant Markets.

158.     **Unnamed Co-Conspirators.** Various additional persons and entities known and unknown to Plaintiffs and not presently identified as Defendants or known co-conspirators in this action knowingly have participated in the alleged anticompetitive scheme and have performed acts and made statements in furtherance thereof.

159.     Discovery in this case may reveal the identities of such additional co-conspirators. Plaintiffs reserve the right to name any or all such co-conspirators as Defendants as appropriate.

## III.    JURISDICTION AND VENUE

160.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

161.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and New Jersey's long-arm statute, N.J. CT. R. 4:4-4.

162.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of casino-hotel rooms.

163.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of casino-hotel rooms.

164.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain

business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.    FACTUAL ALLEGATIONS

### A.    <u>The Relevant Markets Are Extended Stay Hotel Guest Room Rentals in Specific Metropolitan Statistical Areas Within the United States.</u>

165.    Defendants' alleged anticompetitive scheme to artificially fix, maintain, raise, or stabilize extended stay hotel guest room rental prices and supply across the United States, including in the Relevant Markets, is per se illegal under Section 1 of the Sherman Act.

166.    If the Court declines to analyze this case under the per se standard, it alternatively could analyze this case under a "quick look" analysis because the alleged anticompetitive conduct artificially has raised prices and reduced output.

167.    Under either the per se or quick look analyses, Plaintiffs need not prove that Extended Stay Hotel Defendants have held market power in any defined antitrust market.

168.    If the Court applies the "rule of reason" analysis to assess Plaintiffs' claims, the relevant product market is extended stay hotel guest room rentals, and the relevant geographic markets are the specific Metropolitan Statistical Areas in the United States alleged herein.

169.    Defendants' anticompetitive scheme has caused direct purchasers of Extended Stay Hotel Defendants' extended stay hotel guest room rentals to pay artificially inflated prices in at least the following Relevant Markets:

(1)    Los Angeles-Long Beach-Anaheim, CA ("Los Angeles, CA MSA");

(2)    Chicago-Naperville-Elgin, IL-IN-WI ("Chicago, IL MSA");

(3)    Houston-The Woodlands-Sugar Land, TX ("Houston, TX MSA");

(4)    Washington DC-Arlington-Alexandria, VA-MD-WV ("Washington, DC MSA");

(5)    Philadelphia, PA ("Philadelphia, PA MSA");

(6)    Phoenix-Mesa-Chandler, AZ ("Phoenix, AZ MSA");

    (7)     Riverside-San Bernardino-Ontario, CA ("Riverside, CA MSA");

    (8)     San Francisco-Oakland-Fremont, CA ("San Francisco, CA MSA");

    (9)     Detroit-Warren-Dearborn, MI ("Detroit, MI MSA");

    (10)    Seattle-Tacoma-Bellevue, WA ("Seattle, WA MSA");

    (11)    Tampa-St. Petersburg-Clearwater, FL ("Tampa, FL MSA");

    (12)    Denver-Aurora-Lakewood, CO ("Denver, CO MSA");

    (13)    Baltimore, MD ("Baltimore, MD MSA");

    (14)    Austin-Round Rock-Georgetown, TX ("Austin, TX MSA");

    (15)    Boston-Cambridge-Newton, MA-NH ("Boston, MA MSA");

    (16)    Pittsburgh, PA ("Pittsburgh, PA MSA");

    (17)    Sacramento-Roseville-Folsom, CA ("Sacramento, CA MSA");

    (18)    Cincinnati, OH-KY-IN ("Cincinnati, OH MSA"); and

    (19)    Virginia Beach-Norfolk-Newport News, VA-NC ("Virginia Beach-Norfolk, VA MSA").

170.    Consumers, industry participants including Defendants, courts, and basic economic tenets confirm that the relevant product market is extended stay hotel guest room rentals and that the relevant geographic markets include each MSA specifically alleged herein.

### 1. The Relevant Product Market Is Extended Stay Hotel Guest Room Rentals.

171.    Extended stay hotel guest room rentals constitute the relevant product market.

172.    A relevant product market includes all products that are reasonably interchangeable with and compete against each other for customer business.

173.    As hospitality revenue management provider SiteMinder succinctly notes, an extended stay hotel is "a lodging option that combines the best of two worlds for guests, offering the consistency of a home and the amenities of a hotel."

174.     Guest rooms available for rent from extended stay hotels are reasonably interchangeable with one another and compete against one another for customers' business because these hotel rooms offer the same core set of amenities and services that their guests desire and require.

175.     Extended stay hotel guest rooms are not reasonably interchangeable with and do not compete against guest rooms available for rent or lease in other types of lodging, including traditional full service hotels, resorts, and apartments, due to the unique combination of features that only extended stay hotel guest room rentals provide.

176.     By way of example, a guest room at a Hilton Home2 Suites extended stay hotel is not reasonably interchangeable with a guest room at a Hilton Waldorf Astoria luxury full service hotel, whether or not the two hotels are located sufficiently near one another. These hotels do not compete against each other for the same categories of guests, as they do not offer a comparable combination of features and amenities and are not comparably priced.

177.     The extended stay hotel customer base is comprised of certain typical types of guests that choose to rent rooms in these hotels because of the unique combination of key amenities and services they offer that accommodate their particular needs and that are not found in other types of lodging.

178.     A significant proportion of extended stay hotel guests is comprised of an itinerant workforce that includes travelling nurses, construction workers, military members, sales representatives, and insurance adjusters. As various industry publications note, the "extended stay hotel market has been experiencing significant growth in recent years, driven by various factors" including continued strong demand from the above-referenced types of workers as well as "increasing demand from business travelers and corporate houses that need long-term accommodation solutions for their employees," "the rise of the gig economy," and "the growing popularity of remote work."

179.    Another important extended stay hotel guest constituency includes individuals who have experienced disruptive life events associated with relocations, natural disasters, job losses, and family strife that have made more permanent lodging arrangements untenable. Industry reports confirm that "[d]islocations due to natural disasters like floods and hurricanes have similarly increased the need for temporary accommodations" provided by extended stay hotels and that individuals "undergoing personal relocations and home renovations, or experiencing life changes such as divorce, also find extended stay hotels convenient."

180.    Extended stay hotels also provide lodging to guests who do not have the financial means to pay or otherwise qualify for an apartment unit lease—which themselves have become increasingly expensive due to similar alleged misconduct occurring in that industry—but nonetheless require longer term housing and corresponding amenities. Extended stay hotels not only are fully furnished and provide the appliances and space necessary for cost-effective food preparation and storage as well as  some housekeeping services, they also do not require credit checks or down payments and do not charge extra for essentials like water or utilities.

181.    A May 15, 2023 article by industry publication *Skift* discussed major hotel brands' heightened desire to remain major players in the extended stay hotel market. In particular, the article remarked that major companies like Hilton and Hyatt "are wagering that a few factors will power extended-stay hotels for years to come, including U.S. federal infrastructure investment, the resilience of blended travel, and a housing crisis."

182.    The interplay between the national housing crisis that adversely has impacted a disproportionate share of extended stay hotel guests and Extended Stay Hotel Defendants' own rising profit margins is something that Extended Stay Hotel Defendants have recognized and exploited. Extended Stay America CEO Greg Juceam, for example, recently stated that the fact "apartment rents

have been very high, and many people are looking for a new place to hang their head for a minute until they get a new home" "has been a tailwind for us."

183.    Extended Stay Hotel Defendants recognize that the categories of guests discussed above comprise a high proportion of their customer base and actively market to them. Extended Stay America, for example, tells visitors to its website that "when life has you on the move, Extended Stay America is here for you. Whether you're a traveling business professional in need of a home office, relocating for a new job, a traveling medical professional, a college student looking for off-campus housing or moving and need a short-term rental, we provide affordable temporary housing rentals for as long as you need. We offer all the freedom of an apartment without the hassles of short-term apartment rentals."

184.    The specific unique set of features and amenities for which extended stay hotels are known include guest rooms with full kitchens containing appliances and cooking equipment, dining areas, work spaces, and on-site self-serve laundry facilities. These hotels typically do not offer in-house dining options, like restaurants or room service, or common meeting spaces like conference rooms. And these hotels generally have ample on-site guest parking.

185.    Extended stay hotels also offer guests unique pricing options that provide them with lower average daily rates the longer the stay. They commonly offer weekly and monthly rates that offer greater savings the longer guests stay.

186.    Industry participants, including Defendants themselves, understand that extended stay hotels constitute their own product market, recognizing that their unique features and distinct operating model differentiate them from traditional hotels and other lodging options.

187.    According to the Extended Stay Lodging Association ("ESLA") staying at an extended stay hotel "is just like renting an apartment with no fixed contract." This is because these hotels, "where the guest can book accommodation for 5 days or more" and "offer[] limited to no food and

beverage facilities or meeting space," are "comprised of individual guest rooms or suites" and offer amenities "like a normal home with kitchens, utensils, dining areas, self-serve laundry, etc." For this reason, extended stay hotels are sometimes called serviced apartments.

188.    The Highland Group, a prominent industry consulting and research firm that focuses on extended stay hotels, defines an extended stay hotel as "a hotel with a fully equipped kitchenette in each guest room which accepts reservations and does not require a lease." This firm also recognizes that "the extended-stay market" constitutes a distinct market within the broader hotel industry due to these hotels' unique set of characteristics discussed above.

189.    Extended Stay Hotel Defendants themselves emphasize the unique combination of amenities that set extended stay hotels apart from other lodging options.

190.    Hilton's Homewood Suites' website highlights its "apartment-style living." Telling visitors to "[m]ake yourself right at home." "Designed with longer stays in mind," the website describes "suites offer[ing] distinct spaces designed to flex the needs of a longer stay." The website also notes that "[f]rom leisure to laundry, our amenities are designed with the longer stay in mind," and that "[w]hether you're staying two days or two weeks our pricing options ensure you get the best value no matter how long you stay." The website further emphasizes key room features like kitchens and additional work and living space as well as broader hotel features including its pet-friendly policy, on-site laundry facilities, free breakfast, and fitness facilities.

191.    Hilton's Homewood Suites' website also provides illustrations and descriptions of its guest rooms, including the following ones for its studio and one-bedroom suites:



192.    Extended Stay America, the self-proclaimed "leader in extended stay hotels," tells website visitors that its hotels are "[s]omewhere you can count on" "[t]hat feels like home." The website also discusses its hotels' distinct package of features while noting the types of guests who typically rent its rooms:

> When you're away from home, it's nice to be somewhere that accommodates your personal comforts. At Extended Stay America, you'll find everything you need to make your space your own. Like refrigerators that aren't mini so you can fit all your leftovers, even a large pizza. A kitchen stocked with kitchen things so you can enjoy a home-cooked meal. On-site guest laundry that's open 24/7 so you can do your folding when you feel like it. Enough storage space so you have room for all your things. All of them. And with 700+ locations that are pet-friendly, there's room for the whole family.
>
> Take advantage of many different types of special offers including senior rates, military and government, student housing and many more. Whether you're traveling for business, need temporary housing, military personnel on assignment, a traveling medical professional or want some time away, our friendly and dedicated staff is ready to welcome you with genuine care. For the best extended stay hotels nationwide, choose Extended Stay America. That feels like home.

193.    Extended Stay America's website also highlights its "'STAY longer. Save more' discount" that "makes us the perfect place to stay a week, a month or longer."

194.    Sonesta's website provides the following description of the "apartment-like amenities" that its Sonesta ES Suites provide:



195.    Sonesta states the following about its "apartment-style" Sonesta Simply Suites, which are pet-friendly and provide free breakfast, on its website:

> At Simply Suites, we like to keep things uncomplicated, and we know our guests do, too. That's the idea behind our apartment-style suites that feel like home, with the added bonus of Sonesta hospitality. Get comfortable in our spacious suites with functional kitchens, plus workspaces with WiFi for those getting down to business. Enjoy a surprising array of amenities, along with friendly, attentive service so you can worry less about the little things and focus on settling in for a simply seamless stay.

196.    Choice's WoodSpring Suites website greets its visitors as follows:

> Say hello to WoodSpring Suites - a collection of extended stay hotels where guests will find a welcoming environment, friendly staff, comfortable accommodations, and affordable rates for smartly-designed suites with in-room kitchens. Enjoy nightly rates, weekly rates, and monthly rates that cover necessities with add-ons available.

197.    Choice's WoodSpring Suites' website also lists the following "5 Reasons to Choose WoodSpring:"


**AFFORDABLE RATES**


**IN-ROOM KITCHENS**


**SMARTLY-DESIGNED SUITES**


**COMMITMENT TO CLEAN**


**24/7 ACCESS TO ALL YOU NEED**

The website then states that these hotels "offer[s] the perfect mixture of home-like comforts and hotel-like conveniences," including "Smartly-designed suites with in-room kitchens and free WiFi; 24/7 access to guest laundry room, vending machines, and staff support; Pet-friendly and smoke-free accommodations; [and] Fitness centers at select hotels."

198.    At Hawthorn Suites, Wyndham's website tells guests that "we aim to give you everything you need for extended stays," highlighting its "spacious suites" that "offer all the essentials, such as free WiFi and well-equipped kitchens so you can settle in" as well as additional perks like its pet-friendly policy. Wyndham further tells visitors that "[w]hether you're here for a conference, special event, or group trip, you'll feel right at home with on-site fitness centers, laundry facilities, and free hot breakfast at many locations."

199.    Hyatt tells visitors to its website that "Hyatt House hotels provide you with the comforts of home—a spacious room, a full closet, a well-appointed bathroom, a cozy living room, and a well-equipped kitchen." Hyatt lists various "benefits" of staying at Hyatt House, like "Complimentary Morning Breakfast Mix," "24/7 Fitness Room," "24/7 on-site Guest Laundry," "Complimentary Wi-Fi," and a "Pet-Friendly" policy.

200.    Hyatt states that "Hyatt House hotels make guests feel genuinely at home with an elevated, spacious, and perfectly self-sufficient experience." On this theme, Hyatt invites visitors to "[m]ake our house your home" and provides the following graphic:



201.    Defendants expressly use the term "extended stay hotel market" in their marketing and financial submissions.

202.    For instance, Extended Stay America stated in a May 2020 report that the "overall extended-stay market is an estimated $16-$18 billion (or ~500,000 room) sub-sector of the wider $168 billion (or 5.3 million room) U.S. lodging sector."

203.    Sonesta Vice President of Revenue and Distribution Barth Leins described the "extended stay category" as a "unique market segment" within the broader hotel industry in a February 18, 2015 IDeaS-Sonesta joint press release.

204.    IDeaS Vice President of Global Sales Brian Sterrett referenced "[t]he extended-stay hotel market" in discussing room pricing and competition in a June 23, 2014 IDeaS-Extended Stay America joint press release.

205.    Extended stay hotel guest rooms constitute a product market separate and distinct from other lodging types for the additional reason that unique financial and economic considerations apply to their funding and operations.

206.    In the previously referenced February 18, 2015 press release, Sonesta's Barth Leins stated that "[r]evenue management" for extended stay hotels historically had been "particularly difficult because the properties have high occupancies, fixed cost structures and higher margins than traditional hotels."

207.    A July 19, 2023 CRBE article explained why extended stay hotels have been "one of the fastest growing segments in hospitality." "With higher margins and lower development costs than full-service hotels," the article noted, "extended-stay properties have the potential to generate higher returns on investment." "As a result," the article continued, "banks are more likely to provide funding for what are perceived to be lower-volatility, higher-return hotels, particularly those associated with well-established brand families." Recognizing that "operating extended-stay hotels is very different from other hotel types and requires special skills," the article then quoted Mike Nielson, CEO of development firm West77 Partners, as saying "the extended-stay segment" is "not traditional hospitality, and you will get eaten alive as an owner/developer if you think it is."

208.    Panelists at the October 2023 Northwest Hotel Investment Forum, including Hilton's Global Head of Homewood Suites Rick Colling, agreed that the operating model, guest type and profitability of extended stay hotels all differ from traditional hotels. Ian McClure, the CEO of prominent extended stay hotel property manager Gulf Coast Hotel Development, LLC, also stated that extended stay hotels require "very different management" and have "very different (guest) segments" compared to full service hotels or short-term stay motels (e.g., Motel 6).

209. As opposed to traditional hotels or motels, moreover, extended stay hotels cater to and allocate the lion's share of their capacity for guests who rent rooms for substantially longer periods than traditional hotel guests.

210. A December 14, 2023 Lodging Magazine article titled "Succeeding in Extended Stay: Operational and Pricing Insights From a Specialist in the Sector" featured insights from Ryan Overman, Vice President of Performance Improvement at J&P Asset Management, a large hotel management company whose 110 property portfolio consists predominantly of Extended Stay America and Choice extended stay brands and is run by former executives of those Defendants, about "best practices and trends in the extended-stay segment." Overman said that "[e]xtended-stay properties that are serving their intended clientele are "limited as far as transient guests." He also stated that extended stay hotel owners should resist the urge to book a higher proportion of short-term guests "when a major opportunity for transient business arises" and thus "disrupt their usual customer profile."

211. Overman then gave the following real-word example of why booking a high percentage of short-term transient guests is standard practice for traditional hotels but is simply "not advisable" for extended stay properties:

> 'What makes you really strong as a traditional hotel is being very flexible to market changes. If you have an event in town for the weekend, you want to make sure your ADR is rising appropriately and that you're capturing the demand before your competitors eat up that demand. So, for example, if a big-name artist is coming in for a concert, you want to make sure you're selling out that property as fast as possible.' But in the extended-stay world, that approach is 'the death knell,' he warned. 'If you take the Taylor Swift business, you're completely destroying your ability to operate effectively in that property, because you've now gone from three arrivals and three departures a day to 80 arrivals and 80 departures over that weekend, for example. And if I sell out my property eight months in advance to be ready for Taylor Swift, that's eight months I cannot sell to extended-stay travelers. It takes a long time to acquire, accommodate, and hold on to those guests, so you want to make sure that the inventory is available.'

212.    Extended stay hotel guests thus would not switch to other forms of lodging even if extended stay hotels imposed a small but significant and non-transitory increase in guest room rates.

213.    The extended stay hotel guest room rental market nationwide including the Relevant Markets satisfies the "SSNIP test" for market definition that federal antitrust enforcement agencies widely use. The test asks whether a hypothetical monopolist in a proffered market profitably could impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP") without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, then the market is properly defined. If the SSNIP is not profitable, then the market is too narrowly defined and thus does not encompass sufficient economic substitutes.

214.    Pursuant to Defendants' anticompetitive scheme, Extended Stay Hotel Defendants can and have increased guest room rental rates year over year by (at least) small but significant levels. These price increases have not driven enough guests out of the extended stay hotel market such that the SSNIP has become unprofitable for Extended Stay Hotel Defendants. Indeed, relevant data that is detailed further below shows that occupancy levels nationally and in the Relevant Markets across all extended stay hotel companies and for Extended Stay Hotel Defendants specifically have remained relatively stable while guest room rental rates and demand have increased materially during the class period. Thus, the SSNIP test is satisfied, and the relevant market is properly defined.

215.    Based on the foregoing reasons, guest rooms in traditional hotels and other forms of lodging are not sufficiently substitutable for or interchangeable with extended stay hotel guest rooms.

216.    While extended stay hotel guest room rentals constitute the appropriate relevant product market, this market contains three generally recognized segments: economy, mid-price (or midscale), and upscale.

217.    Extended stay hotel brands within each segment offer directly comparable features, and amenities in terms of quantity and quality and historically have competed against one another for guests primarily on the basis of guest room rental pricing. In other words, an extended stay hotel brand's average daily room rental range, driven by the amount of amenities and quality of furnishings, determines into which market segment it falls.

218.    Industry participants, consultants, and analysts commonly use a price spread of $60 in average daily room rates in determining to which market segment a given extended stay hotel belongs.

219.    The economy segment includes brands with average daily room rate range less than approximately $75, the mid-price segment includes brands with an average daily room rate range approximately between $75 and $135, and the upscale segment includes brands with an average daily room rate range greater than approximately $135.

220.    Extended stay hotels in the economy segment provide basic accommodations with essential amenities and limited services at the lowest price point. They thus offer long-term living space to guests who do not have to worry about paying extra for utilities, water, or furniture and offer core extended stay necessities like kitchens, basic appliances, cookware and utensils. Hotels in this segment primarily attract budget-conscious guests looking for a roof over their head while they seek eventual transition to more permanent lodging.

221.    Extended stay hotels in the mid-price segment provide better equipped guest rooms and a broader range of amenities than those available in the economy segment, and typically provide free breakfast, gyms, and bi-weekly housekeeping services. While some additional amenities may be available in hotels in this segment that upscale segment hotels also provide, mid-price hotel guests typically must pay extra for these features. Hotels in this segment predominantly attract travelling workers such as nurses, construction workers, and military personnel.

222.     Extended stay hotels in the upscale segment offer high-end features and extensive amenities. These hotels provide spacious and well-appointed guest rooms with large workspaces, premium furnishings, and fully equipped kitchens, along with professional business centers, conference rooms, complimentary WiFi, swimming pools, free hot breakfasts, complimentary happy hours, regular housekeeping, laundry facilities, and dry-cleaning services, in addition to the core extended stay features like 24/7 laundry that are available in the other segments. Hotels in this segment predominantly attract business and leisure travelers.

223.     Extended Stay Hotel Defendant brands in the economy segment, according to industry participants and observers, are Extended Stay America Select Suites, Choice's Suburban Studios, and Choice's WoodSpring Suites.

224.     Extended Stay Hotel Defendant brands in the mid-price segment, according to industry participants and observers, are Hilton's Home2 Suites, Extended Stay America Suites, Sonesta Simply Suites, Choice's MainStay Suites, and Wyndham's Hawthorn Suites.

225.     Extended Stay Hotel Defendant brands in the upscale segment, according to industry participants and observers, are Hilton's Homewood Suites, Sonesta ES Suites, and Hyatt House.

226.     The following table breaks down Extended Stay Hotel Defendants' extended stay hotel brands by market segment:

| Extended Stay Hotel Brands by Market Segment | | |
|---|---|---|
| **Economy** | **Mid-price** | **Upscale** |
|  |  |  |
|  |  |  |



227.    Other companies besides Extended Stay Hotel Defendants supply extended stay hotel guest room rentals in each segment across the nation and in the Relevant Markets. Publicly available information does not confirm whether some of these companies have deployed the G3 RMS to set rates and occupancy levels during the class period. (One such company, for example, is InTown Suites. This extended stay hotel-focused company, which Extended Stay America co-owner Starwood Capital also owned from 2013 to 2022, operates in the economy segment and provides nearly 200 locations in 22 states with more than 25,000 guest rooms.) Pre-trial discovery in this case should reveal the identities of any additional companies beyond Extended Stay Hotel Defendants that have deployed the G3 RMS to set rates and occupancy levels in an anticompetitive manner during the class period

228.    According to one industry consulting firm specializing in this market, during the class period, extended stay hotels in the economy segment have supplied between 18% and 20% of the total guest room nights of all extended stay hotels nationally, extended stay hotels in the mid-price segment have supplied between 39% and 42% of the total guest room nights of all extended stay

hotels nationally, and extended stay hotels in the upscale segment have supplied between 40% and 41% of the total guest room nights of all extended stay hotels nationally.

229.    The following table illustrates the distribution of national guest room supply by market segment as detailed above:

| Extended Stay Hotel Room Supply by Market Segment (Nationwide) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Segment | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Economy | 21% | 20% | 19% | 18% | 18% | 18% | 18% | 19% |
| Mid-price | 39% | 39% | 40% | 40% | 41% | 41% | 42% | 41% |
| Upscale | 41% | 41% | 41% | 41% | 41% | 41% | 41% | 40% |

**2.  The Relevant Geographic Markets Are Metropolitan Statistical Areas.**

230.    MSAs, including the Relevant Markets, constitute the relevant geographic markets.

231.    Pricing Algorithm Defendants operate a nationwide (and international) business, with multiple offices located across the country and hotel properties of their clients, including Extended Stay Hotel Defendants, in every major metropolitan area. The G3 RMS operates throughout the United States in the same manner, accounting for any regional variations in market conditions. Guests renting extended stay hotel guest rooms located throughout the country are impacted by the anticompetitive scheme enabled and facilitated by Pricing Algorithm Defendants.

232.    That said, a relevant geographic market identifies the geographic boundaries of effective competition and is generally measured by determining the area or areas in which sellers of the relevant product operate and where consumers practically can turn to purchase that product. Relevant factors in assessing the proper geographic scope include barriers to transactions between the sellers and consumers of the relevant product, such as the costs of transportation to a given location and the preferences of consumers regarding travel and price.

233.    The federal government establishes an MSA for each major metropolitan area in the U.S. According to the U.S. Census Bureau, "Metropolitan Statistical Areas have at least one core urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties."

234.    Other federal governmental agencies and divisions uniformly follow this definition. For example, the U.S. Centers for Disease Control and Prevention's National Center for Health Statistics cites the Census Bureau definition in specifying an MSA as a "geographic entity based on a county or a group of counties with at least one urbanized area with a population of at least 50,000 and adjacent counties with economic ties to the central area" that "are measured by commuting patterns."

235.    Each MSA, including every Relevant Market, is an appropriate relevant geographic market here because an extended stay hotel only rents rooms to consumers residing in or travelling to the given city, suburb, or surrounding area in which that hotel is located. Similarly, consumers of extended stay hotel guest rooms practically can only turn to hotels that offer rooms in the city, suburb, or surrounding area in which they reside or will be located during the relevant timeframe.

236.    Any geographic area larger than an MSA is not part of the same relevant geographic market because consumers only look to rent extended stay hotel guest rooms in the specific city, suburb or surrounding area comprising the given MSA in which they reside or will be located during the relevant timeframe.

237.    By way of example, a guest room at a Hyatt House located in the Chicago, IL MSA is reasonably interchangeable with a guest room at a Hilton Homewood Suites located in the same MSA but is not reasonably interchangeable with a guest room at a Hyatt House or Hilton Homewood Suites located in the Washington, DC MSA. This is because the potential guest of the Hyatt House in the Chicago, IL MSA necessarily would be confined to looking for extended stay hotels in that specific geographic area.

238.    Industry analysts and participants including Defendants and courts confirm that MSAs, including the Relevant Markets, are the relevant geographic markets.

239.    Industry participants widely use MSAs as the proper geographic metric to assess competition in the extended stay hotel market and throughout the broader hotel industry.

240.    The Highlands Group issues an annual report called "The US Extended-Stay Hotel Market" and a supplement titled "US Extended-Stay Hotels: 100 Largest Markets." In the supplement, the firm sells its research results to industry participants, including hotel owners and operators, on extended stay hotel guest room occupancy and revenue rates in the nation's 100 largest MSAs. The firm relies on CoStar/STR for specific MSA-level data contained in its research.

241.    STR "deliver[s] data and analytics that are confidential, accurate and actionable," and its "comprehensive solution empowers [its] clients to strategize and compete within their markets." The markets that STR forecasts for its hotel clients correspond to major municipalities and their surrounding cities and suburbs that are identical or substantially similar to MSAs. Indeed, STR uses the Census Bureau-defined term "Metropolitan Statistical Area (MSA)".

242.    STR introduced the concept of a "Comp Set," or "collection of hotels with which a property competes for business," to the hospitality industry in the 1980s. STR notes that "[h]otels included in Comp Sets are typically located in the same geographic area and offer similar services and amenities." It further notes that "[b]y analyzing these properties in aggregate, revenue managers, owners and a host of additional stakeholders can better understand market position and adjust strategies accordingly." According to an early 2024 blog post, STR believes that the "significance of Comp Sets in a comprehensive benchmarking experience remains unwavering."

243.    CoStar, STR's parent, treats MSAs, which it calls "Submarkets," as the proper geographic market in the commercial real estate sector. The company also provides "Submarket

Maps" that let users "Select a Market" from a list of "MSAs," like the following screenshot of commercial retail properties in the Birmingham, AL MSA:



244.    CoStar conceded that MSAs constituted the relevant geographic markets in a case involving alleged anticompetitive conduct in certain segments of the commercial real estate industry. *See CoStar Group, Inc. v. Commercial Real Estate Exchange Inc.*, 2023 WL 2468742, *5 (C.D. Cal. Feb. 23, 2023) ("CREXi alleges the relevant product markets for its antitrust claims are" certain commercial real estate marketing services, "and the relevant geographic markets are Individual Metropolitan Statistical Areas ('MSAs'). CREXi provided a list of 50 MSAs at issue. CoStar does not challenge CREXi's identification of the relevant product markets or the relevant geographic markets[.]").

245.    Extended Stay Hotel similarly views MSAs as the proper geographic areas in which to assess competitive dynamics for their respective extended stay hotel properties. Referencing its "national footprint with high quality locations" in a November 12, 2013 prospectus, Extended Stay America stated that "[w]e have high quality real estate locations with strong demand drivers, with more than 50% of our portfolio located in the 25 most populated metropolitan statistical areas ('MSAs') in the United States."

246.    Various federal courts also have held that MSAs plausibly constitute relevant geographic markets in antitrust cases involving lodging.

247.    In *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478 (M.D. Tenn. 2023), an antitrust conspiracy case premised on competing landlords' knowing use of the same pricing algorithm product to artificially inflate the price of apartment rents to tenants, the plaintiffs defined the relevant geographic markets as MSAs. The plaintiffs "allege[d] the United States market is broken into submarket Metropolitan Statistical Areas (MSAs) because [r]enters in any given MSA do not consider multifamily residential leases in other MSAs as adequate substitutes for multifamily residential leases in their own MSA," and "specifically allege[d] that the conspiracy harmed competition in at least 45 MSAs." 709 F. Supp. 3d at 523 (internal citations and quotations omitted). Recognizing "there are plenty of circumstances in which courts find the use of MSAs as geographic markets to be appropriate," the court held that the plaintiffs "plausibly alleged the relevant geographic markets." *Id.* at 525. In doing so, the court noted that the pricing algorithm was "used by property owners and managers across the United States" and that the plaintiffs "divide[d] that market into sub-markets consisting of MSAs to approximate the geographic areas in which multifamily housing renters may use to identify alternative housing." *Id.* at 27.

248.    In *In re Stitzer v. National Association of Realtors*, 420 F. Supp. 3d 903 (W.D. Mo. 2019), plaintiff home buyers alleged that a national realtor association and its member firms fixed the price of realtor commissions through a policy the association enacted and its members enforced in the many Multiple Listing Service databases ("MLSs") giving access to its members to home sale listings within the defined geographic region. The court found that the plaintiffs adequately alleged that the four MLSs at issue in that case, including the Kansas City MLS and the St. Louis MLS, constituted relevant geographic markets. 420 F. Supp. 3d 903 at 910, 913-14.

249.    Courts also have held MSAs to plausibly constitute relevant geographic markets in antitrust cases involving other industries bearing certain important similarities to the lodging industry. For example, in *In re Blue Cross Blue Shield Antitrust Litigation*, 2017 WL 2797267 (N.D. Ala. June 28, 2017), plaintiff medical providers alleged that insurance companies conspired to allocate markets and reduce provider reimbursement rates, and the court ruled that MSAs were reasonable geographic markets given they were "used in the ordinary course of business in the insurance industry when examining local markets." 2017 WL 2797267, at *11.

### 3. Extended Stay Hotel Defendants Historically Priced Guest Rooms Independently Under a "Heads in Beds" Business Model.

250.    Before Extended Stay Hotel Defendants began setting guest room rental rates and occupancy levels in coordinated fashion pursuant to the anticompetitive scheme, competition in the extended stay hotel guest room rental market was driven by hotel companies' independent decisions to price their guest rooms at rates designed to produce the highest practicable occupancy levels.

251.    In the hotel industry, as in many other capital-intensive industries, hotel operators face a large up-front investment to build a property. Once open, a hotel recoups these costs until eventually turning a profit. Additional profits are made on each additional room that is rented. Any empty hotel room amounts to lost revenue, so hotel operators in a competitive market work hard to fill each room by granting concessions or lowering prices. Basic principles of supply and demand dictate that owners and operators of hotels, including extended stay hotels, attempt to maximize their occupancy rates. These economic tenets and competitive dynamics informed and characterized competition among extended stay hotels nationally and across MSAs, including the Relevant Markets, for years.

252.    This well-recognized and long-practiced business model of placing primary importance on filling hotels to capacity is known as a "heads in beds" business model.

253.    The rationale behind the "heads in beds" strategy is supported by basic economic tenets and hotel finance principles. While high fixed costs come with building, renovating, maintaining, and staffing an extended stay hotel, the marginal costs that owners and operators incur in renting a guest room are quite low. Thus, the costs of owning and maintaining a guest room in an extended stay hotel is not significantly different whether that particular room is occupied or vacant. Vacant rooms result in lost income and, if meaningful enough in terms of number and duration, lost profits. That dynamic provides a strong incentive for extended stay hotel owners and operators, particularly Extended Stay Hotel Defendants, to lower guest room rental rates to the extent necessary to consistently fill vacant rooms and produce occupancy levels at or approaching 100%.

254.    Extended stay hotel companies in particular long had followed a "heads in beds" strategy. Extended stay hotels have always had lower fixed costs than full-service hotels due to lower construction costs and staffing expenses. Consequently, the lost income associated with not filling an extended stay hotel guest room, which would be occupied for considerably more days on average than a full service hotel room, would have a proportionally greater negative impact for the extended stay hotel than the full service property.

255.    Thus, extended stay hotel companies historically have tried to fill their guest rooms to as high an occupancy level as possible for as long as possible by adjusting the room rates accordingly, as this approach consistently had brought them sustainable profit margins that compared favorably to the broader hotel industry.

256.    Extended Stay Hotel Defendants knew that if they collectively resisted the urge to price their guest rooms at rates needed to fill their extended stay hotels to capacity, then they all would benefit from higher average rates. Yet they also knew that if only one of them unilaterally adopted that approach, then that company would lose guest volume and corresponding market share to the other competitors who continued to adhere to "heads in beds" approach. Thus, absent coordination,

no Extended Stay Hotel Defendant unilaterally could raise its guest room rental rates above then-prevailing market rates.

257.    But this well-established, pro-competitive business model would be replaced with a novel coordinated one that provided an elegant solution to the previously unsolvable prisoner's dilemma. The new paradigm began with Pricing Algorithm Defendants' release of its "revolutionary" G3 RMS pricing algorithm and Extended Stay Hotel Defendants' coordinated deployment of this shared pricing brain to set "optimal" guest room rates and occupancy levels at their extended stay hotels nationwide and in the Relevant Markets.

**B.  IDeaS Enters the Revenue Management Field and Begins Developing and Selling Software to Hospitality Industry Clients in 2003.**

258.    IDeaS is currently one of the world's leading revenue management system providers. But it is by no means the only one of significance.

259.    Various other providers, some of which rival IDeaS in size and scope, compete against it for many sizes and types of customers in the hotel industry, including extended stay hotel owners, operators, and managers.

260.    This graphic from the 2024 Hotel TechReport illustrates the current slate of revenue management software providers in the hotel industry:



261.    Nevertheless, according to a September 3, 2019 *Skift* article, the industry publication's research arm estimated that "[o]nly 4 percent of the world's 600,000 hotels use revenue management software."

262.    IDeaS was founded in 1989 by two computer scientists to help airlines increase revenue in the face of demand fluctuations in a newly-deregulated industry.

263.    IDeaS experienced initial success soon thereafter. In 1990, several international airlines retained the new company to create the world's first network optimizer for airline revenue management. The company would continue to experience financial success and recognition in the airline revenue management field for multiple years.

264.    In 1995, IDeaS decided to shift the focus of its revenue management technology expertise to the hospitality industry.

265.    In the following years, IDeaS would reach even higher levels of prominence and profitability in the hospitality industry.

266.    IDeaS, initially by itself and later in coordination with SAS, developed and marketed multiple generations of proprietary revenue management software products that culminated with the state-of-the-art G3 RMS. During this timeframe, IDeaS partnered with other major hospitality industry technology providers and attracted as loyal clients many of the world's biggest hotel brands including Extended Stay Hotel Defendants.

267.    In 2003, IDeaS released the first generation of its flagship revenue management software solution for the hospitality industry. This software was called the IDeaS Revenue Management System, or IDeaS RMS for short. With this product, IDeaS accumulated a significant client base and developed commercial relationships with major hotel companies, including certain Extended Stay Hotel Defendants.

268.    It was not long before IDeaS began developing its next, and most consequential, revenue management software product. The company's work on this front began soon after its acquisition by one of the world's leading providers of advanced analytics and artificial intelligence

software and during the middle of a global recession that had negatively impacted its hospitality clients' finances and made them desperate for answers.

### C.  SAS Acquires IDeaS in 2008, and They Jointly Develop and Refine the G3 RMS.

269.    In August 2008, SAS, one of the world's largest privately held providers of business intelligence and analytics solutions generating billions of dollars in revenue annually, acquired IDeaS.

270.    In an August 4, 2008 press release, IDeaS explained the reasons for the combination and what it meant going forward for both companies. IDeaS stated that while it was "now a wholly owned subsidiary of SAS," it would "continue to prioritize the hospitality industry" and its "global customers" like "Hilton" and "Hyatt International" by utilizing "leading-edge SAS capabilities like forecasting, optimization and statistics." Indeed, "[w]ith its existing broad and powerful portfolio of market-leading advanced analytics, business intelligence and industry-specific solutions," IDeaS noted, "SAS now has the leading revenue-management offering designed specifically for the travel and hospitality industries." Further, as IDeaS noted, its "customers will benefit from the global resources of SAS, a $2 billion company."

271.    The two companies' executives also made statements in the release. IDeaS CEO and Chairman Ed Booth noted that "SAS is a perfect fit for IDeaS," since "[c]ustomers of neither company are locked into long-term licenses, so we both have to earn our customers' business on a daily basis," and "SAS, with a corporate culture remarkably similar to ours, will provide IDeaS with the resources to stretch its wings." SAS CEO Jim Goodnight remarked that "IDeaS is extremely successful in the hospitality industry, and its highly regarded application base is capable of much more." Goodnight added that "SAS has the will, the resources and the domain expertise to nurture the potential of IDeaS" while "remaining attentive to the extremely loyal IDeaS customer base."

272.    In an SAS paper presented at the SAS Global Forum 2010 titled "Optimizing Revenues in the Hospitality and Retail Industries: Comparing and Contrasting Different Industry

Problems and How SAS Analytics is Used to Solve Them," authors Alex Dietz and Kelly McGuire noted that "[w]ith the acquisition of IDeaS by SAS in 2008, SAS now offers advanced revenue optimization solutions for both the retail . . . and hospitality industries."

273.    IDeaS later issued another statement regarding the SAS acquisition. In the statement, IDeaS commented that SAS's core business strengths aligned perfectly with its own automated revenue management focus. IDeaS also noted that SAS's expertise and resources have allowed IDeaS to further enhance its analytical capabilities and accelerate its pace of innovation after the acquisition.

274.    Soon after the acquisition was finalized, Pricing Algorithm Defendants began working to develop IDeaS' next generation revenue management software product that would harness both companies' full array of technological expertise and industry experience.

275.    In 2009, IDeaS embarked on a multi-year development phase for its "revolutionary G3 RMS solution, which leverage[d] the power of advanced analytics from SAS."

276.    As noted in an April 21, 2009 blog post on SAS's website titled "Innovations in Revenue Management" by SAS employee Kelly McGuire, "SAS and IDeaS are working on a technology solution" to help hotel clients achieve the "goal of property-wide profit optimization." For her part, McGuire was "very excited about the potential of the joint offerings from IDeaS and SAS, and the chance to be a part of developing the next generation of integrated revenue optimization solutions" for the "hospitality industry."

277.    This developmental phase culminated in the G3 RMS' limited release in 2013 with Hilton and its subsequent adoption by the remaining Extended Stay Hotel Defendants.

278.    IDeaS Americas Managing Director Jane Stampe called out the extended stay hotel market as an intended beneficiary of the G3 RMS in its early years. In connection with Sonesta ES Suites' deployment of the product, Stampe said:

> We developed IDeaS G3 RMS to extend advanced pricing analytics
> and forecasting to hotel properties that had not previously

implemented automated revenue management—especially in the extended stay or focused service categories. We believe there are very real benefits and revenue opportunities in these segments and are proud to extend our solutions to Sonesta ES Suites.

**D. The G3 RMS Makes Automated Pricing and Occupancy "Decisions" for Extended Stay Hotel Defendants Using Their Current, Non-Public Business Data.**

279.    The "revolutionary" G3 RMS enables clients like Extended Stay Hotel Defendants to raise guest room rates and revenues to new heights based on critical features that Pricing Algorithm Defendants developed and incorporated into IDeaS' legacy revenue management system.

280.    High-level summaries of the G3 RMS are discussed immediately below, and detailed descriptions of particularly relevant product features follow.

**1. The "Revolutionary" G3 RMS Is an "Analytics and Pricing Breakthrough."**

281.    In a 2019 G3 RMS Datasheet, IDeaS provided a high-level overview of how this "Analytics & Pricing Breakthrough," fueled by "IDeaS' unique approach to revenue optimization," "deliver[s] maximum impact to [clients'] bottom line."

282.    Stating that the G3 RMS's "Key Benefits" included clients' ability to "[s]et optimal pricing through advanced price sensitivity modelling" based on "granular transaction data," the Datasheet proceeded to highlight important product features that made it "the most scientifically advanced solution available." Specifically, the Datasheet emphasized that the G3 RMS:

- "uses a 'best-fit' analytical model approach [that] selects from more than 100 proprietary models to produce more accurate forecasts with extremely high levels of detail";

- "features exclusive price sensitivity modelling leveraging historical and future competitive pricing data, fueling impactful pricing decisions that drive incremental revenue";

- "is designed to manage by exception—empowering you to complete tactical duties quicker—freeing up time for strategic activities that drive better revenue[] [by] set[ting] an optimal mix of key pricing and

inventory controls and seamlessly distributes changes across all integrated selling systems, eliminating the need to do so manually";

- "ensures that historical data, competitor rates, reputation scores and relevant market data, such as TravelClick Demand360, influence pricing decisions"; and

- "informs [clients] as to…competitive set metrics through STR data".

In short, IDeaS' G3 RMS and staff "will help [clients] make better pricing decisions and capture more revenue."

283.    IDeaS' G3 RMS Product Brochure and accompanying website section declared that the "world's most advanced revenue management system," "paired with a world-class client care model," "will ensure [clients'] success" by "transform[ing]" the "right data" through "SAS High Performance Analytics" into "automated pricing" "decisions [they] can take to the bank."

284.    The Product Brochure and related website materials provided the following:

- "Welcome to the world's most advanced revenue management system, powered by revenue science, advanced analytics and machine learning. Get ready to embrace the full benefits of automation, with accuracy you can count on and decisions you can take to the bank. This industry leading solution is paired with a world-class client care model that will ensure your success."

- "[This] sophisticated yet simple-to-use hotel revenue management system is more effective than rules-based imitators and leverages advanced data analytics for automated decision-making."

- "Powered by SAS High Performance Analytics, G3 RMS automates pricing, restrictions and overbooking decisions to maximize RevPAR and help you focus on what's important."

- "[G3 RMS] is a system that delivers scientific pricing decisions at the room type and rate code level to drive optimal revenue performance [through] Proven analytics; Data-driven decisions; and Deep learning."

- "SAS High Performance Analytics incorporate multiple hotel and market data sources to accurately learn, adapt and forecast guest and market demand patterns."

53

- "[A]utomated pricing, restriction and overbooking decisions maximize RevPAR across available demand and room-type upgrades."

- "G3 RMS continually re-optimizes controls using deep insight into demand, cancellation and no-show patterns, price sensitivity and market behavior."

- "G3 RMS transforms the right data into clear and actionable insights so you can: … Know with confidence the solution will react quickly and appropriately to dynamic market conditions…. Optimize pricing across all products and room types…. Incorporate external market rate and demand data…. Fully automate distribution and revenue management tasks allowing you to focus on exceptions, critical dates and more."

285.    These materials added that the G3 RMS could deliver unparalleled results to clients because of what "is under the hood." Specifically, the "G3 RMS leverages superior analytics to determine the optimal price for all key products by room type (e.g., Best Flexible Rate and Advance Purchase)" because it "[a]utomatically weights the true influence of competitors' pricing, future demand data such as TravelClick Demand360 and more on hotels' pricing to produce the most accurate forecast."

286.    IDeaS' website displayed the following "At-a-Glance Product Comparison" that identifies in table format critical new features of the G3 RMS features (highlighting added):



287.    IDeaS' G3 RMS promotional materials for "Extended Stay & Serviced Apartments" on its website link to the marketing materials discussed above and tout how this product benefits extended stay hotels specifically.

288.    The IDeaS G3 RMS marketing materials targeting "Extended Stay & Serviced Apartments" state the following:

- "It can be challenging to meet price-sensitive guest expectations while maximizing revenue. For example, consider the process of optimizing the ideal balance of short- and long-stay demand. IDeaS' powerful length-of-stay controls are designed for extended-stay properties and automatically optimize occupancy and capture the most valuable business."

- "With booking patterns being unpredictable, maintaining straight-line availability is more important than ever. While it may be tempting to select the highest paying business for a single night stay, IDeaS' precise

forecasts automatically anticipate future demand to ensure you can accept the more valuable longer-stay business."

- "An automated, room-type pricing strategy with superior length-of-stay controls and strategic upgrade paths can help optimize your booking mix in a way manual, rules-based pricing cannot replicate."

289.   Particularly relevant G3 RMS features described in the hospitality industry technology publication *Hotel Tech Report* overview that echoed IDeaS' own statements, and that are discussed in greater detail in the following section, included: fully automated generation of pricing "decisions" for clients to implement; use of "competitor" and "market" data to generate pricing "decisions" for clients; use of clients' STR reports containing clients' "competitive set" data; use of clients' Demand360 data that forecasts future market demand based on a year's worth of forward-looking occupancy data that the client and other participants submit; application of SAS-powered artificial intelligence and predictive analytics to this data trove to generate pricing "decisions"; and a "management-by-exception" approach that limits manual overrides and promotes adherence to the algorithm's determinations.

### 2. The G3 RMS Produces Fully Automated Pricing and Occupancy "Decisions" for Extended Stay Hotel Defendants.

290.   IDeaS emphasizes that the G3 RMS generates fully automated pricing and occupancy "decisions"—not mere "recommendations"—that clients like Extended Stay Hotel Defendants adopt consistently and continuously.

291.   IDeaS reiterated its "position on the topic of decisions versus recommendations" on a website post titled "Decisions vs. Recommendations: It's all in the Name," adding strategically placed italics for emphasis:

> Many revenue management systems provide *recommendations* that require a manual validation and/or deployment while IDeaS' advanced revenue management solutions produce automated *decisions*. . . .

Unlike decisions, which are system controls that are continually optimized and automatically deployed to integrated selling systems, recommendations have to be manually implemented into integrated selling systems. This means users are still responsible for reviewing, approving and uploading every recommendation the revenue management system produces. This not only impacts the amount of time and resources spent validating and uploading decisions, but also forces users to be less nimble – having less time to course correct when there are sudden shifts in the market. . . .

Underneath the surface and behind its sleek user interface, IDeaS' cloud-based solutions continually produce powerful decisions that enable hotels to achieve optimal revenue performance through automatically deployed controls that manage pricing, rate availability and overbooking. These decisions are based on a sophisticated analytical understanding of how a hotel's business behaves.

292.    IDeaS similarly has emphasized the importance of the G3 RMS' fully automated pricing "decisions" in various other materials. For example:

- "These days, the secret to success in the hospitality sector lies in automated decisions and a willingness to break the rules."

- "Get ready to embrace the full benefits of automation, with accuracy you can count on and decisions you can take to the bank."

- "Our sophisticated yet simple-to-use hotel revenue management system…leverages advanced data analytics for automated decision-making."

- "Why settle for rules-based, pricing-recommendation tools? G3 Revenue Management Solution (G3 RMS) is a system that delivers scientific pricing decisions at the room type and rate code level to drive optimal revenue performance[.]"

- "G3 RMS automates pricing, restrictions and overbooking decisions to maximize RevPAR and help you focus on what's important."

- "[G3 RMS] guide[s] [managers] through critical tasks while automatically producing decisions."

- "[G3 RMS lets] corporate executives automate revenue strategy and enhance culture around driving profitable commercial decisions."

- "IDeaS G3 RMS transforms the right data into clear and actionable insights so you can…[f]ully automate distribution and revenue management tasks allowing you to focus on exceptions, critical dates and more."

- "Full automation eliminates the possibility for user error, creates a framework where our RMS can react as conditions change, and limits the need for human resource consumption."

- "Avoid pricing uncertainty by using IDeaS hotel pricing strategies, a game-changing mix of analytics, intelligent pricing, and automated decisions."

- "The AI-powered analytics recognize relationships between all rates and segments, continuously making the smartest pricing decisions based on the latest information."

293.    IDeaS' marketing materials and efforts, some of which are highlighted below, promote the fully automated "pricing decisions" that its solutions like the G3 RMS deliver to hospitality clients.

294.    In a February 22, 2022 video post on X (formerly Twitter), IDeaS stated that while "[t]his decision's on you," *i.e.*, whether to use IDeaS for revenue management needs, "[t]he rest are on us," before promoting its "automated decisions you can trust:"





295.    In a September 6, 2023 Facebook post, IDeaS noted the large number of hotel properties that "run on IDeaS" and the billions of "daily pricing decisions" IDeaS delivers to them to "achiev[e] higher revenue:"



296.    In an April 3, 2024 Facebook post, IDeaS proclaimed that a "new era of hospitality is here" where "the future is automated," while saying that "together we will push the boundaries of technology" and "anticipate the future:"



297.    IDeaS also has taken to social media to promote new hotel clients' deployment of the G3 RMS to make "automated pricing decisions" for their guest rooms portfolio-wide.

298.    For example, on March 21, 2019, IDeaS posted on Facebook that a large hotel chain "will roll out IDeaS G3 RMS to make automated pricing decisions for over 21,000 guest rooms[.]"

299.    Similarly, on a June 25, 2021 Facebook post, IDeaS welcomed foreign serviced apartment provider "SMARTments Business to the #IDeaSFam," and it told viewers to "[r]ead about how they will be using our G3 RMS to deliver automated, dynamic pricing and accurate forecasting across their growing portfolio."

300.    IDeaS executives have described and promoted the G3 RMS as a tool for hotel clients to automate pricing and occupancy "decisions."

301.    During an episode of the hospitality industry podcast *No Vacancy*, IDeaS Co-Founder and CEO Sanjay Nagalia said: "There are two ways of getting profitability. Either increase revenue or decrease costs. And our solutions are all aimed increasing your revenue . . . in a totally automated manner."

302.    During the same *No Vacancy* podcast episode, IDeaS Vice President of Global Marketing Mike Chuma promoted the G3 RMS by stating:

> [M]ost importantly, how quickly your system can help you make that decision [to close off certain rates] or make that decision for you, which is a major difference between other revenue management systems and ourselves is that we do that through automation, through artificial intelligence and machine learning, so we can make that decision quicker . . . .

303.    In a post on its website titled "Meet IDeaS New Chief Evangelist," IDeaS introduced Klaus Kohlmayr through a question and answer format facilitated by IDeaS Senior Director of Marketing Elizabeth Walsh. In response to a question on the role that revenue management would have in the evolution of the hospitality industry, Kohlmayr offered, in relevant part, that:

> First of all, whoever has the most relevant data, combined with the most advanced analytics, will win. . . . [P]ricing will be automated, instant and in real time. Gone will be the days where hotel revenue managers will be able to validate and confirm pricing decisions before they are sent to the channel managers. The systems will be making their pricing decisions and someone (not at the property level) will validate the decisions after the fact. Amazon doesn't have a pricing manager validating if the price of a charging cable should be $1.99 or $1.89. They let their system price automatically and afterwards review the algorithms to ensure they worked correctly. . . . Properties will not be able to hire the resources with the capabilities to understand or use these systems so they will also be located centrally. As a result, pricing and demand optimization will become more centralized, sophisticated and automated.

304.    In a July 19, 2023 *Lodging* article titled "Current Capabilities: IDeaS' Klaus Kohmayr on Helping Hoteliers Tell Their Data Stories," the IDeaS Chief Evangelist and Development Officer said that his company was focused on "making more automated decisions for more revenue streams."

305.    IDeaS' technology partners and other industry participants familiar with IDeaS' offerings have described the G3 RMS as a tool for hotel clients to automate pricing and occupancy "decisions."

306.    Commenting on his company's integration with IDeaS in a post titled "Amadeus and IDeaS Partner to Help Hoteliers Build Pricing Strategies During Recovery," Amadeus Senior Vice President Curtis Brewer noted that the "integration provides hotels with the ability to optimize pricing

strategies" by enabling hotels to set different daily room rates for different lengths of stay "without forcing hoteliers to merchandise a discount." Brewer then referred to this as an example of "an easy 'set-and-forget' tactic" that hotels could utilize with the G3 RMS.

307.    HotelMinder, a consulting firm with "extensive experience in hospitality management" focused on "bring[ing] next-gen technology" to independent hotels and connecting these clients "with top industry experts and cutting-edge technology," counts IDeaS as one of its revenue management software partners. In describing IDeaS for its client base, HotelMinder states:

> Combining industry knowledge with innovative, data-analytics technology, IDeaS creates sophisticated yet simple ways to empower revenue leaders with precise, automated decisions they can trust. IDeaS is not a recommendation System but a decision System, influenced by demand, competitors, volatility & uncertainty of market segments: it doesn't need human interaction to make a decision.

308.    In sum, IDeaS has designed and intends the G3 RMS to operate in a fully automated manner with client intervention kept to an absolute minimum. In other words, the pricing algorithm powering the G3 RMS is a black box that IDeaS tells its clients like Extended Stay Hotel Defendants to trust implicitly—and they do.

309.    On this point, IDeaS' Kohlmayr distinguished the G3 RMS from other suppliers' revenue management offerings in the August 8, 2024 *Lodging* article "Rigorous Revenue Management: AI Tech Tools Take Pricing and Forecasting Accuracy to the Next Level." In relevant part, he stated:

> [M]any solutions display external data within the RMS interface for the revenue manager to decipher and decide how to use. At IDeaS, we feel that introduces noise into the equation. Knowing revenue managers are extremely busy and have more strategic endeavors to focus on, our solution (G3 RMS) keeps that noisy, up-for-interpretation data analysis under the hood, so to speak.

### 3. The G3 RMS Uses Each Extended Stay Hotel Defendants' Non-Public and Competitively Sensitive Business Data to Generate Pricing and Occupancy "Decisions."

310.    Each Extended Stay Hotel Defendant continuously submits its internal current, confidential, and forward-looking pricing and occupancy data to the G3 RMS. In turn, the G3 RMS continuously incorporates this data into a comprehensive database that it relies on to generate each such Defendant's pricing and occupancy "decisions."

311.    IDeaS and its personnel admit that the G3 RMS relies on each Extended Stay Hotel Defendant's proprietary business data as well as "competitor data" and "market data" in producing pricing and occupancy "decisions" for that client. Public statements from IDeaS and its personnel show that this competitor data is non-public information supplied by IDeaS' competing G3 RMS user clients, including the Extended Stay Hotel Defendants.

312.    In fact, the IDeaS website explains how the G3 RMS uses its hotel subscribers' non-public and competitively sensitive pricing data, pools that confidential competitor pricing data, and uses the combined information to make pricing decisions for its competing subscribers with the stated "goal" of "maximiz[ing] revenue" and "improv[ing] profitability." The website's "How G3 RMS Determines Pricing" video specifically walks through the pricing optimization process, which uses IDeaS' hotel clients' proprietary and non-public data, such as occupancy and capacity data, data concerning existing contracts, and pricing and discounts data. The video expressly states that the G3 RMS "system considers competitors' prices," "calculates what impact future competitor prices have on . . . demand," "and produces pricing decisions to optimize that demand":











313.    The IDeaS website also gives G3 RMS users step-by-step instructions on how to share their "Pricing Strategy" with the software because each G3 RMS user's individual, non-public pricing setup "is the primary input" for making pricing decisions.

314.    It is evident from the website's discussion of "Competitor Details" that G3 RMS pools the pricing data it gathers from its competing hotel subscribers. Not only does the website tell subscribers to use the software's "Competitor Details" function "to view the most recent data from all competitors," but it also states that the competitor "Price" data element G3 RMS subscribers can access includes the "pricing decision" that the G3 RMS software makes for other competing hotel subscribers:

| Detail | Description |
|--------|-------------|
| Price | The pricing decision for the competitor, if available.<br><br>For properties in countries with Tax-inclusive Pricing ❶, the competitor price includes the tax percentage that you set up.<br><br>A "Closed" value in this column indicates that the competitor is closed, or the rate being shopped is restricted for a given arrival date and LOS. G3 RMS creates a value for that competitor and uses that in its calculations. The system sets the value assuming that closed competitors are a sign of compression and high demand in the market. |

315. The voice-over narrative for an IDeaS G3 RMS promotional video from June 2018 explains the process consistently. It told existing and potential hotel clients that "[o]nly IDeaS automatically folds a wealth of vital data directly into a powerful analytics engine, giving you multi-dimensional insights into your business for yesterday, today, and into the future." The video then provided a graphic to illustrate that the "wealth of vital data" the G3 RMS analyzes through "analytical automation," "artificial intelligence," and "machine learning" included "competitor data," "market data," and "your data:"



316.    One way that IDeaS pools the non-public, competitive data of its customers to make pricing recommendations is by using the data it collects from its hotel customers, including the Extended Stay Hotel Defendants, in training and fine-tunings its algorithms.

317.    For example, a June 15, 2017 IDeaS press release announcing AccorHotels Group's use of the G3 RMS recognized that the platform receives, pools, and analyzes its hotel clients' internal pricing and supply data to generate its clients' pricing and occupancy decisions. In particular, IdeaS stated:

> By integrating thousands of hotel and external market data points into its analytics engine, the IDeaS G3 Revenue Management System (RMS) platform automatically evaluates demand fluctuations and competitive changes to deploy optimal pricing and inventory control decisions.

318.    Similarly, IDeaS has admitted that it receives and pools nonpublic, competitively sensitive business data of its hotels clients around the world, including Extended Stay Hotel Defendants, to calibrate the G3 RMS algorithms used to make pricing and occupancy decisions.

319.    For example, in a September 7, 2021 *Hospitality Net* video titled "HITEC TV: It's Not Your Old Revenue Management System Anymore," IDeaS Chief Evangelist and Chief Development Officer Klaus Kohlmayr conceded that the G3 RMS pricing algorithm was developed and trained on sensitive, non-public competitor hotel data. Specifically, he said the G3 RMS utilizes internal hotel data to "teach" and "finetune" its "algorithms and the science that goes into the pricing decisions" generated for all its clients. Specifically, Kohlmayr stated that IDeaS was:

> focused on leveraging the data we had from our 16,000 hotels around the world to understand what's going on and teach the system what's going on. Right now, over the last 18 months, every two weeks, we go in and look at all the data we collect from millions and millions of datapoints around the world, and we finetune the algorithms and the science that goes into the pricing decisions.

320.    As discussed elsewhere, all three U.S.-based "charter clients for IDeaS G3 RMS"— Hilton, Extended Stay America, and Sonesta—helped IDeaS develop and refine the algorithm

powering this system. They knowingly did so by participating in exclusive pilot programs that involved each hotel company using the G3 RMS across its extended stay hotel branded properties while feeding G3 RMS their respective sensitive, non-public data. The G3 RMS, in turn, used this data to refine and improve the accuracy and reliability of the algorithm that would generate pricing and supply "decisions" for its clients, particularly these "charter clients" and the other Extended Stay Hotel Defendants that would later deploy the G3 RMS or G3 RMS-based in-house revenue management systems IDeaS developed for select companies.

321.    In other words, IDeaS collects and pools sensitive, nonpublic data that, absent coordinated behavior, the Extended Stay Hotel Defendants would not otherwise have access to in making pricing decisions. IDeaS pricing algorithms—and the pricing and occupancy decisions they generate—are a product of the data used for training and fine-tuning. The algorithms are calibrated to maximize a client's profits by analyzing historical data to recognize trends and patterns, and then encode the profit-maximizing response when it sees the same trends and patterns in real-time. The training and finetuning process for a machine learning algorithm like G3 RMS involves, among other things, checking its outputs for pricing and occupancy against recent historical data, determining which outputs for pricing or occupancy were not profit-maximizing, then "learning" from those mistakes, *i.e.*, recalibrating the weights of the algorithm to make the profit-maximizing pricing and occupancy decision going forward. Incorporating pools of nonpublic competitively sensitive data into this training and fine-tuning of its algorithms puts upward (and supracompetitive) pressure on G3 RMS's pricing "decisions." In doing so, IDeaS is substituting its software, powered and driven by machine learning and next-generation AI, for the smoke-filled rooms of yesteryear. Instead of exchanging competitive pricing data at secret in-person meetings, Extended Stay Hotel Defendants pool their competitive data through IDeaS RMS products, particularly the G3 RMS, and that competitive data

is translated into a common algorithmic formula that makes automated pricing and occupancy "decisions" for these Defendants.

322.    IDeaS executives and other senior employees have confirmed the use of sensitive competitor data in making pricing recommendations. In the April 24, 2024 *Hospitality Net* article "Wherever You Go, There is Artificial Intelligence," Klaus Kohlmayr commented:

> Calibrating the system to the unique nuances of the hospitality sector, G3 RMS incorporates comprehensive datasets, considering factors like special events, competitor pricing, days to arrival, and more.

"Implementing G3 RMS in tens of thousands of properties," Kohlayr continued, "facilitates continuous improvement. Human involvement is minimized, with the system autonomously selecting models and parameters based on continuous learning."

323.    Kohlmayr made similar points only a few months later in the August 8, 2024 *Lodging* article "Rigorous Revenue Management: AI Tech Tools Take Pricing and Forecasting Accuracy to the Next Level)," stating:

> Through the use of advanced demand forecasting methods that take in factors like the hotel's data, booking pace, guest segment price sensitivity, competitive data, market trends, and more, we're able to efficiently generate and distribute optimal prices by room type and/or market segment.

324.    An IDeaS piece titled "Lessons in Revenue: Modern Pricing Strategies" notes that "[o]nly a best-of-class RMS platform enables a truly dynamic, demand-based approach to pricing" by "offering features" including [d]ynamic competitive benchmarking, drawing from a broad array of competitors, channels, and pricing data to make rate decisions."

325.    Another IDeaS piece titled "Lessons in Revenue: Dynamic Demand Forecasting" states the following on the subject of "Competitive data," focusing on the G3 RMS's use of Demand 360 data and STR report data (both of which are discussed in detail further below).

> Although a competitor's retail price is used most frequently, there are other sources such as forward-looking segment performance by

Amadeus's Demand360 or even past performance benchmarking by STR. While competitive benchmarking data provided by STR reports may not be well suited for forecast models, displaying such data within the RMS can be a helpful pricing reference tool. Forward-looking market data, on the other hand, can help improve a forecast's robustness as it accounts for market-wide compressions or decompressions.

326.     In the July 19, 2023 *Lodging* article titled "Current Capabilities: IDeaS' Klaus Kohmayr on Helping Hoteliers Tell Their Data Stories," Kohlmayr discussed the "huge amount of data" flowing between IDeaS and its hotel clients' proprietary systems that enabled IDeaS to provide daily "pricing decisions" to these clients. After noting the G3 RMS's "incredible" power that allowed it to set separate best-available rates by room type and stay duration for its clients "scientifically," Kohlmayr referenced the type of data that IDeaS received and relied upon from its clients, including Extended Stay Hotel Defendants, in generating these pricing "decisions":

> The limits are legacy infrastructures, like legacy property management systems (PMS) or central reservation system (CRS) booking engines. And there are limits around the data you can send back and forth. We make 15 billion pricing decisions every day, and we have a commitment to send them to our hotels before 8:00 a.m. local time. We do that for 23,000 hotels. It's a huge amount of data that goes back and forth, and you have to continuously upgrade your tech stack and build capabilities in the backend to be able to do that at scale.

327.     A January 26, 2022 *Hotel Tech Report* article discussed, among other things, a feature of the G3 RMS that new hotels "[w]ithout any historical data" could use to "properly price[]" rooms. "The Limited Data Build feature," the article noted, "addresses this existential issue for new hotels" by "clon[ing] data from existing hotels with similar business mixes to provide baselines for demand and predicted guest behavior." The article also stated that one IDeaS client's new hotel brand's deployment of the G3 RMS at a new hotel "helped beat its ADR expectations by 15% in the first half year," while commenting on the Limited Data Build feature's use of "baseline data" not obtainable from "examining the public price points of other hotels."

328.    Certain Extended Stay Hotel Defendants also have conceded that they feed their contemporaneous confidential internal data to the G3 RMS.

329.    For example, Extended Stay America states that its hotels "feed" this "data" to IDeaS. The company's Premier Suites 2022 Franchise Disclosure Document ("FDD") stated that "ESA shall have the right to oversee and manage the installation and delivery of" revenue management services from IDeaS, and that "IDeaS will add the Hotel to the RMS environment and enable the data feed for RMS environment to the Hotel."

330.    Third-party marketing and advisory platforms that IDeaS and other vendors use to inform potential clients about their products also indicate that the G3 RMS receives, pools, and analyzes all its clients' non-public, internal current and future business data in making the pricing and supply "decisions" for each client.

331.    Capterra, a third-party marketing platform, notes on its website that the G3 RMS is "powered with forward market data and a hotel's own data."

332.    GetApp, a software buyer education platform, notes on its website that a "key benefit[]" of the IDeaS G3 Revenue Management System" is that it "[a]ccurately forecasts demand using advanced analytics that incorporate hotel, market, and competitor data."

333.    Property management systems installed directly into the proprietary computer systems of IDeaS clients like Extended Stay Hotel Defendants automatically send clients' non-public internal, contemporaneous business data to the G3 RMS and automatically receive and convey the G3 RMS' pricing and occupancy "decisions" to the same clients.

334.    Stayntouch PMS is one such property management system that IDeaS clients use. Stayntouch states that the G3 RMS receives, through the PMS installed on the hotel client's system, that client's "rates," "reservations," and "inventory" data "every 4 hours" "for the last 45 days and the

next 365 days." In turn, Stayntouch notes, the client's PMS receives from the G3 RMS and conveys to the client the "daily rate value recommendations (also known as decision files)."

335.    The following screenshot from the Stayntouch PMS website sets forth in greater detail the logistics behind this ongoing procedure:

IDeaS G3 is a Revenue Management System (RMS) that provides Stayntouch PMS daily rate value recommendations (also known as decision files).

The way this works is as follows:
- Stayntouch PMS sends real-time messages to IDeaS G3 for reservations, groups, rates, and inventory.
    - Every 4 hours, there is an "IDP" (intraday processing) message sent.
    - This message is an inventory and summary for the last 45 days and next 365 days.
    - This is sent every 4 hours after End of Day.
- IDeaS G3 then produces daily rate of the day recommendations along with Minimum Length of Stay for BAR and other rates.
- IDeaS G3 sends these messages to Stayntouch PMS for processing.

336.    Stayntouch has first-hand knowledge of how the G3 RMS interacts with IDeaS clients' internal property systems. IDeaS and Stayntouch have mutual hotel clients who use each of their systems in an integrated manner to operate their properties. Further, IDeaS and Stayntouch (as well as various other property management system vendors) have close business ties with each other. Indeed, Stayntouch, as well as other IDeaS technology partners like Amadeus and STR, have sponsored past IDeaS client summits, including the most recent Converge Hospitality Revenue Summit held in Miami on July 23–24, 2024.

337.    Host Hotel Systems' Hostpms, another property management system that IDeaS clients use, released an October 16, 2020 report on "recent accomplishments" by hotel companies and vendors that discussed the "Two-Way Data Integration" that "IDeaS" and "Host Hotel Systems Implement[ed]," including with respect to G3 RMS. The report stated that this "two-way data integration provides hotels with the most advanced science and automation to optimize the front- and back-office operations while maximizing revenue performance," while noting that "[t]he collaboration automates the seamless transfer of information between IDeaS' revenue management solutions and

Hostpms Property Management System (PMS)." "By streamlining the exchange of data between the

Hostpms PMS and IDeaS RMS and G3 RMS," the report added, "the integration transfers real-time

transactional data by room type to IDeaS, while automatically providing Host's PMS with IDeaS'

pricing and inventory controls." "Near-real-time updates," the report concluded, "provide hoteliers a

time-saving solution to reduce manual efforts while optimizing revenue."

338.    Other industry sources confirm that the G3 RMS receives and relies on its hotel clients'

confidential and comprehensive transactional datasets to generate each client's pricing and occupancy

"decisions."

339.    An September 3, 2019 article from industry publication *Skift* titled "Hoteliers Take a

Harder Look at How They Set Room Rates" discussed, among other things, why the type of data that

IDeaS has obtained from hotel clients for use in its revenue management software now "must" include

"full transactional data." Specifically, the article stated:

> In the late 1990s, IDeaS began building software for hotels. It found
> that hotel systems often couldn't share accurate transaction data with
> it. IDeaS created a workaround to extract insights about customers.
> But its forecasts suffered.
>
> "The design mistake sent us down a wrong path and cost us a few years
> of development time," said Ravi Mehrotra, president, founder, and
> chief scientist at IDeaS. IDeaS discovered it must insist on obtaining
> full transactional data. It also found it must clean up that data before
> using it.
>
> The lessons helped put IDeaS into a market-leading position today.
>
> "Everybody talks about machine learning, or operations research, or
> about general purpose models," Mehrotra said. "But model quality
> matters the most. How well you model hotel supply and demand is an
> issue I don't hear discussed."

340.    IDeaS executives have provided information and quotations over the years to *Skift* for

its use in articles relating to revenue management. One such executive who has repeatedly appeared

in these *Skift* articles is Klaus Kohlmayr. His Linkedin profile states that he has served as a contributor to *Skift* during his tenure as Chief Evangelist and Chief Development Officer.

341.    As addressed in the sections below, in addition to Extended Stay Hotel Defendants' current and non-public internal pricing and occupancy information, the G3 RMS incorporates, pools and uses other important internal datasets from all these clients in generating pricing and occupancy "decisions" for each client. The G3 RMS offers its clients the ability to plug in data from IDeaS' two market intelligence system "Integration Partners." This data is delivered under give-and-get arrangements, under which participating hotels share confidential nonpublic information with the respective Integration Partner and, in return, the hotels receive the same type of confidential, nonpublic information from their closest competitors. As set forth below, the G3 RMS incorporates this third-party data into its pooled dataset and algorithms, enabling Extended Stay Hotel Defendants to use the G3 RMS to generate supracompetitive pricing and occupancy "decisions" with this additional nonpublic, confidential data. These "Integration Partners"—Smith Travel Research and Amadeus Group—and the respective data they provide to clients—STR reports and Demand360—are addressed below.

> **4.    The G3 RMS Uses Extended Stay Hotel Defendants' STR Reporting Data, Which Incorporates Non-Public and Sensitive Competitor Data, to Generate Pricing and Occupancy "Decisions,"**

342.    Smith Travel Research Inc., commonly known as STR and owned by CoStar Group, Inc., is one of two IDeaS "Integration Partners" that provide data to the G3 RMS.

343.    An important "Market Intelligence and Forecasting" feature of the G3 RMS is its use of clients' STR benchmarking reporting data to generate pricing and occupancy "decisions."

344.    IDeaS executives confirm that STR data is incorporated into and used by the G3 RMS. For example, in IDeaS' Unconstrained Conversations podcast from March 25, 2021 titled "Checking the Pulse of Revenue Management," IDeaS Chief Evangelist and Chief Development Officer Klaus

Kohlmayr said that "we do incorporate a lot of future demand signals into our system, we work with companies like TravelClick for Demand360, we incorporate STR data for information purposes, so we have future-looking signals that help the system understand what's going on."

345.    Each Extended Stay Hotel Defendant subscribes to and receives benchmarking data reports from STR, and the G3 RMS receives and analyzes each Extended Stay Hotel Defendant's STR reporting data to generate the "decisions" for that Defendant.

346.    All Extended Stay Hotel Defendants have been clients of STR and received its benchmarking data reports at all times that they each have used the G3 RMS.

347.    STR "provide[s] benchmarking and analytics for the hospitality industry both on a subscription basis and an ad hoc basis," "earning revenue on ad hoc transactions as reports or data are delivered to the customer."

348.    "Hotel benchmarking is the process of comparing your property's or portfolio's performance against the competition, adding a layer of context to what success and failure looks like in your circumstances and environment," STR notes.

349.    Only hotel clients who submit data to STR can access its private benchmarking reports. These recurring reports digest, analyze, and summarize the same datasets from those clients and their closest competitors. This is a "give to get" arrangement in which clients' access to these benchmarking reports, commonly known within the industry as "STR reports" or "STAR reports," is conditioned on them providing the relevant data to STR.

350.    STR promotes that it "provide[s] data that is confidential, reliable, accurate and actionable, and [its] comprehensive reports empower [its] clients to strategize and compete within their markets."

351.    STR reports that clients like Extended Stay Hotel Defendants receive let them monitor key performance metrics of their closest competitors on a regular and near-contemporaneous basis.

352.    In STR's words, its reports "can help you answer questions such as:"

- "Am I ahead of the competition or can I make gains in occupancy and average daily rate?"

- "Was focusing on occupancy or rate the right strategy?"

- "What are the underlying factors behind changes in demand and rate? A shift in transient or group demand sources?"

- "Are my future bookings ahead or behind the market?"

"Benchmarking top-line historical performance, profitability data, and forward bookings—both yours and that of the competition," STR adds, "is the key to answering questions like these."

353.    STR subscribers like Extended Stay Hotel Defendants submit their "top-line historical metrics"—namely, "occupancy, average daily rate (ADR) and revenue per available room (RevPAR)"—to STR. STR digests these metrics and sends each subscriber a benchmarking report containing the same categories of aggregated and averaged data compiled from a set of competitors, or "Comp Set," that subscribers like Extended Stay Hotel Defendants hand-pick.

354.    STR reports and Comp Sets are discussed in greater detail immediately below.

355.    An STR report contains a "report card" that demonstrates a given subscriber's performance relative to other hotels in their Comp Set. Indices are used to evaluate performance based on occupancy, ADR, and RevPAR. According to STR, "[a]n index of 100 means a hotel is capturing a fair share," an index greater than 100 means that a hotel is capturing more than its "fair share," and an index below 100 shows that the hotel is capturing less than its "fair share."

356.    A Comp Set, as STR notes, "comprises a collection of hotels with which a property competes for business" and "are typically located in the same geographic area and offer similar services and amenities." A Comp Set can include as few as three competitors not affiliated with the given subscriber's hotel.

357.    STR advises subscribers like Extended Stay Hotel Defendants to choose hotels for their Comp Sets that are geographically proximate and offer comparable features and amenities. In particular, STR provides:

> When choosing a Comp Set for your property, we advise against merely opting for hotels 'across the street' from your subject property. Instead, you should carefully assess the features of hotels in your vicinity, including their class, room count, meeting space, and other relevant factors. This approach is essential as selecting hotels with performance levels significantly different from your own property may lead to misleading results.

"Having plenty of options for selecting your ideal Comp Set is key," STR notes before adding that "CoStar and STR provide those options through the world's largest hotel performance sample with more than 80,000 participating properties."

358.    "The data that powers Comp Sets is not generated through an algorithm." Instead, "the data is submitted directly by hotel chain headquarters, management companies, owners and properties" to STR.

359.    The STR reports that each Extended Stay Hotel Defendant receives thus include its Comp Set's average current ADR, RevPAR, and occupancy rates and average future occupancy levels.

360.    During an investor call, CoStar Chief Financial Officer Scott Wheeler said that "one of the biggest opportunities" arising from the STR acquisition was "moving [STR's] content into CoStar on an aggregated basis . . . so [customers] can see super-timely revenue and occupancy data." Wheeler added that "we see a lot of our customers buying that from STR."

361.    "[T]he significance of Comp Sets in a comprehensive benchmarking experience remains unwavering," STR notes. "By analyzing these properties in aggregate," subscribing hotels' "revenue managers" and "owners," among other "stakeholders," "can better understand market position and adjust strategies accordingly." Indeed, as STR tells existing and potential subscribers:

> Aggregated performance data for a selected set of your competitors is key to making the whole process work. Without a Comp Set, you are

left to compare your business against yourself and the market. While those comparisons are important, Comp Sets provide the most granular intel available in learning where you can improve the performance of your property or portfolio.

362.     The STR reports that Extended Stay Hotel Defendants receive and are integrated into the G3 RMS have furthered and reinforced Defendants' anticompetitive scheme.

363.     The G3 RMS utilizes the STR reporting data provided to it from all Extended Stay Hotel Defendants to help generate the pricing and occupancy "decisions" issued to each Extended Stay Hotel Defendant. As IDeaS notes, the G3 RMS uses "STR compset data to leverage in [its] yield strategy and decision making" for these Defendants.

364.     In addition, Extended Stay Hotel Defendants use STR report data to monitor each other's financial performance and confirm that they each are getting a "fair share" pursuant to the optimal pricing and occupancy "decisions" that the G3 RMS automatically sets for them and that they adopt as a matter of course. By regularly receiving this current, sensitive data through STR's G3 RMS integration, these Defendants are able to ensure and reinforce that they each are jointly adhering to their common plan of centralizing pricing and supply strategy and decision-making to a shared agent.

### 5.     The G3 RMS Uses Extended Stay Hotel Defendants' Demand360 Data, Which Incorporates Competitors' Non-Public Demand Forecasts, to Generate Pricing and Occupancy "Decisions."

365.     Amadeus Group ("Amadeus") is the other IDeaS "Integration Partner" that provides data to the G3 RMS.

366.     The other important "Market Intelligence and Forecasting" feature of the G3 RMS is its integration and use of clients' Demand360 data to generate pricing and occupancy "decisions."

367.     IDeaS executives confirm that Demand360 data is incorporated into and used by the G3 RMS. In the March 25, 2021 IDeaS' Unconstrained Conversations podcast noted above, IDeaS's Kohlmayr said that "we do incorporate a lot of future demand signals into our system, we work with

companies like TravelClick for Demand360, we incorporate STR data for information purposes, so we have future-looking signals that help the system understand what's going on."

368.    Most if not all Extended Stay Hotel Defendants subscribe to and receive Demand360 data from Amadeus, and the G3 RMS inputs and analyzes each relevant Extended Stay Hotel Defendant's the Demand360 data to generate the "decisions" for that Defendant.

369.    At least Hilton, Hyatt, Sonesta, and Wyndham are clients of Amadeus and receive Demand360 data. Hilton and Hyatt are "founding brand partners" of Demand360 and have received Demand360 data since its 2015 launch. Sonesta and Wyndham have been Amadeus clients and received Demand360 data since no later than 2022.

370.    Demand360 provides subscribers including the relevant Extended Stay Hotel Defendants with a rolling 12 months of forward-looking demand data of their competitors—yet another type of commercially sensitive data that non-coordinating competitors would not share with each other. According to Amadeus, its hotel clients "provide unique future-looking data into the Demand360 platform." "As the only competitive market intelligence product available to the hospitality industry with forward-looking reservation metrics and competitive share by segment and channel," the company adds, "Demand360 gives hoteliers a comprehensive picture of hotel demand over time so they can better optimize revenue management, distribution and marketing strategies."

371.    Subscribing to Demand360 is a "give to get" arrangement in which clients' access to Demand360 data is conditioned on them providing their own rolling 12 months of future demand data to Amadeus. Thus, Demand360 data, like STR data, is not available to non-clients.

372.    Demand360 enables hotel clients that submit their own private forward-looking demand data to choose a set of at least four competitors located in the same geographic area, or "competitive set," for which Demand360 continuously generates and sends these clients an aggregated and averaged 12-month picture of future market demand. As Maverick Mak, Vice President of

TravelClick, the company that founded and marketed Demand360 before Amadeus acquired it, stated, "in agreeing to offer their data," subscribers "will in return get the aggregated view with what is happening with their direct competitors."

373. Demand360 also provides clients with a "fair share" index score. As explained in a video titled "Best Practices in Demand360+" that Amadeus Director of Business Intelligence Success Management Deni Popluharova and Hyatt Revenue Management Performance Analytics Director Gabe Eveland co-presented, Demand360 features an Occupancy Index that shows when a client is receiving "more than fair share" and "less than fair share."

374. The G3 RMS has used Demand360 data since Fall 2016, when IDeaS and TravelClick began integrating Demand360 data into the G3 RMS for the companies' mutual clients. The G3 RMS uses Demand360 data—which itself consists of sensitive competitive demand forecasting based on the pooled non-public business data of the participating hotels' competitors—to generate automated pricing and occupancy decisions.

375. On September 28, 2016, IDeaS issued a press release titled "TravelClick's Demand360 enhances IDeaS advanced revenue management solutions, a first-of-its-kind integrated solution" to announce that the G3 RMS would "combine TravelClick's Demand 360 market intelligence product to further optimize hotels' pricing and revenue strategies."

376. "Integrated with IDeaS' industry-leading automated revenue management capabilities," IDeaS stated, "customers who subscribe to both IDeaS' advanced revenue management systems and Demand360 will be empowered by an even more robust demand forecast." Specifically, "TravelClick's Demand360 customers" were "now able to integrate their subscription data into IDeaS systems to allow forward-looking data that power revenue management strategies." This development, IDeaS noted, "mark[ed] the most advanced hotel analytics and demand intelligence integration currently available in the market."

377.    In the release, IDeaS explained the genesis and results of its TravelClick partnership. "Initially announced as a joint research and development project in 2015, the initiative represents the latest innovation for long-time partners, TravelClick and IDeaS." IDeaS noted that this "integration combines the competitive market intelligence of TravelClick's Demand360 with the world's most advanced automated revenue management solutions to provide" hotel clients "with a deeper understanding of a property's market position and business potential." IDeaS added that "Demand360 is the only competitive market intelligence product available to the hospitality industry that provides forward-looking reservation metrics and competitive share by segment and channel," and therefore, the G3 RMS would be even better able to assess and react to "changes" in clients' "competitive environments and markets" by "leveraging [this] future booking data."

378.    IDeaS' press release also featured quotes from each company. "Demand360's future occupancy and revenue metrics drive RevPAR strategies for brands, groups and independents around the globe," said TravelClick Senior Vice President for Business Intelligence Products Greg Sheppard. Referencing a client base that included most Extended Stay Hotel Defendants, Sheppard noted that "Demand360 gives customers a comprehensive view of the competitiveness in their market." He also stated that "by integrating the power of Demand360 data directly into IDeaS solutions, our mutual customers will be able to further leverage this data with enhanced forecasting algorithms to optimize their competitive position like never before."

379.    IDeaS Chief Operating Officer Sanjay Nagalia commented that as "the leader in revenue management," his company was "continually seeking innovative ways to provide customers with tools that enhance their revenue strategy." IDeaS' integration of "demand intelligence like TravelClick Demand360," he noted, "does just that." Nagalia added that the G3 RMS "automatically implements and capitalizes on" the "revenue opportunities" provided from the Demand360 data.

380.    The press release further noted the integration's proven ability to bring results. "The research and development project" that IDeaS and TravelClick executed before releasing the integration to the industry "demonstrated that the insertion of demand intelligence data notably improved the demand forecast and uplift for hotels."

381.    On July 12, 2017, TravelClick issued a press release announcing a "re-launch" of Demand360 called Demand360 Quick View that enabled its hotel clients to "driv[e] outcomes" by more efficiently identifying "the most actionable data." All original version Demand360 clients also would be able to use Demand360 Quick View.

382.    The release described what Demand360 Quick View offered to clients—and thus to the G3 RMS which those clients used and fed Demand360 data to set guest room rates:

> Upon logging in, hoteliers can instantly see their revenue per available room (RevPAR) rank compared to their competitive sets looking forward 30 and 90 days. This tells them how they are performing in the future – a metric no other platform can offer.

383.    "Demand360 has seen incredible adoption and utilization by our customers globally," said TravelClick Senior Vice President for Business Intelligence Greg Sheppard, "and the future-looking competitive demand data that we supply is essential to a hotel's revenue management strategy, revolutionizing how hoteliers run their businesses."

384.    After the July 2017 "re-launch," Demand360 provided hotel clients with continuously refreshed future demand data through advance booking data that they submitted to the platform.

385.    On December 14, 2017, IDeaS and TravelClick announced an "expanded partnership" relating to Demand360 with "advanced integration" capabilities.

386.    In a joint press release, the two companies discussed a new "integration between TravelClick's iHotelier Central Reservations System (CRS), as well as Demand360, and the IDeaS G3 Revenue Management System." The companies noted that this integration would "allow IDeaS customers to drastically reduce manual operations, receive real-time updates, and optimize their

pricing strategy against competitors by utilizing exclusive future-looking market data." Further, the the release stated that the integration would "enable[] the efficient distribution of data-driven decisions, like pricing and inventory management, to maximize profitability for hotels."

387.    IDeaS and TravelClick personnel discussed how this development benefitted their hospitality clients. "Hotels can effortlessly deploy analytically determined pricing and inventory controls for specific room types and rate plans across their distribution networks and reach guests globally through" this integration," said IDeaS Vice President of Product Strategy Mike Chuma.

388.    "The IDeaS G3 RMS integration enhances TravelClick's suite of solutions by providing hotels with the unique opportunity to own pricing decisions and revenue management strategies from a central location," added TravelClick Vice President of Reservations Solutions and Global Connectivity Matt Vice. "This advanced method for hotels to manage their revenue strategy with future-looking demand data is revolutionizing the hotel industry," Vice added, "with both TravelClick and our partner, IDeaS, leading the charge."

389.    In October 2018, Amadeus acquired TravelClick and its suite of business intelligence products including Demand360.

390.    Following the acquisition, Amadeus discussed the revenue-maximizing benefits of its newly acquired product in a marketing document titled "Five Ways Forward-Looking Data Can Boost Your Hotel's Revenue." In particular, Amadeus stated that "[t]he best performing hotels have mastered the use of forward-looking demand data to make more informed decisions that maximize their revenues and help them earn their fair share of bookings," while adding that "[h]oteliers that use this powerful information understand that educated guesswork has been replaced by real, hard data from actual future bookings in their market."

391.    Nearly four years later, on September 23, 2021, IDeaS issued a press release in which it reminded the hospitality industry that "[t]he combined power of IDeaS and Amadeus' technology

solutions deliver accessible, actionable data insights via seamless integrations to help hoteliers recover stronger and grow revenue faster."

392.    Under the heading "Maximizing RevPAR," the release stated that "IDeaS G3 RMS integrates with Amadeus' Demand360 to maximize RevPAR with insights into historical and forward-looking groups and transient on-the-books performance compared to a hotel's competitive set."

393.    The release also quoted IDeaS Chief Evangelist and Chief Development Officer Klaus Kohlmayr, who stated that "[g]lobal data silos must break down for hoteliers to achieve a more complete picture of their commercial revenue opportunities," and that "the data integrations between IDeaS and Amadeus drive a brighter, more connected future for the hospitality industry[.]"

394.    The Demand360 data that most Extended Stay Hotel Defendants receive and are integrated into the G3 RMS has furthered and reinforced Defendants' anticompetitive scheme.

395.    The G3 RMS utilizes Demand360 data to generate the pricing and occupancy "decisions" it issues to each Extended Stay Hotel Defendant.

396.    In addition, the relevant Extended Stay Hotel Defendants can use Demand360 data to monitor their competitive sets' forward-looking aggregate demand data to confirm they each are getting their "fair shares" pursuant to their common anticompetitive plan.

397.    Even if a given Extended Stay Hotel Defendant has not integrated Demand360 data into the G3 RMS, that Defendant still would benefit from this integration because the "comprehensive database" from which the G3 RMS draws and learns in generating optimal "decisions" for each Extended Stay Hotel Defendant includes the Demand360 data obtained from their co-Defendants.

### 6. The G3 RMS Applies "Groundbreaking" AI to "Comprehensive Datasets" to Reach "Optimal Results" for Extended Stay Hotel Defendants.

398.    The G3 RMS has "revolutionized" revenue management by autonomously applying artificial intelligence to "comprehensive datasets" to produce "proven" "optimal results" that maximize revenue and profits for clients, including Extended Stay Hotel Defendants.

399.    One article about the G3 RMS highlights its "machine learning data driven approach to analytics." The artificial intelligence underlying the product is "automated to continually learn and adapt to how pricing and control impact the booking pattern and demand to improve outputs" and "automatically weights the true influence of competitors pricing and reputation." As a result, the G3 RMS "ensure[s] hotels can capture the most optimal mix of demand by segment, room type and length of stay."

400.    An April 24, 2024 article by IDeaS Chief Evangelist and Development Officer Klaus Kohlmayr titled "Wherever You Go, There is Artificial Intelligence" that was posted on various hospitality industry-focused websites, including *Hospitality Net* and the Hospitality Financial and Technology Professionals' website, "addresse[d] how systems such as IDeaS' G3 Revenue Management System (RMS) leverage AI."

401.    In the article, Kohlmayr wrote that "an advanced RMS" like the G3 RMS "absolutely fits the definition of an AI application" because it is "an integrated system using various analytics techniques to perform tasks that otherwise require human thinking and produce highly complex decisions." Kohlmayr noted that the G3 RMS's "core analytics have used a wide variety of analytic tools associated with AI" that comprise the "revenue science" that IDeaS espouses. Indeed, AI has been an important part of "the discipline of infusing sophisticated mathematics with industry expertise to transform data into accurate, automated, and actionable revenue-enhancing decisions."

402.    Kohlmayr then discussed "the revenue science behind the G3 RMS:"

> Since its inception, G3 RMS has revolutionized conventional revenue optimization, pushing beyond the limitations of simplistic algorithms. While other systems offer data-driven, dynamic pricing, G3 RMS distinguishes itself by delving deeper, incorporating a holistic suite of controls essential for optimizing diverse business models.
>
> The proven success of G3 RMS hinges on its ability to adapt to real-world business complexities without requiring manual intervention. The development teams at IDeaS created a system that could not only withstand the intricacies of the hospitality business but also deliver

statistically proven results. Their mission was clear: to achieve complete automation, eliminate user error, and create a framework where the RMS could dynamically respond to changing conditions.

Calibrating the system to the unique nuances of the hospitality sector, G3 RMS incorporates comprehensive datasets, considering factors like special events, competitor pricing, days to arrival, and more. Unlike many solutions with simplified forecasting approaches, IDeaS leverages more than 100 models tailored to different hotel business models, ensuring a nuanced understanding of various scenarios. . . .

Implementing G3 RMS in tens of thousands of properties facilitates continuous improvement. Human involvement is minimized, with the system autonomously selecting models and parameters based on continuous learning.

The AI in G3 RMS ensures it adapts and adjusts models to produce optimal results, with advanced analytics providing data-backed decision-making at every level. This level of autonomy extends to optimizing pricing for all key products and each length of stay and creating dynamic-rate restrictions that surpass simple business rules.

403.    By "leveraging advanced analytics through AI and Machine Learning," Kohlmayr added, the "forward-thinking" G3 RMS can "produce more accurate data analysis" that "leads to rational decision-making" and "sets the stage for a transformative era in the hospitality industry." "It's an exciting time" for IDeaS "to be at the forefront of revenue science," he concluded, "providing our users with more confidence in the system's decisions[.]"

404.    An article by IDeaS Director of Product Management and Solution Success Stephen Hambleton titled "The Science Behind G3 RMS" is published on the company's website. In the article, Hambleton "opens the hood of the industry's leading revenue science engine" to describe the pivotal role that its "groundbreaking artificial intelligence" and "predictive analytics" play in producing its pricing "decisions" and optimizing clients' revenue.

405.    Hambleton began the article by noting that "IDeaS set out to build G3 Revenue Management System (RMS) with a vision to reinvent what's possible for revenue technology." While "[o]ther systems may do a decent job enabling data-driven, dynamic pricing," he noted, "they don't

go that extra mile" because they "are limited by overly simplified assumptions about how the world works and neglect the full suite of controls needed to optimize business." Because these other systems' "statistical approach and data sources just aren't robust enough," "there will always be circumstances that require manual intervention or money left on the table."

406.    "For IDeaS to stand behind a novel solution," Hambleton continued, "we challenged ourselves to build something that could account for real-world business realities without requiring hands-on attention at each property. Results had to be statistically proven, backed by research, statistical simulation and peer review from academia." "Full automation," the "clear mission" of the G3 RMS, "eliminates the possibility for user error, creates a framework where our RMS can react as conditions change, and limits the need for human resource consumption."

407.    Key to the G3 RMS' success, Hambleton recognized, was "accounting for the unique nature of the hospitality business, based on decades of field research and operational understanding:"

> We calibrated the system to incorporate comprehensive datasets and account for limited volumes of data, enabling it to create a more complete picture of unconstrained demand and market conditions, while considering a full range of key factors, such as special events, competitor pricing, days to arrival, and many more.

He then stated that "IDeaS' proven approach folds all key data sources directly into optimization (competitor pricing, for example, is accounted for in optimization, as opposed to applying it simply as pricing rules after the RMS sets a price), optimizes all room types optimally, and avoids rules in doing so," "as opposed to simpler" and less reliable "deterministic approaches that assume the demand forecast and other calibrations and assumptions are perfect." "The results of these efforts" have "empower[ed] hoteliers to optimize pricing and forecasting outcomes like never before[.]"

408.    "[B]ut IDeaS' development process didn't end with creating the most complex, holistic, research-based algorithm we could," Hambleton continued. IDeaS' "work was then subjected to multiple rounds of unbiased peer review," turning to "hospitality industry experts and, importantly,

academia to validate our approach and ensure the system was well-primed to adapt to uncertainty and produce consistently beneficial results." After major universities "had signed off, we moved onto a rigorous testing phase," which "necessitated another development project of its own."

409.    In the testing phase, IDeaS "created custom-built simulation tools we could use to stress-test the system and ensure it would react appropriately to real-world data, and that it would deliver results over other best-in-class revenue technology." Notably, IDeaS continued this practice "through real installations and reviewed results against many other solutions." "Finally," Hambleton stated, "we conducted live pilot tests in controlled, statistically matched properties to confirm outcomes would benefit our clients," undoubtedly referencing IDeaS' pilot programs with Hilton, Extended Stay America, and Sonesta.

410.    "After years of scientific scrutiny and engineering perfectionism," Hambleton wrote, "G3 RMS was launched," and "it only gets better with age." He then explained why:

> This is because it's now been implemented at tens of thousands of properties, and we can use the data collected to constantly improve the algorithms, ensuring the forecasting approaches assigned by our system automatically benefit the property by producing the best match to the data conditions observed and that the system responds as conditions change.

Furthermore, IDeaS' "team of data scientists—including more than 25 PhDs—continuously works to improve the forecasting and optimization processes, and we create tools and verify the properties that show any sign of underperformance."

411.    Turning to the AI powering the G3 RMS, Hambleton stated that the G3 RMS "is always working to improve upon itself, regularly recalibrating and adjusting, without human intervention." Specifically:

> The groundbreaking artificial intelligence in G3 RMS allows each implementation to autocorrect, individually, as needed and continuously learn about the property at which it's installed (and how its controls are impacting in the market it is supporting), applying and adjusting models to produce the best results. Humans needn't be

> involved in deciding which models and parameters are selected or how data is incorporated. These are areas a well-designed solution will always perform best, and it's these automated processes, combined with performance simulations and academic research (not forgetting peer review), that give our users more confidence in the system's decisions and more time back in their day—and drive more profit for their hotels.

Indeed, the author continued, "IDeaS' advanced analytics allow for data to back up each level of decision-making so the system is never left to make assumptions about things that can greatly impact potential revenue opportunities" like "competitor impacts."

412.    Hambleton also expressly noted the G3 RMS' particular applicability and suitability to the extended stay hotel market, commenting that IDeaS was "excited" to bring "enhanced approaches to pricing for longer stay business."

413.    Hambleton ended by noting IDeaS' responsibility for "the success of [its] clients" like Extended Stay Hotel Defendants and why its "solutions" like the G3 RMS "certainly don't leave anything to chance:"

> We are responsible for the performance of our solutions and, ultimately, the success of our clients. That's why we don't cut corners, and we certainly don't leave anything to chance or human intuition— no offense, humans. Because of these guiding principles, an IDeaS RMS is future-proof, fully automated, and truly science-backed. And even if all of that still isn't convincing enough for you, the real proof is in the ROI.

414.    Pricing Algorithm Defendants have continued to enhance the G3 RMS' underlying AI to produce the most optimal "decisions" possible for Extended Stay Hotel Defendants.

415.    In mid-2018, IDeaS "introduce[d] agile rates, a fundamental change in pricing strategy designed to incorporate flexibility and simplicity into a hotel's revenue-productivity engine."

416.    A June 12, 2018 IDeaS press release announced that this G3 RMS feature would "provide the ability to price and distribute key linked or independent products for the wider market or specific guest microsegments."

417.    The release described what "agile rates" meant and why it mattered to clients like Extended Stay Hotel Defendants. "Pricing products independently is not a new concept, but revenue leaders have been forced into rigid pricing structures and rules-based tactics," IDeaS COO Sanjay Nagalia said. "Agile rates breaks free from those limitations, allowing hotels to manage their business as needed, using multiproduct optimization to jointly maximize both independent and linked products."

418.    What allowed IDeaS, to "break free" from these previously existing "rules-based" "limitations," the release stated, was its revolutionary AI:

> Powered by sophisticated artificial intelligence capabilities, agile rates provides IDeaS G3 RMS with visibility into a hotel's rate strategy—understanding the relationships between products, which results in dramatically smarter pricing decisions and ultimately greater revenues.

419.    The G3 RMS' "visibility" into a "hotel's rate strategy" to generate optimal pricing "decisions" for the hotel on a room-by-room basis necessitates access to and analysis of that hotel's internal pricing and occupancy data.

420.    On June 12, 2018, IDeaS also released a promotional video titled "Hotel Pricing Strategies & Models, Reinvented" to promote "game-changing" improvements to the G3 RMS.

421.    In the video's introduction, existing and potential hotel clients were told to "[a]void pricing uncertainty by using IDeaS hotel pricing strategies, a game-changing mix of analytics, intelligent pricing, and automated decisions." "Only IDeaS," viewers were advised, "automatically folds a wealth of vital data directly into a powerful analytics engine, giving you multi-dimensional insights into your business for yesterday, today, and into the future."

422.    "Meanwhile," the video continued, "powerful analytics recognize the relationship between all rates and segments. This is deep machine learning. It breaks the rules, and we've perfected it." "With an unparalleled understanding of demand," the video went on, "you know exactly when

and how to price appropriately and maintain the most profitable business mix." The video then displayed the following explanatory graphic:



423.    "Drawing on the power of analytics, intelligent pricing, and automated decisions," the video concluded, "your products will withstand the forces of uncertainty, producing incremental revenue like never before no matter where you are on your revenue productivity journey."

424.    Finally, IDeaS launched the G3 RMS's automated configuration feature in 2023. "By leveraging data science," IDeaS developed this feature "to help its clients realize returns on their technology investment almost immediately." "By reducing the amount of manual setup and training required," the G3 RMS's automated configuration feature enables clients to "gain confidence in system settings and decisions by replacing guesswork with optimal settings based on science, and achieve a faster ROI with a system that delivers revenue-enhancing decisions from day one."

**E.    Defendants Form and Operate an Anticompetitive Scheme Based on Their Coordinated Use of the G3 RMS to Set Guest Room Rates and Occupancy Levels.**

425.    Defendants have formed and operated an anticompetitive scheme centered on Extended Stay Hotel Defendants' knowing collective use of the G3 RMS to set their extended stay hotel guest room rental rates and occupancy levels across the nation including the Relevant Markets.

426.    Defendants' anticompetitive scheme has been implemented, maintained, and enforced through high-ranking IDeaS and SAS personnel and Extended Stay Hotel Defendants' executives, managers, and employees responsible for revenue management, including the individuals specifically identified in this Complaint and those whose identities will be revealed during pre-trial discovery in this case.

427.    In early 2012, Pricing Algorithm Defendants and Hilton began an exclusive year-long pilot program for the G3 RMS that they publicly would reveal only a year later. Under this program, Hilton, in close collaboration with Pricing Algorithm Defendants, would pilot the G3 RMS at certain of its portfolio's branded properties, including at both of its extended stay hotels. This pilot program was a success for both parties and, together with the largely contemporaneous pilot programs for two other Extended Stay Hotel Defendants discussed below, helped launch Defendants' anticompetitive scheme. The Hilton program gave IDeaS the opportunity to promote its next-generation product to a highly valued and strategically significant client whose actions other Extended Stay Hotel Defendants monitored and followed.

428.    In early 2013, Hilton began deploying the G3 RMS across its entire portfolio. Around the same period, yet unbeknownst to the broader industry at the time, Extended Stay America and Sonesta also were exploring the piloting and eventual deployment of the G3 RMS at their respective extended stay hotels. In early 2014, IDeaS and Extended Stay America announced that the latter would deploy the G3 RMS starting later than year. And in early 2015, IDeaS and Sonesta announced that Sonesta had begun deploying the G3 RMS across its entire portfolio the prior year. Thus, Extended Stay America and Sonesta both deployed the G3 RMS at their respective extended stay hotels at the same time, and almost immediately after Hilton had done the same.

429.    According to IDeaS, these three Extended Stay Hotel Defendants—Hilton, Extended Stay America, and Sonesta—constituted three of the four "charter clients for IDeaS G3 RMS."

Moreover, these Defendants were the only G3 RMS "charter clients" based or operating in the U.S., and they all had extended stay hotel brands that represented a significant part of their business. Additionally, IDeaS touted these "major partnerships" as critical to promoting the G3 RMS's development and broader release.

430.    Not too long after the "charter client" group of Extended Stay Hotel Defendants deployed the G3 RMS and saw their room rates and revenues markedly increase just as Pricing Algorithm Defendants had promised, the remaining Extended Stay Hotel Defendants signed their own contracts to use the G3 RMS and knowingly joined the scheme.

431.    Between 2021 and 2022, Choice, Wyndham, and Hyatt each deployed the G3 RMS, a closely related IDeaS-developed in-house RMS, or both. Specifically, Wyndham deployed the G3 RMS and RevIQ (an IDeaS-developed in-house revenue management system based on the G3 RMS), Choice deployed ChoiceMAX (another IDeaS-developed in-house revenue management system based on the G3 RMS), and Hyatt deployed the G3 RMS (and the rest of IDeaS' product suite). In doing so, each of these hotel companies issued coordinated press releases with IDeaS announcing these developments to existing Extended Stay Hotel Defendants and other actual and potential co-conpsirators.

432.    Defendants' conduct constitutes a common plan and course of conduct whose purpose and effect has been to generate supra-competitive guest room rates and artificially suppressed occupancy levels at their extended stay hotels across the nation and in the Relevant Markets during the class period.

### 1. Pricing Algorithm Defendants and Hilton Conduct an Exclusive Pilot Program in 2012, and Hilton Implements the G3 RMS in 2013 and 2014.

433.    In early 2012, Pricing Algorithm Defendants and Hilton began an exclusive year-long pilot program that would serve as the foundation for Defendants' anticompetitive scheme, laying the groundwork for additional Extended Stay Hotels' entry into the common plan and course of conduct.

434.    In this exclusive pilot program, long-time IDEaS client Hilton tested the new G3 RMS across a portion of its portfolio, including its extended stay hotels, in a real-world setting and in close collaboration with Pricing Algorithm Defendants.

435.    In mid-2013, IDeaS and Hilton jointly announced the results of the pilot program, Hilton's ongoing adoption of the G3 RMS across its portfolio, and the product's broader imminent availability to other hospitality industry clients.

436.    On June 24, 2013, IDeaS and Hilton issued a joint press release titled "Hilton Worldwide Partners with IDeaS on Global Revenue Initiative" that began with the headline "IDeaS' G3 RMS is in limited availability status now and is scheduled for general availability in 2014."

437.    In the press release, IDeaS and Hilton began by "announc[ing] their agreement to continue to deploy IDeaS G3 Revenue Management System (G3 RMS)" across "focused-service hotels within Hilton Worldwide's global portfolio of brands," including "Homewood Suites and Home2 Suites." The release then explained what the G3 RMS was while discussing the pilot program and development partnership that led to this announcement:

> Building on a year-long pilot program, the agreement supports Hilton Worldwide's Global Revenue Optimization (GRO) initiative, which is designed to help hotel owners better manage room availability and pricing in order to maximize each hotel's revenue and profitability. This agreement marks a significant expansion in the 15-year relationship between Hilton Worldwide and IDeaS.

> The G3 RMS, which will be integrated with existing systems to ensure seamless operation, will track and analyze historical and current business performance to support revenue optimization company-wide. It will also deliver invaluable data and provide a standard base upon which Hilton Worldwide can build future analytical applications.

> The system was initially deployed to hotels at a number of brands within the Hilton Worldwide portfolio, including Hampton Hotels, Hilton Garden Inn, Homewood Suites and Home2 Suites, starting January 2013. With over 250 properties now live on the solution, Hilton Worldwide plans to complete deployment to the focused service estate by Summer 2014.

The development partnership between Hilton Worldwide, IDeaS and IDeaS' parent company, SAS, has been critical to the success of the G3 RMS. In 2012, IDeaS and Hilton Worldwide completed a successful G3 RMS pilot program, which validated the business impact of the system in a live hospitality environment and served as a proving ground for the system's e-learning capabilities. Moreover, the G3 RMS solution builds on IDeaS' more than 20 years of industry experience of providing revenue solutions to over 2,400 hotels from more than 70 brands.

438. Featuring quotes from key employees of Hilton, IDeaS, and SAS, the release signaled that the G3 RMS would enable "IDeaS clients and other leading brands" following in the footsteps of Hilton, the "industry leader in revenue management," to achieve "enhanced revenue performance" by taking the "guesswork" out of "pricing." In particular, the release stated:

'Hilton Worldwide is committed to becoming the industry leader in revenue management,' said Chris Silcock, global head, revenue management, online and regional marketing, Hilton Worldwide. 'Through the G3 revenue management system and other cutting-edge analytics, we are taking the guesswork out of revenue management and pricing. And by helping our hotel operators and owners make better-informed revenue management decisions, we are positioning both our company and our franchisees for long-term financial success.'

'IDeaS and SAS are proud to partner with Hilton Worldwide to bring innovations in pricing to the hospitality industry,' said Brian Sterrett, vice president of global sales and marketing, IDeaS. 'This announcement is an important milestone in bringing our next-generation G3 RMS to IDeaS clients and other leading brands pursuing enhanced revenue performance.'

'The teams at SAS and IDeaS have done a terrific job bringing a sophisticated but accessible pricing solution to the hospitality marketplace,' said Dr. Radhika Kulkarni, vice president of advanced analytics, R&D, SAS. 'Our most recent collaboration with IDeaS on G3 RMS takes the science of revenue management to new heights within hospitality and serves as a sign to the industry of exciting innovations to come from IDeaS and SAS.'

439. Remarking on the impact the G3 RMS has had on Hilton's bottom line, the company's CFO praised IDeaS when describing its revenue management system's "special sauce."

440.    IDeaS' G3 RMS product brochure displays the following representative list of hotel customers including Hilton:



441.    The "Extended Stay & Serviced Apartments" page on IDeaS' website shows the following partial list of extended stay hotel customers including Hilton's Homewood Suites and Home2 Suites:



442.    Pursuant to Hilton's Homewood Suites 2024 Franchise Disclosure Document, franchisees must use IDeaS's revenue management software. Indeed, they must install Hilton's "required Global Revenue Optimization ('GRO') system," which "is an online application that utilizes third-party software" and "is based on a solution provided by Integrated Decisions and Systems, Inc. ('IDeaS')" "to provide pricing recommendations for [franchisees' hotels] based on robust data analytics and forecasting." IDeaS "provides maintenance and customer support services for the application" and updates and centrally maintains the system. "There are no other approved vendors at this time." Hilton's Home2Suites 2024 Franchise Disclosure Document contains the same requirements.

443.     Various public sources confirm that Hilton's GRO system uses the G3 RMS as a stand-alone product. For example, source is the Hilton-IDeaS June 2013 press release discussed above. Another source consists of multiple Hilton revenue managers' LinkedIn pages. For example, the LinkedIn page of Stewart Brown, who had the title of Revenue Management Analyst – GRO Support from early 2019 to mid-2022, states that he was a "[s]ubject matter expert of IDeaS SAS/Hilton's G3 (GRO) Revenue Management System," "assist[ed] hotels with inquiries regarding G3," and helped "the Implementation Team in the rollout of G3's Continuous Pricing model to non-Americas hotels."

444.     Hilton has continued to use the G3 RMS to set room rates and occupancy levels at its extended stay hotels across the nation and in the Relevant Markets.

445.     Pursuant to Defendants' anticompetitive scheme, a critical mass of Hilton's extended stay hotel competitors soon would adopt the G3 RMS to set guest room rates and occupancy levels at their extended stay hotels across the nation and in the Relevant Markets.

### 2. Extended Stay America and Sonesta Implement the G3 RMS in 2014 and 2015.

446.     **Extended Stay America.** Starting in the third quarter of 2014, Extended Stay America and its extended stay hotel brands began using the G3 GMS to set guest room rates. This implementation followed a selection process that began the prior year. By late 2015, the company had phased in most of the functionality for the G3 RMS across its entire hotel portfolio, and it finished the rolling out by the first quarter of 2016.

447.     Before Extended Stay America began deploying the G3 RMS, it promoted this partnership with IDeaS on June 23, 2014, in parallel press releases issued that bore various similarities to the prior IDeas-Hilton press release.

448.     The IDeaS press release highlighted a "Major Partnership" with "[r]evenue management leader" Extended Stay America. In particular, "IDeaS Revenue Solutions, the leading

provider of pricing and revenue management software, services and consulting," "unveiled a major revenue management initiative with Extended Stay America, the largest owner/operated hotel chain in North America, with plans to deploy IDeaS G3 Revenue Management System (RMS) across the entire estate of nearly 700 hotels and more than 76,000 rooms by year-end."

449.    The IDeaS release noted that Extended Stay America "will leverage IDeaS' powerful pricing and forecasting capabilities across all market segments and stay patterns, optimizing revenues estate-wide." The release further commented that "Extended Stay America's implementation of IDeaS G3 RMS is expected to begin initial piloting at the end of the third quarter."

450.    The IDeaS release emphasized the critical role that SAS played in product development and operation. "IDeaS G3 RMS," the release stated, "is a fully integrated revenue management solution built upon IDeaS' 25 years of industry expertise and powered by advanced SAS analytics."

451.    The IDeaS release concluded by telling its audience of existing and potential hotel clients to "Tweet this news to your networks" and adding a link to the Extended Stay America press release that contained "more information about the partnership."

452.    In the press release titled "Extended Stay America Announces Partner for Revenue Management System," Extended Stay America announced its "selection of IDeaS Revenue Solutions as the provider for a new Revenue Management System (RMS)" called "G3 RMS." The company promoted the product using the same language from IDeaS' own release, noting that "IDeaS G3 RMS is a fully integrated revenue management solution, built upon IDeaS' 25 years of industry expertise and powered by advanced SAS analytics." The company also stated that it "will use IDeaS' powerful forecasting and pricing capabilities to optimize revenues across all market segments and stay patterns."

453.    Extended Stay America Chief Marketing Officer Tom Seddon gave the same quote in this release as featured in the IDeaS release, stating that "[w]e expect to begin initial piloting at the end

of the third quarter" and "intend to take a phased approach to deploying this across the system geographically, as well as phasing in elements of functionality, so we anticipate the full capabilities and benefits will be realized in 2015 and beyond."

454.    IDeaS' Sterrett echoed the sentiments made in his company's release while giving additional commentary on what Extended Stay America should expect to see from adopting the G3 RMS. "IDeaS has a proven record of successfully managing large-scale deployments, and we're thrilled to partner with a category leader like Extended Stay America today and in the future," said Sterrett. "By integrating our end-to-end Revenue Management System, we're confident Extended Stay America will benefit from IDeaS' market-leading technology."

455.    In a Form 10-K for 2015 filed with the U.S. Securities and Exchange Commission in early 2016, Extended Stay America discussed the timing and scope of its new "automated revenue management system." The company also noted that the G3 RMS "allows us to automatically price against demand from our short and long-term guests" and "will further improve our sales team's efficiency and effectiveness."

456.    In a "Success Story" video posted on IDeaS' website in 2016, Tom Buoy, Extended Stay America's Executive Vice President for Pricing and Revenue Management (August 2011-September 2016), Executive Vice President for Marketing and Revenue Management (September 2016-October 2017), and Executive Vice President for Revenue (October 2017-March 2020), discussed his company's adoption of the G3 RMS.

457.    After noting that "Extended Stay America is the dominant provider, the category leader, in the mid-scale extended stay hotel segment," Buoy discussed "the challenge" that Extended Stay America had faced with revenue management and "the change" it made as a result. "So in revenue management," he said, "it's really about speed to value, try to send size and shape demand to maximize our profitability. As you can imagine, managing 629 hotels in 44 states, it becomes a daunting task

when you don't have a dedicated revenue manager per site." "So we need a system to improve our forecasting capability," he added. "Forecasting extended stay business is challenging. Forecasting intentions complicates that process." Thus, Buoy noted, "we just needed this automated solution that enabled us not only to do that well, but then to deliver our decisions back into our environment as quickly as possible." "As we decided to transform our revenue management practices," he added, "our managers went from being descriptive, able to describe our occupancy and rate and BAR for last night, but then became more predictive or more importantly prescriptive."

458.    On his LinkedIn page, Buoy confirmed that G3 RMS had significantly impacted Extended Stay America's financial performance. As EVP for Pricing and Revenue Management, he "[t]ransformed ESA's Pricing and Revenue Management practices over a 5-year period, culminating in the deployment and customization of IDEAS/SAS's G3 Next Generation Revenue Management System, which captured an incremental 2% - 3% increase in revenues per annum." And "[s]ince 2011," he "le[]d the team that increased RGI in 7 of the last 8 years, while driving occupancy, ADR, and RevPAR to highest levels in company's 25-year history."

459.    Extended Stay America Suites' 2020 Franchise Disclosure Document states that franchisees "must use" Extended Stay America's "approved revenue management system ('RMS') that will enable [the franchisee] to predict customer demand and optimize inventory and price availability." Extended Stay America has "one approved source of revenue management software"—IDeaS. Indeed, franchisees must sign a hotel technology agreement with Extended Stay America, which provides that "ESA shall have the right to oversee and manage the installation and delivery of" the IDeaS RMS, which "will add the Hotel to the RMS environment and enable the data feed for RMS environment to the Hotel." Extended Stay America Select Suites' 2024 Franchise Disclosure Document contains similar provisions. Likewise, Extended Stay America Premier Suites' 2023 Franchise Disclosure Document states that "ESA shall have the right to oversee and manage the

installation and delivery of" specified technology services from certain vendors including IDeaS, and that "IDeaS will add the Hotel to the RMS environment and enable the data feed for RMS environment to the Hotel."

460.    IDeaS' G3 RMS product brochure displays the following partial customer list that includes Extended Stay America:



461.    The "Extended Stay & Serviced Apartments" page on IDeaS' website also shows the following partial list of extended stay hotel customers that includes Extended Stay America:



462.    Extended Stay America has continued to use the G3 RMS to set room rates and occupancy levels at its extended stay hotels across the nation and in the Relevant Markets.

463.    **Sonesta**. In February 2015—after around two years of internal work and discussions with IDeaS—Sonesta announced that it had started using the G3 RMS at its extended stay hotels.

464.    On February 18, 2015, IDeaS issued a press release titled "Sonesta ES Suites Partners With Industry Leader IDeaS, Focuses on Growth." The release began by noting that "IDeaS Revenue Solutions, the leading provider of pricing and revenue management software, services and consulting, today announced it has expanded its partnership with Sonesta International Hotels to implement

IDeaS G3 Revenue Management System (RMS) across 16 Sonesta ES Suite properties, delivering powerful analytics and pricing decisions, and driving revenue opportunities in a unique market segment."

465.    At the time of the release, Sonesta was a pre-existing client of IDeaS, already having "utilize[d] IDeaS' flagship RMS product across its full-service portfolio." Indeed, a few days before the June 2013 IDeaS-Hilton press release, IDeaS issued a separate press release discussing "IDeaS' long-standing partnership with Sonesta International Hotels Corporation" for the then-current generation IDeaS revenue management software product.

466.    In the February 2015 press release, IDeaS also noted that "[i]n 2013, when Sonesta began to grow into the extended stay category with Sonesta ES Suites, the company researched multiple revenue management solutions before deciding to expand its partnership with IDeaS." "This decision," IDeaS added, "coincided with the imminent widescale release of the innovative G3 RMS"—*i.e.*, around mid-2013, when IDeaS and Hilton previewed the product's upcoming launch for the broader industry in their joint press release discussed above. "Backed by SAS and IDeaS' longstanding presence in the hospitality technology category," IDeaS further stated, the "G3 RMS offers the industry's most scientifically advanced analytics for more informed pricing decisions, driving profitability across thousands of hotels worldwide."

467.    The release then featured quotes from IDeaS and Sonesta executives that promoted deployment of the G3 RMS to boost room rates and revenues. Sonesta Vice President of Revenue and Distribution Barth Leins stated:

> Revenue management in the extended stay category is particularly difficult because the properties have high occupancies, fixed cost structures and higher margins than traditional hotels, IDeaS G3 RMS is great for extended stay hotels because it can generate powerful demand forecasts—by length-of-stay and by suite type—so we can make informed, strategic decisions to get the right mix of business for our hotels at the right price. IDeaS G3 RMS is a great addition to the IDeaS product portfolio.

> There are risks when moving into a new category, and we needed a proven system that could scale to our needs. IDeaS' track record and reputation—plus their ability to deploy a sustainable, accurate and actionable system—created a tremendous amount of confidence that we had chosen the right partner.

> Incremental revenue per available room (RevPAR) growth is the goal, and we're expecting to see a significant lift with IDeaS G3 RMS. I believe it will be a very powerful tool.

468.    Echoing Leins' sentiments about the G3 RMS' utility for the extended stay hotel market, IDeaS Americas Managing Director Jane Stampe added:

> We developed IDeaS G3 RMS to extend advanced pricing analytics and forecasting to hotel properties that had not previously implemented automated revenue management—especially in the extended stay or focused service categories. We believe there are very real benefits and revenue opportunities in these segments and are proud to extend our solutions to Sonesta ES Suites.

469.    Recently, Sonesta touted its use of IDeaS in an investor presentation, identifying the company as one of the "Best in Class Systems" it uses.

470.    Sonesta ES Suites' 2021 Franchise Disclosure Document "currently require[s] that [franchisees] use the . . . IDeaS Revenue Management System." Sonesta may even "designate the specific version of each software that [franchisees] are required to use."

471.    Pursuant to Sonesta Simply Suites' 2021 Franchise Disclosure Document, franchisees "must install, and complete the necessary training for (if needed), one of the revenue management systems ('RMS') that [Sonesta] designate[s]." Sonesta expressly designated the G3 RMS as such a system.

472.    That same Franchise Disclosure Document notes that Sonesta also offers a "centralized 'revenue management for hire' program," which "provides [franchisees] with the services of a dedicated revenue management leader." The program "includes a revenue management specialist providing direct oversight over all aspects of subscribing hotels' price positioning, inventory

management and distribution strategies and management of the RMS." Franchisees must use the revenue management for hire program if they do "not have a person carrying the title of Director or Manager of Revenue Management, Revenue Optimization, or Revenue Strategy whose role exclusively focuses on those functions" and meets other requirements dictated by Sonesta, "such as formal training and certification in the revenue management system."

473.    Sonesta posted a job opening on WayUp for a Corporate Revenue Analyst position. "Principle Duties and Responsibilities (Essential Functions)" for this role included "[c]onfigur[ing], maintain[ing], and monitor[ing] proper usage of revenue management systems and [business intelligence] tools," including IDeaS G3 RMS. "Qualifications and Skills" preferred for the role included "IDeaS . . . skills."

474.    The "Extended Stay & Serviced Apartments" page on IDeaS' website shows the following partial list of extended stay hotel customers, including both Sonesta extended stay hotel brands:



475.    Sonesta continues to use the G3 RMS to set guest room rates and occupancy levels at its extended stay hotels across the nation and in the Relevant Markets.

### 3.    IDeaS Confirms That Hilton, Extended Stay America, and Sonesta Are the G3 RMS's "Charter Clients."

476.    A few weeks after the June 2014 IDeaS-Extended Stay America press releases, but a half-year before the February 2015 IDeaS-Sonesta press release, IDeaS issued another press release about the G3 RMS whose full import would only become apparent later.

477.    On June 15, 2014, IDeaS issued a press release unveiling the G3 RMS to the broader hotel industry. Titled "The Future is Here: IDeaS Launches Advanced Revenue Management System," the release's heading read, "IDeaS G3 Revenue Management System leverages SAS analytics, delivers breakthroughs in pricing technology to increase hotel revenues and profitability."

478.    IDeaS began by "today announc[ing] its newest and most scientifically advanced automated revenue management system, IDeaS G3 Revenue Management System (RMS)." "Powered by best-in-class SAS analytics and coupled with IDeaS' 25 years of innovation," IDeaS continued, "this market-leading solution will empower users to increase revenue performance with the industry's most comprehensive pricing decisions, precise forecasting and detailed reporting tools."

479.    The release then proclaimed that "[t]he advanced features in IDeaS G3 Revenue Management System" would "allow hotel revenue managers to capture more revenue opportunities," while adding that "[t]he system is fully scalable, capable of creating pricing decisions for one property or worldwide estates." The release then listed the system's "Key Benefits" in bullet-point format:

- Provides precise forecasting, inventory controls and pricing decisions, delivering maximum impact by room class and length of stay

- Forecasts and reports with greater accuracy using granular transaction data

- Maximizes revenue via next generation price optimization

- Assesses the impact of pricing decisions using risk-free "What-If" Analysis

- Improves staff efficiency and reduces time spent on tactical activities

- Elevates overall profitability and competitiveness.

480.    The release also featured quotes from IDeaS Chief Operating Officer Sanjay Nagalia promoting the new product and some of its key attributes. He noted that "IDeaS G3 RMS is redefining revenue management" and would "create new revenue opportunities every single day" for its users. He then boasted:

> We have a solid track record of solving the revenue management challenges our clients face. With best-in-class analytics at our core, we continually advance our products by utilizing revolutionary technology. This latest release represents the next generation of an entire suite of advanced revenue management solutions, and we're proud to be on the forefront of the industry.

481.    In the release, IDeaS noted its "four charter clients for IDeaS G3 RMS." IDeaS specifically identified three of these clients as U.S.-based Hilton and Extended Stay America, and Scandic Hotels, a foreign company with locations in "Scandinavia and Northern Europe."

482.    IDeaS discussed its "Major Partnerships" with these "charter clients." "Developed originally in partnership with Hilton Worldwide," IDeaS noted, "more than 2,000 properties are now live on IDeaS G3 RMS, with more coming online every day." IDeaS noted that "Extended Stay America, the largest owner/operated hotel chain in North America, also recently announced plans to implement IDeaS G3 RMS across nearly 700 properties and 76,000 rooms by year-end 2014."

483.    The fourth and final G3 RMS "charter client"—who went unnamed in the press release but already had piloted the G3 RMS and had started to deploy it at its hotels—was Sonesta.

484.    In sum, these three Extended Stay Hotel Defendants—Hilton, Extended Stay America, and Sonesta—constituted three of IDeaS' four "charter clients" for the G3 RMS, they were the only "charter clients" based or operating in the United States, and they all featured extended stay hotel brands that were prominent pieces of their respective businesses. The "major partnerships" that these "charter client" Extended Stay Hotel Defendants had with IDeaS, moreoever, proved critical to G3 RMS' development, launch, and commercial success.

### 4. Choice and Wyndham Implement the G3 RMS and Revenue Management Platforms Based on the G3 RMS between 2021 and 2022.

485.    Between early 2021 and mid-2022, co-conspirator Choice and Defendants Wyndham and Hyatt each deployed the G3 RMS (and/or a G3 RMS-based in-house revenue management system) at their respective extended stay hotel brands. Not only did two of the companies deploy the

product within two months of one another, but all three announced their deployments within a four-month span.

486.    Choice and Wyndham each deployed a G3 RMS-based in-house revenue management system at the very least. These systems possesses various key attributes of the stand-alone G3 RMS, as detailed below. It presently is unclear if, and Plaintiffs do not allege that, either in-house system receives and uses the competitively sensitive, non-public data of competitors to set daily pricing and supply "decisions" like the G3 RMS does. At a minimum, however, each in-house system's pricing algorithms (including their models and predictive analytic and forecasting abilities) were developed, trained, and refined with competitively sensitive, non-public competitor data, like the pricing algorithm powering the G3 RMS.

487.    **Choice.** In early 2021, Choice began using ChoiceMAX, an IDeaS-developed in-house revenue management system based on and possessing core attributes of the G3 RMS (if not the G3 RMS itself, as various public materials seemingly suggest), to set guest room rates and occupancy levels across its portfolio, including at its extended stay hotels.

488.    IDeaS and Choice began working together to develop ChoiceMAX in early 2020. Before, during, and after ChoiceMAX's developmental period, the G3 RMS was IDeaS' flagship revenue management software product.

489.    Management consulting firm ZS posted an online case study titled "Change management fuels successful debut of Choice Hotels' new revenue management system" that discussed Choice's implementation of ChoiceMAX in "early 2021." "[D]eveloped by IDeaS," the study noted, ChoiceMAX "positions the company and its franchisees to capitalize on shifts in domestic U.S. travel and help drive revenue-per-available-room (RevPAR) growth."

490.    The ZS case study described "the challenge" that Choice faced as a lodging franchisor with thousands of properties and multiple brands and "the solution" that it reached. "The previous

RMS had run its course and the company recognized the importance of replacing its system with one that had state-of-the-art capabilities," and "Choice believed wide-scale franchisee adoption of ChoiceMAX would prove critical for meeting revenue growth objectives." Thus, "ZS worked in partnership with both Choice Hotels and IDeaS" "to establish trust very quickly with the franchisees" and "Choice Hotels' franchisee-focused area directors" in "guiding the ChoiceMAX implementation."

491.    The ZS case study also featured quotes from relevant IDeaS and Choice personnel. IDeaS Vice President of Global Marketing, Engagement and Enablement Mike Chuma commented that this collaboration "significantly increased adoption" of ChoiceMAX by Choice's franchised hotels. "While 30% of franchisee owners signed on to use the prior system," Choice Vice President of Revenue Management Doug "Lisi said nine out of 10 raised their hands to use ChoiceMAX" immediately—a significant ratio that increased even further soon thereafter. "No one has achieved the level of adoption that we've achieved in the short amount of time that we did," added Lisi.

492.    Choice publicly announced its partnership with IDeaS the next year. In an April 18, 2022 press release, Choice unveiled "its collaboration with IDeaS, a SAS company, the world's leading provider of hospitality revenue management software and services, to help drive commercial success and help enable franchisee revenue growth across its entire global enterprise of more than 7,000 hotels."

493.    Choice discussed the collaboration, its new revenue management system's key features, and the significant financial uplift it already had caused. "In collaboration with Choice Hotels," the release began, "IDeaS developed ChoiceMax, a mobile-first revenue management solution designed for quick, painless implementation and immediate efficiency and to help with revenue gains." "As an automated, advanced tool," the release continued, "the award-winning

ChoiceMax continuously adapts to changes in the market using real-time data to help ensure hotels are always priced competitively."

494.    Choice then highlighted several key attributes of the system, including "IDeaS' user-friendly mobile app" that enables franchisees to "more effectively manage channels, rates and inventory by adapting to local market trends in real time," a "seamless, downtime-free rollout" enabled "through simplified, plug-and-play implementations," "easy-to-use functionality and ongoing user education and support," and enhanced "time savings and revenue uplift."

495.    Both companies' executives offered comments in the release. Choice Vice President of Revenue Management Douglas Lisi noted that Choice launched "ChoiceMAX powered by IDeaS to help our hotels optimize their pricing structure and ultimately increase revenue production." He added that, "[t]o date, 93 percent of pricing recommendations from ChoiceMAX have been accepted by properties, and the reception of ChoiceMAX among franchisees has been overwhelmingly positive."

496.    IDeaS Co-founder, COO and CTO Sanjay Nagalia said that "IDeaS is honored to collaborate with Choice Hotels and help deliver ChoiceMax, a shared innovation built upon the proven principles of revenue science and powered by advanced automation and data-driven, analytics-based decision-making," a nod to the SAS High Performance Forecasting application that has powered the G3 RMS since its debut. Nagalia added that "it has become critical for large commercial organizations to break down data silos and align revenue strategies and systems like never before."

497.    IDeaS hosts the ChoiceMAX platform on its website at the address https://id.ideasrms.com/choice/max?continue=https:%2F%2Fchoicemax.ideasrms.com. Relevant Choice personnel who wish to access the platform are prompted to sign in with their "Choice Account" or "IDeaS username," as shown below:



498.   In 2022, Choice introduced "a free resource for its hotel owners: *Your Key to Profit*," which put "profitability tools," including ChoiceMAX, "in an on-demand, mobile-friendly system" for franchisees.

499.   Additional statements and actions from the two companies and their relevant personnel corroborate Choice's use of the G3 RMS-based ChoiceMAX to set guest room rates and occupancy levels across its entire portfolio, including at its extended stay hotels.

500.   In a January 23, 2024 press release, Choice discussed keys to its plan for continued financial success following a "banner 2023." Under the key "Committed to Being Franchise Friendly," Choice explained that its "industry leading voluntary retention rate of 98%" was due to "its proven track record of lowering [franchisees'] reliance on OTAs and third-party booking platforms, leveraging AI enabled technology to provide tools that drive efficiency and profitability, and unwavering commitment to driving revenue." Under the key "Continuing to Invest in Success," the company stated that "Choice owners and operators" are given "access" to "ChoiceMAX and IDeaS G3 mobile-friendly revenue management tools that continuously help them adapt to changing marketplace conditions using artificial intelligence and real-time data." This press release also referenced certain hotel brands previously associated with Radisson Hotel Group Americas, which was a pre-existing user of the G3 RMS, that it now owned following Choice's August 2022 acquisition of that company's franchise business and operations.

501.    In late 2023, IDeaS Area Director for New Ventures Michael Maher posted on LinkedIn the following:

> What a difference a year makes. We went from "what is ChoiceMAX?" To "we love ChoiceMAX!". It was a great week spending time with Choice Hotels International leadership and franchisees learning about their success in the past year and the exciting future ahead with the acquisition of Radisson Hotel Group Americas. We're honored to partner in this journey with #ChoiceMAX and IDeaS Revenue Solutions G3 RMS.

502.    In a follow-up comment to his LinkedIn post stating that "We even made the main stage!," Maher displayed the following photo of Choice President and CEO Patrick Pacious presenting on the big screen next to a graphic with the words "IDeaS" at the top and "ChoiceMAX" and "G3 RMS" underneath:



503.    In September 2023, IDeaS Director of Sales Alex Pensyl posted on LinkedIn about Choice's "commitment to staying at the forefront of the hospitality industry" while noting its "mobile-first hotel revenue management solution with IDeaS Revenue Solutions G3."

504.    Choice Revenue Manager and Analyst Erik Peraza states on his LinkedIn page that he is "[r]esponsible for optimizing revenue performance and fostering strategic growth through analysis of room statistics, demand factors and competitive landscapes" and that, "[t]hrough collaborative efforts with various departments, [has] identified and seized revenue opportunities while aligning

with corporate pricing and distribution strategies." Pursuant to these duties, he has "[m]aintained the integrity of revenue and property management systems such as IDeaS G3/Opera/Synix ensuring accurate rates and inventory allocation across diverse distribution channels."

505.   "[P]rimary users of IDeaS G3 RMS with at least 6-12 months of practical system experience," IDeaS notes, are "ideal candidate[s]" to become "IDeaS G3 RMS Certified Users." According to IDeaS, "IDeaS G3 RMS Certified Users have demonstrated the essential skills and knowledge to successfully optimize revenue with G3 RMS" and "validated their ability to manage and promote revenue strategy around the guiding principles of the IDeaS revenue optimization cycle." IDeaS G3 RMS Certified Users receive and can display the following verified digital badge issued by SAS as proof of the credential:



506.   Numerous Revenue Managers employed by Choice (and other Extended Stay Hotel Defendants) are IDeaS G3 RMS Certified Users and display the badge shown above.

507.   For example, Choice Regional Manager for Revenue Management Nancy McCarty became an IDeaS G3 RMS Certified User in 2023. In that role, she "provide[d] Revenue Management Services to [Choice's] franchisees" and "[a]ssisted Team Members in their learning of new systems" like "ChoiceMAX (IDeaS)" while she "[c]ontinued with previous responsibilities" she had as Radison Hotel Group America's Supervisor of Revenue Optimization Services before the August 2022 Choice acquisition. And Choice Revenue Manager Raquel Martin Alvaro became an IDeaS G3 RMS

Certified User in 2023, posting the news of her "verified achievement from SAS" and showing a copy of the badge on her LinkedIn page.

508.    In 2024, Choice posted a job opening on Glassdoor for the Corporate Director of Sales & Marketing in its Managed Hotels division. "Responsibilities" for this "leadership role" included "[p]artner[ing] with Corporate Director Revenue Management, the global sales organization and the MHD Revenue Management team to define strategic pricing activities for Managed Hotels which maximize[] revenue and profitability," and "[e]nsur[ing] sales, marketing and revenue tools are being utilized as well as support[ing] the field team for implementation of the strategies." "Skills" required for the role included a "[w]orking knowledge of technical systems including . . . IDeaS G3 RMS" and experience with "evaluating, using and/or interpreting . . . Demand360[.]"

509.    Finally, a January 2023 IDeaS video recapping the company's highlights from 2022 stated that it "partnered with" Choice "to bring revenue automation to [its] franchisees" and displayed the following graphic:



510.    Choice has continued to use the G3 RMS-based ChoiceMAX to set guest room rates and occupancy levels at its extended stay hotels across the nation and in the Relevant Markets.

511.    **Wyndham.** Two months after Choice announced the deployment of ChoiceMAX across its hotel portfolio, Wyndham began using the IDeaS-developed RevIQ, a "powerful new

revenue management platform" based on and possessing the core attributes of the G3 RMS, and according to IDeaS' own marketing materials the G3 RMS itself, to set guest room rates and occupancy levels across its hotel portfolio, including at its extended stay hotels.

512.    IDeaS and Wyndham began working together to develop RevIQ in or around early 2020. Before, during, and after RevIQ's developmental period, the G3 RMS was IDeaS' flagship revenue management software product.

513.    On June 28, 2022, Wyndham, "the world's largest hotel franchising company with more than 8,900 hotels across over 95 countries," issued a press release that "unveiled RevIQ, a next-generation, cloud-based, mobile-first" platform that promised to enable "franchisees to further optimize their revenue strategies" and market position.

514.    The press release stated that RevIQ was "[c]reated in collaboration with IDeaS, an industry leader in hotel revenue management software" and "is designed to deliver top-tier performance" by "[l]everaging real-time data and analytics to make automatic pricing recommendations and adjustments"—known hallmarks of the G3 RMS.

515.    The press release then discussed the platform's delivery of "smart revenue management capabilities" and other "core benefits" that are also key attributes of the G3 RMS. Specifically, RevIQ "instantly adjust[s] its forecasts and recommendations" for rates, features "a cloud-based, mobile-first design" that "allows hotel owners the ability to easily transition between their property management and revenue management systems," "makes it easy to quickly update pricing" "immediate[ly] across all channels," and contains "a clean, intuitive interface allow[ing] for faster training of new team members."

516.    The press release quoted a Wyndham hotel owner and Franchise Advisory Council member who said that RevIQ was "a game changer for Wyndham franchisees." "What I love about RevIQ," he added, "is it allows me to put my hotel's revenue management strategy on autopilot,

freeing my time to focus on other parts of the business while helping ensure I'm always getting the best possible return on every available room."

517.    IDeaS hosts the RevIQ platform on its website with the address https://id.ideasrms.com/wyndham/reviq?continue=https:%2F%2Freviq.ideasrms.com.    Relevant Wyndham personnel wishing to access the platform are prompted to sign in with their "Wyndham Account" or "IDeaS username," as shown below:



518.    IDeaS' marketing materials corroborate that Wyndham uses the G3 RMS.

519.    IDeaS' G3 RMS product brochure displays the following partial customer list that expressly identifies Wyndham:



520.    All customers in this list, including two of Wyndham's Co-Defendants, are confirmed G3 RMS users. Hilton's and Extended Stay America's use of the G3 RMS is detailed above. The remaining companies' use of the G3 RMS is further corroborated below:

- Radisson Hotel Group. On October 13, 2021, IDeaS announced that "Radisson Hotel Group has implemented IDeaS RevPlan" across its EMEA-region portofolio. "Released by IDeaS in

2020, RevPlan is a standalone, cloud-bsed solution built to complement its flagship RMS products," the release added." Commenting on the benefits of RevPlan, Radisson Hotel Group's Head of Revenue Projects stated that "the tool integrates very well with IDeaS G3 RMS," and thus conceded his company's use of the G3 RMS. IDeaS Chief Operating Officer and Chief Technology Offier Sanjay Nagalia further corroborated this fact by discussing "IDeaS' lasting partnership with the Radisson Hotel Group[.']"

- Accor. On June 15, 2017, IDeaS "announced a partnership that will enable the AccorHotels Group's properties to rely on IDeaS' revenue optimization expertise." "With IDeaS, each AccorHotels property will be able to intelligently price rooms through the use of advanced SAS analytics and the IDeaS suite of user-friendly, cloud-based technology." "AccorHotels' 20 hotel brands will have the option to implement IDeaS' advanced revenue management solutions, which include IDeaS G3 RMS . . . . [S]aid Fabrice Otano, chief data officer for AccorHotels, '[t]he SAS analytics behind IDeaS G3 RMS bring a superior dimension to the relationship, and we are eager to see how their proven analytics can optimize pricing and bottom-line revenue.'"

- Grand America Hotels & Resorts. IDeaS's website contains the "Client Success Story" for "Grand America Hotels & Resorts," a pre-exising G3 RMS user that "selected IDeaS Optix, a revenue intelligence module for G3 RMS," "to provide game-changing insights into each of their hotels' evolving business conditions." When choosing between competitive offerings, "Optix was the clear winner since the data integrations were already in place with G3 RMS, and users could adapt to its use quickly." Added a Grand America executive, "Optix has helped shed further insight into how to better use G3 RMS" by, among things, "help[ing] us understand why the system makes its decisions[.]"

- Omni Hotels & Resorts. On March 21, 2019, IDeaS announced that "Omni Hotels and Resorts will roll out both IDeaS G3 Revenue Management System (RMS) and IDeaS Smart Space, a cloud-based meetings and events strategy application, across its portfolio of 60 distinct luxury hotels and resorts in North America." Under the heading "Automated pricing decisions for over 21,000 guest rooms," the release discussed that "IDeaS G3 RMS" would empower "Omni's revenue managers."

- Shangri-La Hotels & Resorts. IDeaS' website states that "Shangri-La and Hilton International," "two major global hotel chains," became "key IDeaS clients" in 1996, "marking the company's transition to meeting the revenue management needs of hospitality businesses." In a June 26, 2014 press release announcing a new module called Reputation Pricing, IDeaS stated that Shangri-La Hotels and Resorts was one of two "charter clients" for this "module as part of the latest version of IDeaS Revenue Management System" that "will be available" in "July 2014," *i.e.*, the G3 RMS.

- Terranea. A November 15, 2017 IDeaS promotional piece in *Travel Daily News*'s Hospitality Solutions section discussed a "new IDeaS G3 RMS feature" "powered by SAS Analytics." "Combined with sophisticated pricing and inventory control decisions, powerful forecasting and interactive reporting dashboards, component room pricing showcases IDeaS' commitment to solving the unique and complex business challenges facing hotels and resorts." "Agnelo Fernandes, Senior Vice President for Terranea Resort," stated that "[t]his technology

has enabled us to look at inventory by type or segment and actually make decisions to yield room types uniquely across different channels." Fernandes added that "[w]e find ourselves diving into IDeaS for every decision, and that has helped us become a lot more efficient. IDeaS helped us understand pricing, availability and demand for each room in order to optimise profitability."

- <u>MINOR Hotels</u>. In a May 18, 2020 IDeaS "Client Success Story" titled "The Evolution of Revenue Management at MINOR Hotels," MINOR Hotels' Director of Revenue Management Jeff Young discussed the "integration of IDeaS' G3 RMS" across properties.

521.    Public statements from Wyndham's relevant personnel corroborate the company's use of the G3 RMS and RevIQ to set guest room rates and occupancy levels across its hotel portfolio, including at its extended stay hotels.

522.    For example, Stewart Brown, the previously referenced Hilton revenue management employee, also held the title of Wyndham Regional Revenue Manager and Manager, Revenue Management & Systems Support - IDeaS RevIQ Coach from mid-2022 to early 2023. According to his LinkedIn profile, Brown is a G3 RMS "[s]ubject matter expert," and he had roles at other Extended Stay Hotel Defendants immediately before and immediately after his tenure at Wyndham largely focused on training staff how to use the G3 RMS. As noted above, from early 2019 to mid-2022, Brown was Hilton's Revenue Management Analyst - GRO Support, where he was a "[s]ubject matter expert of IDeaS SAS/Hilton's G3 (GRO) Revenue Management System," "[a]ssisted hotels with inquires regarding G3," "[p]erform[ed] deep dive analysis of G3's forecasts and decisions," and "aid[ed] the Implementation Team in the rollout of G3's Continuous Pricing model to non-Americas hotels." In addition, since early 2023, he has held the title of RM Support Implementation and Learning for Hyatt, which has deployed IDeaS' entire platform, including the G3 RMS, across its entire hotel portfolio since mid-2022, as discussed in detail below.

523.    Similarly, Christopher Majcher, a "[s]ubject matter expert with IDeaS G3 RMS," was a Wyndham Regional Revenue from early 2022 to early 2023. In this role, per his LinkedIn page, he was an "IDeaS RevIQ Taskforce" member who worked with "Wyndham Revenue Management

Service" and "Senior Director, Franchise Revenue Management" to implement standard procedures concerning the "new IDeaS RevIQ system slated to control rates, inventory, and forecasts for all Wyndham corporation properties." In dispatching his corresponding duties, he utilized "STR report" and "comp set" data and his proficiency with "Demand360." From late 2018 to early 2022, Majcher served as a Revenue Specialist at Hilton, where he was the "[r]ates, inventory, contract, and forecast decision maker for 14+ franchises," including "Homewood" and "Home2," "with all properties on IDeaS G3." In this role, he employed his "expert understanding of G3 RMS Rate Codes, Market Segments, Attributed Market Segments, and Forecast Groups, by Room Class, to validate the Unconstrained Demand and Wash forecast" and "validate ADR forecast" set by the G3 RMS. Since early 2023, he has worked in Hyatt's RMS Support, Implementation, and Learning department. In this position, Majcher has "[a]ssist[ed] with IDeaS suite rollout to full 1300+ property Hyatt portfolio" and is the "[s]ole presenter for groups of hotels in their 10 week training program, which includes eight two-hour training sessions on Hyatt PrO (G3 RMS), RevPlan (financial forecasting and budgeting), and Optix (reporting tool combining G3 RMS and RevPlan data)," to Hyatt's "revenue managers, resort Directors of Revenue Management, and corporate revenue leaders."

524.    Finally, the January 2023 IDeaS video noted above confirms that IDeaS began partnering with Wyndham in 2022 "to bring revenue automation to [its] franchisees," as shown below:



525.    Wyndham's Hawthorn Suites' 2022 Franchise Disclosure Document provides that Wydham offers its franchisees "comprehensive revenue management programs for additional fees" at three service levels. The lowest service level provides "STR review and evaluation, rate and inventory maintenance, . . scheduled communication and accessibility and monthly meetings with an assigned Revenue Management Specialist." The next level up offers "STR review and evaluation, rate and inventory maintenance, . . . scheduled communication and accessibility and bi-weekly meetings with [the franchisee's] assigned Revenue Management Specialist." The highest level "includes inventory management, . . . scheduled communication and accessibility, weekly meetings with [the franchisee's] Revenue Management Specialist, and STR review and recommendations." The programs include a "Rate & Inventory Changes" service, which recommends and maintains "price point & availability restrictions for >90 days."

526.    As part of the Hotel Revenue Management Agreement, Wyndham also helps "[d]evelop a *rate strategy*" for franchisees' hotels and "[e]ffect execution of the rate strategy on an ongoing basis, specifically advising the [franchisees' hotel] stall on [Wyndham's] actions to:

- Maintain the pricing structure for [franchisees' hotels] . . .

- Analyze and identify the relevant market segments which apply to the Facility and make pricing and rate policy recommendations for those segments

- Review competitive pricing and availability

- Recommend price points and availability restrictions for future dates across all distribution channels[.]"

527.    As part of that same agreement, Wyndham will "[f]acilitate weekly or bi-weekly meetings with the [franchisees' hotel] staff to review past results and future market conditions."

36

528.    Along those lines, franchisees that subscribe to the service "must sign up a rate shop program" designated by Wyndham. Wyndham has "sole discretion" to decide "the number of hotels, booking sources and arrival dates to include in the shop reports."

529.    According to Wyndham's Hotel Revenue Management Agreement, franchisees must, among other things, "authorize [Wyndham] to access [the franchisees'] room rates, inventory and other Facility information" and let Wyndham "make adjustments to the Facility's rates, inventory and restrictions in order to comply with the [Revenue Management Policies and Best Practices] without advance notice." Franchisees may only "modify or reverse any change [Wyndham] make[s] by notifying [Wyndham]" and ensuring that the modification or reversal complies with the Revenue Management Policies and Best Practices.

530.    Wyndham has continued to use RevIQ and the G3 RMS to set guest room rates and occupancy levels at its extended stay hotels across the nation and in the Relevant Markets.

### 5.    Hyatt Implements the G3 RMS in 2022.

531.    Only two months after Wyndham announced its partnership with IDeaS, IDeaS announced that Hyatt would deploy IDeaS' entire platform, including the G3 RMS, across its portfolio including its extended stay hotels.

532.    On August 11, 2022, IDeaS issued a press release titled "IDeaS Announces Hyatt Will Deploy IDeaS' Platform Across Global Portfolio." ("The term 'Hyatt' is used in this release," IDeaS noted, "for convenience to refer to Hyatt Hotels Corporation and/or one or more of its affiliates.")

533.    In the release, IDeaS unveiled its "global collaboration with Hyatt to power Hyatt's commercial revenue platform" in which "Hyatt will deploy IDeaS' suite of products globally as a key component in the evolution of its commercial stack."

534. The press release stated that "leading hospitality company" Hyatt "will leverage the breadth of IDeaS' suite of products to embark on a journey towards profit optimization" and "drive best-in-class adoption across their global portfolio."

535. The press release then highlighted "key features" of "IDeaS' industry-leading technology and service approach," such as its "automation equals profit" "data-driven approach," and its "[d]edicated training and enablement efforts" that "will ensure that colleagues at each property engage in the set-up and configuration process" that is "critical to the success of the system."

536. The release featured quotes from each company's executives. Hyatt Vice President of Global Revenue Management Michael Klein said that "[c]ollaborating with a known innovator and disruptor in the revenue management space like IDeaS" would "create a differentiating value proposition for Hyatt owners and operators and make it easier for property colleagues to focus on" other tasks.

537. IDeaS' Nagalia said that his company was "excited to be a part of the transformation of Hyatt's commercial revenue platform at a moment of unparalleled opportunity" and "pleased to bring IDeaS' market-leading automation, pricing approach, and a singular focus on holistic, profit optimization to Hyatt's portfolio of properties."

538. Trade publications covering the development provided additional information about the partnership.

539. A *Hotel Management* article issued the same day as the IDeaS release, for example, noted that the collaboration "aims to supercharge Hyatt's commercial revenue efforts." The article also contained quotes from IDeaS Vice President of Marketing Mike Chuma about his company's ability to be a value-added "strategic business partner" to major clients like Hyatt:

> 'We are ecstatic to be working with Hyatt, one of the world's largest and most dynamic and forward-thinking hotel organizations. It is a significant client addition for IDeaS, given the breadth of their portfolio across market segments and the strength of footprint, both

domestic and international,' said Mike Chuma, VP Marketing for IDeaS. . . . Chuma said IDeaS takes pride in its ability to function as a strategic business partner rather than simply a revenue management software provider: 'This is due to our incredibly strong track record of supporting large, complex organizational transitions, like Hyatt, with our world-class support and industry training programs.'

540.    Additional statements from Hyatt's relevant personnel corroborate its use of the G3 RMS to set guest room rates and occupancy levels across its entire portfolio, including at its extended stay hotels.

541.    As previously stated, Hyatt RMS Support, Implementation, and Learning employee Christopher Majcher has "[a]ssist[ed] with IDeaS suite rollout to full 1300+ property Hyatt portfolio" and is the "[s]ole presenter for groups of hotels in their 10 week training program, which includes eight two-hour training sessions on Hyatt PrO (G3 RMS)" and other complementary IDeaS revenue management products, to the company's "revenue managers, resort Directors of Revenue Management, and corporate revenue leaders."

542.    Hyatt's Hyatt House 2022 Franchise Disclosure Document provides that franchisees may "receive revenue services from" Hyatt either at Hyatt's demand or by election. If the franchisee signs a "Service Agreement for Revenue Optimization Services," then Hyatt "will provide specialized central revenue optimization services on a daily, weekly, monthly, and annual basis to assist [franchisees] in a variety of essential Hotel functions, including resource planning, inventory controls, market segmentation, and industry and competitor analysis for the Hotel." All franchisees "must participate in and comply with the terms of all [Hyatt's] mandatory . . . rate and room inventory management . . . programs." And they may only establish room rates "if those rates and [the franchisee's] pricing policies comply with System Standards (to the maximum extent the law allows)."

543.    More generally, one industry publication noted that hotel chains' provision of revenue management services to hotel owners "offer[s] one of the strongest draws toward brand affiliation." This market reality renders the widescale use of revenue management systems like the G3 RMS by

franchised properties of Extended Stay Hotel Defendants, including but not limited to Hyatt, even more plausible.

544.    Hyatt has continued to use the G3 RMS to set guest room rates and occupancy levels at its extended stay hotels across the nation and in the Relevant Markets.

> **6.    Extended Stay Hotel Defendants, Enabled and Facilitated by Pricing Algorithm Defendants, Knowingly and Intentionally Have Deployed the Same Pricing Algorithm that Collects and Uses Their Sensitive Business Data to Set Guest Room Rates and Occupancy Levels.**

545.    Coordinated and facilitated by Pricing Algorithm Defendants, Extended Stay Hotel Defendants knowingly and intentionally have used the same pricing algorithm to set guest room rates and occupancy levels at their respective extended stay hotels. Extended Stay Hotel Defendants further know that their shared pricing algorithm receives and uses each other's sensitive business data.

546.    Extended Stay Hotel Defendants' knowledge and intent on this issue is shown by, among other things, the context and circumstances underlying their respective decisions to deploy the G3 RMS, the relevant communications that they each have given and received during the relevant period, relevant documents they have executed and exchanged with Pricing Algorithm Defendants, and the reasonable inferences to be taken from these collective facts considered holistically.

547.    The manner in which Pricing Algorithm Defendants developed, released, and announced the arrival of the G3 RMS to the extended stay hotel market was a carefully planned and executed strategy based on IDeaS' and Hilton's long-standing relationship and reputations as leading innovators of hospitality revenue management, SAS's game-changing analytics expertise, and IDeaS' pattern of communicating to the "industry" through targeted channels.

548.    Hilton is one of IDeaS' longest tenured and most prominent hotel clients. This "close partnership" started in the late 1990's and continues to this day.

549.    A December 3, 2003 IDeaS press release referenced this close partnership in discussing Hilton's roll-out of the now-obsolete IDeaS Revenue Optimization Solution. Commenting on Hilton's "long term" and "close" partnership with IDeaS, Hilton Senior Vice President of Distribution and eCommerce Tim Davis stated:

> 'Automated revenue optimization has been an integral part of Hilton International's revenue strategy for many years[.]' . . . 'When we selected IDeaS as our revenue optimization provider in 1997, we knew we had found a long term partner to help us execute and achieve our goals. Hilton International maintains a close partnership with IDeaS and we have confidence in their solutions and their outstanding team.'

550.    The press release also quoted an IDeaS executive who recognized that the Hilton partnership "has helped IDeaS continually develop next-generation technology" providing "solutions" to the "hospitality industry:"

> 'The Hilton International brand is known throughout the world as the leader in the hospitality industry. We can attribute our market position, in large part, to our affiliation with Hilton International,' comments Joseph Martino, Senior Vice President of IDeaS. 'IDeaS has worked very closely with Hilton International over the years and this partnership has contributed not only to the success of IDeaS Revenue Optimization Solution, but has helped IDeaS continually develop next generation technology that provides meaningful solutions to the hospitality industry.'

551.    IDeaS also used industry-focused communications channels such as press releases and conferences to communicate its relationships with Hilton and other leading hotel companies, to convey developments about its own products, and to discuss revenue management practices and trends.

552.    Indeed, IDeaS conceded that it "regularly publishes press releases, participates in industry events, and offers resources such as podcasts and webinars" in order "[t]o stay connected with their clients and the industry." "These initiatives," in IDeaS' own words, "keep hoteliers updated on the latest trends and best practices in revenue management."

553.    When Pricing Algorithm Defendants began developing the G3 RMS, IDeaS and Hilton were ready to leverage their "close partnership" to develop and promote "next generation" products to benefit both themselves and the "industry" through the various industry-specific channels mentioned above.

554.    Given their reputations as industry leaders, Pricing Algorithm Defendants and Hilton knew that the announcements and communications they would make regarding the G3 RMS would carry substantial influence and weight with other major hotel companies, particularly those operating in the extended stay hotel market.

555.    By the time Pricing Algorithm Defendants and Hilton began collaborating on the G3 RMS, IDeaS long had described itself as a leader in the revenue management software field.

556.    For example, in a September 18, 2012 press release announcing a Washington, D.C. luxury hotel's implementation of its then-current revenue management system, IDeaS called itself "the leading provider of pricing and revenue management software, services and consulting to the hospitality industry."

557.    And in a June 20, 2013 press release discussing a Sonesta property's use of an earlier IDeaS revenue management system product, IDeaS called itself "the leading provider of pricing and revenue management software."

558.    IDeaS still promotes itself as a leader in the field of hospitality revenue management, pointing to its decades of "industry leadership" in marketing materials like the following:



559.    If anything, IDeaS' self-promotion as the hospitality industry's leader in revenue management has increased following the wide-scale release of the G3 RMS.

560.    In an IDeaS website post titled "Meet IDeaS New Chief Evangelist" from around August 2017 introducing Klaus Kohlmayr, a common theme throughout the post centered on the importance that this new position at the company would have for "the hospitality industry" as a whole. Responding to the question "Why is this role important for the hospitality industry?," Kohlmayr said:

> The industry has never had anyone whose job it was to think about long term trends and implications on a full-time basis. Rather, everyone is constantly focused on delivering against near-term objectives. People tend to get caught up in day-to-day operational issues, which constrains time for profound thinking. Technology is evolving fast and, as a result, there is a lot of confusion about what is, and what is not, critical for success. Especially in the revenue management and pricing arena, there is a lot of confusion and noise about concepts that might sound fancy and flashy but actually are not proven to produce optimal results. There are more and more providers who pretend to offer revenue management and pricing solutions but actually only provide an efficient way to manually manage pricing decisions, rather than automating analytics. I believe my role is to elevate the conversation and to educate the industry about the critical items that need to be in place to be best prepared for the future.

561.    Kohlmayr's role as a thought leader for not only IDeaS, but the "industry" at large, was a key—and explicit—part of the Chief Evangelist position he has held since August 2017. according to his Linkedin page, Kohlmayr has had the following "core responsibilities" regarding "in this position:

- Re-hired by President and Co-Founder to join the Executive team and establish IDeaS as the undisputed thought leader for pricing, revenue management and commercial performance in Hospitality and be the public face of IDeaS.

- Established regular cadence of conversations with the C-suite of hotel brands, owners and management companies to develop the transformational forces impacting the industry over the next 5-7 years.

- Build a network of hotel and travel tech founders to understand innovation shaping the travel tech space and formulated industry facing themes about the future of the industry.

- Worked closely with all internal departments to fold themes into IDeaS brand and product messaging, product development, sales approaches and strategy to ensure IDeaS is able to fully take advantage of future changes.

- Helped shape and worked closely with internal and external strategy stakeholders to define and implement IDeaS 5 year strategy.

- Recognized Thought Leader in the areas of Commercial Performance, Revenue Management and Pricing. Frequent speaker at key industry events: ITB, HITEC, HSMAI/ROC; Contributor to industry publications: Hotel Network, Skift, Phocuswire.

562.    Hilton also had long described itself as the aspirational "industry leader in revenue management" before the G3 RMS came to market.

563.    A December 5, 2011 press release stated that it was "the leading global hospitality company, spanning the lodging sector from luxurious full-service hotels and resorts to extended-stay suites and mid-priced hotels."

564.    The June 2013 Hilton-IDeaS press release stated that Hilton "is committed to becoming the industry leader in revenue management," that "IDeaS and SAS are proud to partner with Hilton Worldwide to bring innovations in pricing to the hospitality industry," and that "[t]his announcement is an important milestone in bringing our next-generation G3 RMS to IDeaS clients and other leading brands pursuing enhanced revenue performance."

565.    A later Hilton report stated that it "has been a leader in the hospitality industry" since its founding and "aspire[s] to remain a beacon of innovation, quality and success for the hospitality industry."

566.    Hilton's 2023 Year in Review stated that its "scale, global presence and leading brands" and reputation for "innovation" through "leading the industry" in "digital solutions" have enabled it to "deliver[] industry-leading performance."

567.    Defendants promoted Extended Stay Hotel Defendants' use of the G3 RMS through coordinated press releases, marketing materials, papers, articles and other industry-facing statements. Defendants knew that executives, managers, and other employees of major hotel companies, including those with extended stay brands, would receive the information contained in these statements.

568.    Extended Stay Hotel Defendants also made various statements, including during the relevant time period, demonstrating that they knew about their competitors' use of revenue management systems including the G3 RMS.

569.    In Extended Stay America's 2015 Form 10K filed with the SEC, the company recognized that "the lodging industry depends upon the use of sophisticated information technology and systems, including those utilized for," among other areas, "revenue and property management[.]" The company also noted that "if we are unable to achieve the intended benefits of any new information technology or other systems, including our revenue management system, our results of operations could be adversely affected and our ability to compete effectively could be diminished."

570.    In Choice's 2023 Form 10-K filed with the SEC, the company used similar wording to Extended Stay America's prior filing, noting that "the lodging industry depends upon the use of sophisticated information technology and systems including those utilized for," among other areas, "hotel revenue management."

571.    Pricing Algorithm Defendants likewise made various statements, including those contained in their marketing materials, designed to reveal the identities of certain major clients, including Extended Stay Hotel Defendants, to an audience comprised of executives, managers, and other relevant employees of major hotel companies.

572.    IDeaS' website and related materials identify some of its major hotel clients, including multiple Extended Stay Hotel Defendants.

573.    The G3 RMS Product Brochure linked in the IDeaS website states that Hilton, Extended Stay America, and Wyndham all use this product.

574.    The Extended Stay Hotel section of the IDeaS website counts Hilton's Homewood Suites and Home2 Suites, Extended Stay America, and Sonesta's ES Suites and Simply Suites among its partial list of clients.

575.    The IDeaS website displays a "Success Story" video on Extended Stay America, one of its earliest adopters and promoters of the G3 RMS, that it has featured since the start of the class period.

576.    The IDeaS Revenue Solutions Wrapped 2023 video provided a "sincere thank you to our clients, partners and the hospitality industry for your trust and collaboration in 2023," stated that "[t]ogether we are shaping the future of hospitality revenue management," and reminded its hotel industry audience that "You're in Good Company."

577.    Extended Stay Hotel Defendants' knowledge and intent concerning their shared use of the G3 RMS is also evidenced by discussions occurring at various industry meetings focused on revenue management that they attended, including ones that IDeaS convened for its own clients. (These meetings are discussed in greater detail further below.)

578.    In addition, Extended Stay Hotel Defendants know that they each submit their current, non-public business data to the G3 RMS for its use in generating their respective price and occupancy "decisions." Extended Stay Hotel Defendants' awareness of this fact is demonstrated by various statements and actions of Defendants and third parties.

579.    The G3 RMS is installed and connected into Extended Stay Hotel Defendants' internal systems and databases so that the pricing algorithm can receive the necessary rate and occupancy data from the respective Defendant and send the corresponding "decisions" to that Defendant.

580.    Each Extended Stay Hotel Defendant knows this. For example, the first Extended Stay Hotel Defendant to deploy the G3 RMS, Hilton, stated in its mid-2013 press release that the G3 RMS "will be integrated with existing systems" and "track and analyze historical and current business performance to support revenue optimization."

581.    Extended Stay Hotel Defendants' own contracts with IDeaS concerning the G3 RMS, once produced in discovery, will further confirm that these hotel companies provide the G3 RMS with recurring access to current business data from their own proprietary systems.

582.    IDeaS' marketing materials similarly demonstrate that the G3 RMS receives and relies on each client's own data as well as data from the market and the client's competitors in generating pricing and occupancy "decisions" for each client. For example, the IDeaS June 2018 promotional video discussed above stated that the G3 RMS "automatically folds a wealth of vital data directly into a powerful analytics engine" which generates pricing "decisions" for the client and that the "wealth of vital data" includes the client's data as well as "competitor data" and "market data."

583.    Statements from relevant industry participants, like those from Stayntouch PMS, Capterra, and GetApp discussed above, further confirm Extended Stay Hotel Defendants' awareness that the G3 RMS receives and uses one another's current, internal pricing and occupancy data.

**7.    Extended Stay Hotel Defendants and Their Co-Conspirators Have Accepted the G3 RMS' Pricing and Occupancy "Decisions" Consistently and Continuously.**

584.    Extended Stay Hotel Defendants and their co-conspirators have accepted the G3 RMS' "decisions" to set their guest room rates and occupancy levels across the nation and in the Relevant Markets on a consistent and continuous basis.

585.    Extended Stay Hotel Defendants' and their co-conspirators' overwhelming acceptance rate of the G3 RMS' "decisions" is demonstrated by their own admissions, the automated manner in which the G3 RMS transmits "decisions" and the "manage-by-exception" approach governing the product's use, the existence and utilization of G3 RMS tools that reenforce the acceptance of these "decisions," and the instruction and guidance that IDeaS team members give each Extended Stay Hotel Defendant.

586.    Extended Stay Hotel Defendants and their co-conspirators admit that they consistently defer to and adopt the G3 RMS' pricing and occupancy "decisions" as a matter of course.

587.    In Extended Stay America's 2015 Form 10-K, the company stated that its new G3 RMS "automated revenue management system" would "allow[] us to automatically price against demand from our short and long-term guests" and "further improve our sales team's efficiency and effectiveness."

588.    In Choice's April 2022 press release, Vice President of Revenue Management Douglas Lisi stated that its properties had accepted "93 percent of pricing recommendations from" the G3 RMS-based ChoiceMAX.

589.    In March 2023, Choice Vice President of Revenue Management Doug Lisi made a post on Linkedin about a March 2, 2023 analyst report discussing Choice's dividend announcement. After the heading "Factors Driving Growth," Lisi quoted the following excerpt from the linked report:

> Choice Hotels majorly focuses on strengthening all its franchisees to ensure consistent long-term growth prospects. To support its franchise business, the company initiated the rollout of a new mobile-enabled revenue management app. The tool allows franchisees to effectively manage their channel rates and inventory by adapting to local market trends. It enables repricing and competitive rate shopping to execute the right pricing strategy. With the higher acceptance of rate recommendations coupled with solid bookings, the company anticipates this enhanced capability to drive top-line growth in the upcoming periods.

The "new mobile-enabled revenue management app" that boasted a "higher acceptance of rate recommendations" was the G3 RMS.

590.    Extended Stay Hotel Defendants' and their co-conspirators' overwhelming acceptance rate of the G3 RMS' pricing and occupancy "decisions" is further demonstrated by the automated manner in which the product operates and the "manage-by-exception" approach that governs the product's use.

48

591.    IDeaS promotes that the G3 RMS produces automated "decisions"—not just "recommendations"—that clients should and do accept routinely. Various examples of IDeaS' promotion of this guiding principle are discussed above and below.

592.    IDeaS' promotes that clients like Extended Stay Hotel Defendants can and do rely habitually on the G3 RMS' "decisions" to set their guest room rates and occupancy levels for the simple reason that doing so is the interest of both IDeaS and its clients.

593.    As Hambleton wrote in his paper, IDeaS is "responsible for the performance of [its] solutions and, ultimately, the success of [its] clients," and it "certainly [doesn't] leave anything to chance or human intuition." Because the G3 RMS "is future-proof, fully automated, and truly science-backed," the only reasonable path for its clients is to follow its "decisions" as a matter of course.

594.    The "decision-based methodology" driving the G3 RMS, IDeaS notes, "not only drives higher revenue, but it empowers users to manage by exception." Under this "manage-by-exception" approach, "[b]asic tactical activities are automated, while users are made aware when there are significant changes or conditions they can focus their expertise on."

595.    IDeaS has described the "manage-by-exception" approach underlying the proper use of the G3 RMS to set room rates and occupancy levels in various marketing materials. For example, IDeaS has stated:

- "Truly automated revenue management technology helps hotels create and execute a consistent strategy, informing critical decisions without becoming dependent on individual user expertise. . . . That's why a good RMS must be equipped to serve all job roles and hotel types, regardless of user background. IDeaS pioneered the manage-by-exception approach to revenue management for this very reason, letting our machine-learning automation handle the bulk of the decisions with the user having the option to step in when they see an opportunity to add value."

- "IDeaS G3 RMS is designed to manage by exception—empowering you to complete tactical duties quicker—freeing up time for strategic activities that drive better revenue. G3 RMS sets an optimal mix of key

49

pricing and inventory controls and seamlessly distributes changes across all integrated selling systems, eliminating the need to do so manually."

- "[The] user-friendly interface focuses on management by exception through features like configurable dashboards, proactive alerts, and the Information Manager workflow guide."

- "When shopping for an RMS that enables dynamic demand forecasting, hoteliers should look for . . . . [a] highly automated system that doesn't require extensive user intervention or managing too many parameters, allowing users to manage by exception with alerts, dashboards, and reports."

596.    Because the G3 RMS produces reliable and accurate automated pricing and occupancy "decisions" that enable clients to "manage-by-exception," IDeaS tells clients they should manually override these "decisions" rarely if ever.

597.    While "clients have the ability" to manually "override" the pricing algorithm's decisions, IDeaS instructs them to do so only "sparingly" and if "absolutely necessary" using the following analogy:

> Think of a self-driving vehicle. They often do a spectacular job of handling the basics—braking, obstacle avoidance, turning, etc.—but most understand it'd be foolish to not include manual driver input as a check on the system. In general, the same thinking applies for automated revenue management software. You have the ability to directly override the system if it's absolutely necessary, but it's important to understand that this should be done sparingly as overrides, like other inputs, will influence how the system responds to forecast conditions.

598.    The G3 RMS contains multiple tools that reinforce its clients' continuous and consistent acceptance of its "decisions" under the "management-by-exception" approach. These tools include "Single Sign-On," "Information Manager," "What-If Analysis," and "Investigator."

599.    The Single Sign-On feature gives the client "the ability to maintain centralized control over employee access rights" to the G3 RMS and thus limits the number of relevant personnel who can manually override any "decision" for any given guest room transaction.

600.    The Information Manager feature "[g]uides user workflow while identifying opportunities to maximize revenue, such as alerting you to out-of-order rooms or overrides."

601.    The What-If Analysis feature allows clients to "quickly simulate the impact" that manual intervention would have on "forecasts and pricing—prior to making changes."

602.    The Investigator feature "helps you understand and build confidence in how your pricing outputs were derived." It "[p]rovides clarity" by letting clients "[e]asily view data points that drive pricing decisions such as competitors, demand, price sensitivity, pace and price ranking." This feature also "delivers confidence" by "[e]xpertly communicat[ing] price reasoning with key stakeholders" in order to "gain alignment on pricing strategy across departments."

603.    As IDeaS recognizes, "enhancing our tools to proactively monitor [clients'] systems," and thus "ensuring they are operating effectively and efficiently," reinforces clients' widespread acceptance of the G3 RMS's automated "decisions."

604.    IDeaS supplements the G3 RMS' revolutionary technology with its "Ultimate Client Care Program," also called "IDeaS for Success." Under this program, IDeaS assigns clients, including each Extended Stay Hotel Defendant, a "Comprehensive Client Care Team" that includes multiple management personnel. The team's remit is to "efficiently deploy [the client's] revenue solution," "get [the client's] team up and running," "quickly achieve maximum productivity and profitability," provide "proactive advice" and "ongoing training and engagement," and deliver "support throughout every stage of [the] partnership."

605.    IDeaS also assigns larger corporate clients like Extended Stay Hotel Defendants a "Client Relationship Manager" that "brings innovation and clarity to the client's experience of working with IDeaS and our sophisticated technology solutions."

606.    IDeaS also offers a "Virtual Revenue Management Service" to clients including Extended Stay Hotel Defendants. The service "helps hotels accelerate their revenue strategy by

assigning an industry revenue expert to work directly with hotel staff" to "align hotel management and staff around the techniques and habits of a revenue-focused culture. With the end goal of establishing clear standard operating procedures around revenue optimization," IDeaS notes, the service "ensure[s] that hotels of all kinds benefit from the revenue management revolution."

607.    IDeaS provides Extended Stay Hotel Defendants and their co-conspirators with this comprehensive set of human resources that supplement the technology to further support and enable their consistent and uniform adherence to the G3 RMS' "decisions" as a matter of course across their numerous extended stay hotel properties.

608.    Finally, Extended Stay Hotel Defendants' widespread acceptance of the G3 RMS' pricing "decisions" is demonstrated by basic financial tenets. The large financial investment that these Defendants have continued to make in connection with their continued use of the G3 RMS is proof that the product has worked as advertised. In other words, their use of the G3 RMS as advertised and promoted, through adopting its automated "decisions" and "managing by exception," has allowed them to significantly raise rates and revenue and given them reason to continue doing so.

609.    Extended Stay Hotel Defendants have paid significant fees to IDeaS in connection with the implementation and use of the G3 RMS and corresponding services. While the fees IDeaS charges to Extended Stay Hotel Defendants and its other clients for the G3 RMS are not publicly available, industry sources confirm that the product is expensive even by revenue management system standards.

610.    Industry publication *Hotel Tech Report* states that "[t]his product is priced higher than the average product in the category" of revenue management software, "which is usually an indicator that it is a premium product with enhanced functionality designed for more complex operations and use cases and larger properties."

611.    Hospitality consulting firm HotelMinder similarly recognizes that "IDeaS is an expensive solution with a high pricing ranking."

612.    Extended Stay Hotel Defendants themselves confirm that they have paid and continue to pay substantial sums of money to IDeaS. For example, Extended Stay America stated in its 2015 Form 10-K that it incurred "ongoing costs related to" the initial system-wide implementation and deployment of its "new revenue management system of approximately $1.6 million."

613.    Despite the high costs associated with using the G3 RMS, its client base that includes Extended Stay Hotel Defendants has continued to expand. IDeaS notes that it has a continuously expanding client base to which it "has delivered tangible and sustainable results," in turn producing an "unrivaled" 98% client retention rate:"



614.    These facts collectively demonstrate that Extended Stay Hotel Defendants have nearly always accepted the G3 RMS' "decisions" in setting guest room rates and occupancy levels across the nation and in the Relevant Markets.

### 8. Extended Stay Hotel Defendants Possess Market Power Nationally and in the Relevant Markets.

615.    Extended Stay Hotel Defendants collectively have possessed market power in the extended stay hotel guest room rental market across the United States and in each Relevant Market during the class period. This is supported by both direct and circumstantial evidence of market power.

616.    Direct evidence of Extended Stay Hotel Defendants' market power exists in the form of their ability to charge supercompetitive prices in the Relevant Markets during the class period. Stated specifically,  Defendants' anticompetitive scheme has directly caused extended stay hotel room

guest rental prices to substantially increase beyond what would have occurred in a competitive market, as discussed elsewhere.

617.    Circumstantial evidence of Extended Stay Hotel Defendants' market power exists in the form of sufficiently high market shares and the presence of structural features that render the extended stay hotel market conducive to effective collusion. Detailed allegations supporting these facts are set forth both immediately below and further below.

618.    Extended Stay Hotel Defendants collectively have possessed a dominant share of the extended stay hotel guest room rental market, and of the market's mid-price segment, nationwide and in the Relevant Markets during the class period.

619.    The allegations in the three paragraphs immediately above are detailed and supported by the facts provided below.

### Nationwide:

620.    **2016**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2016 collectively had about 38% of extended stay hotel guest rooms nationally across all segments at that time.

621.    Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2016:

- 0% of extended stay hotel guest rooms nationally in the economy segment;

- 62% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 33% of extended stay hotel guest rooms nationally in the upscale segment.

622.    In 2016, there were approximately 410,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant | Rooms |
|---|---|
| Extended Stay America Suites | 69,318 |
| Homewood Suites (Hilton) | 52,119 |
| H2 Suites (Hilton) | 29,582 |
| Sonesta ES Suites | 3,272 |

623.    **2017**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2017 collectively had about 35% of extended stay hotel guest rooms nationally across all segments at that time.

624.    Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2017:

- 0% of extended stay hotel guest rooms nationally in the economy segment;

- 58% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 31% of extended stay hotel guest rooms nationally in the upscale segment.

625.    In 2017, there were approximately 435,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant | Rooms |
|---|---|
| Extended Stay America Suites | 69,318 |
| Homewood Suites (Hilton) | 52,119 |
| H2 Suites (Hilton) | 29,582 |
| Sonesta ES Suites | 3,272 |

626.   **2018**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2018 collectively had about 35% of extended stay hotel guest rooms nationally across all segments at that time.

627.   Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2018:

- 0% of extended stay hotel guest rooms nationally in the economy segment;

- 53% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 31% of extended stay hotel guest rooms nationally in the upscale segment.

628.   In 2017, there were approximately 467,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant | Rooms |
|---|---|
| Extended Stay America Suites | 69,318 |
| Homewood Suites (Hilton) | 52,119 |
| H2 Suites (Hilton) | 29,582 |
| Sonesta ES Suites | 7,000 |

629.   **2019**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2019 collectively had about 35% of extended stay hotel guest rooms nationally across all segments at that time.

630.   Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2019:

- 0% of extended stay hotel guest rooms nationally in the economy segment;

- 55% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 31% of extended stay hotel guest rooms nationally in the upscale segment.

631.    In 2019, there were approximately 495,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant | Rooms |
|---|---|
| Extended Stay America Suites | 69,318 |
| Homewood Suites (Hilton) | 54,682 |
| H2 Suites (Hilton) | 39,620 |
| Sonesta ES Suites | 8,200 |

632.    **2020**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2020 collectively had about 36% of extended stay hotel guest rooms nationally across all segments at that time.

633.    Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2020:

- 0% of extended stay hotel guest rooms nationally in the economy segment;

- 59% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 30% of extended stay hotel guest rooms nationally in the upscale segment.

634.    In 2020, there were approximately 518,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant | Rooms |
|---|---|
| Extended Stay America Suites | 70,000 |
| Homewood Suites (Hilton) | 55,365 |

| Defendant | Rooms |
|---|---|
| H2 Suites (Hilton) | 48,004 |
| Sonesta ES Suites | 7,326 |
| Sonesta Simply Suites | 7,553 |

635.    **2021**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2021 collectively had about 44% of extended stay hotel guest rooms nationally across all segments at that time.

636.    Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2021:

- 43% of extended stay hotel guest rooms nationally in the economy segment;

- 60% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 28% of extended stay hotel guest rooms nationally in the upscale segment.

637.    In 2021, there were approximately 554,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants and their co-conspirators who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant/Co-Conspirator | Rooms |
|---|---|
| Extended Stay America Suites | 70,000 |
| Extended Stay America Premier Suites | 3,000 |
| Homewood Suites (Hilton) | 55,365 |
| H2 Suites (Hilton) | 48,004 |
| Sonesta ES Suites | 7,326 |
| Sonesta Simply Suites | 7,553 |
| MainStay Suites (Choice) | 6,994 |

| Defendant/Co-Conspirator | Rooms |
|---|---|
| Suburban Studios (Choice) | 6,395 |
| WoodSpring Suites (Choice) | 36,374 |

638. **2022**. Extended Stay Hotel Defendants and their co-conspirators who had deployed the G3 RMS at their extended stay hotel brands by 2022 collectively had about 48% of extended stay hotel guest rooms nationally across all segments at that time.

639. Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2022:

- 45% of extended stay hotel guest rooms nationally in the economy segment;

- 60% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 35% of extended stay hotel guest rooms nationally in the upscale segment.

640. In 2022, there were approximately 564,500 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant/Co-Conspirator | Rooms |
|---|---|
| Extended Stay America Suites | 70,000 |
| Extended Stay America Premier Suites | 3,000 |
| Extended Stay America Select Suites | 3,000 |
| Homewood Suites (Hilton) | 55,365 |
| H2 Suites (Hilton) | 48,004 |
| Sonesta ES Suites | 7,326 |
| Sonesta Simply Suites | 7,553 |
| MainStay Suites (Choice) | 6,994 |
| Suburban Studios (Choice) | 6,395 |

| Defendant/Co-Conspirator | Rooms |
|---|---|
| WoodSpring Suites (Choice) | 36,374 |
| Hawthorn Suites (Wyndham) | 5,462 |
| Hyatt House | 18,361 |

641.    **2023**. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands by 2023 collectively had about 51% of extended stay hotel guest rooms nationally across all segments at that time.

642.    Broken down by segment, these Extended Stay Hotel Defendants collectively had the following approximate percentages of extended stay hotel guest rooms nationally in 2023:

- 45% of extended stay hotel guest rooms nationally in the economy segment;

- 66% of extended stay hotel guest rooms nationally in the mid-price segment; and

- 37% of extended stay hotel guest rooms nationally in the upscale segment.

643.    In 2023, there were approximately 575,000 total extended stay hotel guest rooms across all segments nationally. Extended Stay Hotel Defendants who had deployed the G3 RMS at their extended stay hotel brands at that time had the following approximate numbers of guest rooms:

| Defendant/Co-Conspirator | Rooms |
|---|---|
| Extended Stay America Suites | 70,000 |
| Extended Stay America Premier Suites | 3,000 |
| Extended Stay America Select Suites | 12,000 |
| Homewood Suites (Hilton) | 58,530 |
| H2 Suites (Hilton) | 62,479 |
| Sonesta ES Suites | 7,643 |
| Sonesta Simply Suites | 6,464 |
| MainStay Suites (Choice) | 8,831 |

| Defendant/Co-Conspirator | Rooms |
|---|---|
| Suburban Studios (Choice) | 9,046 |
| WoodSpring Suites (Choice) | 28,350 |
| Hawthorn Suites (Wyndham) | 5,284 |
| Hyatt House | 19,154 |

**Relevant Markets:**

644.    Extended Stay Hotel Defendants (and their co-conspirators) collectively possessed a dominant share of extended stay hotel guest rooms across all three segments combined, and of rooms in the mid-price segment, in each Relevant Market for 2023, the most recent full year of the class period to date.

645.    While 2023 appears to be the only year for which there is sufficient publicly available information to compute Extended Stay Hotel Defendants' market share figures at the MSA level based on counsel's investigation, pre-trial discovery in this case should reveal the market share figures of Extended Stay Hotel Defendants and all presently unnamed co-conspirators for the prior years of the class period.

646.    **Los Angeles, CA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Los Angeles, California MSA as of year-end 2023:

| Los Angeles, CA MSA | | | |
| --- | --- | --- | --- |
| Total Extended Stay Hotel Rooms - 14,862 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 10 | 1304 | |
| Home2 (Hilton) | 6 | 800 | |
| Extended Stay America (all) | 22 | 2715 | |
| Sonesta ES + Simply Suites | 8 | 1022 | |
| MainStay (Choice) | 1 | 176 | |
| WoodSpring (Choice) | 1 | 122 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 5 | 877 | |
| Total Defendant Rooms | | 7016 | 47% |

647. **Chicago, IL MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Chicago, Illinois MSA as of year-end 2023:

| Chicago, IL MSA | | | |
| --- | --- | --- | --- |
| Total Extended Stay Hotel Rooms - 13,867 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 10 | 1389 | |
| Home2 (Hilton) | 9 | 1034 | |
| Extended Stay America (all) | 27 | 3294 | |
| Sonesta ES + Simply Suites | 9 | 1250 | |
| MainStay (Choice) | 7 | 688 | |
| WoodSpring (Choice) | 11 | 1328 | |
| Suburban (Choice) | 2 | 265 | |
| Hawthorn (Wyndham) | 1 | 120 | |
| Hyatt House (Hyatt) | 5 | 775 | |
| Total | | 10143 | 73% |

648. **Houston, TX MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel

Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Houston, Texas MSA as of year-end 2023:

| Houston, TX MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 18,718 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 17 | 1764 | |
| Home2 (Hilton) | 18 | 2016 | |
| Extended Stay America (all) | 17 | 2243 | |
| Sonesta ES + Simply Suites | 4 | 407 | |
| MainStay (Choice) | 2 | 183 | |
| WoodSpring (Choice) | 12 | 1426 | |
| Suburban (Choice) | 1 | 84 | |
| Hawthorn (Wyndham) | 1 | 100 | |
| Hyatt House (Hyatt) | 4 | 569 | |
| Total | | 11631 | 47% |

649.     **Washington, DC MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Washington, DC MSA as of year-end 2023:

| Washington DC MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 15,486 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 14 | 2127 | |
| Home2 (Hilton) | 7 | 848 | |
| Extended Stay America (all) | 18 | 2257 | |
| Sonesta ES + Simply Suites | 3 | 351 | |
| MainStay (Choice) | 1 | 72 | |
| WoodSpring (Choice) | 7 | 849 | |
| Suburban (Choice) | 3 | 328 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 3 | 503 | |
| Total | | 7335 | 47% |

650. **Philadelphia, PA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Philadelphia, PA MSA as of year-end 2023:

| Philadelphia MSA | | | |
|---|---|---|---|
| Total ES rooms (2023) - 9,418 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 13 | 1528 | |
| Home2 (Hilton) | 7 | 925 | |
| Extended Stay America (all) | 15 | 1632 | |
| Sonesta ES + Simply Suites | 2 | 243 | |
| Staybridge (IHG) | 6 | 626 | |
| WoodSpring (Choice) | 2 | 243 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 57 | |
| Hyatt House (Hyatt) | 3 | 394 | |
| Total | | 5648 | 58% |

651. **Phoenix, AZ MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel

Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Phoenix, Arizona MSA as of year-end 2023:

| Phoenix, AZ MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 11,494 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 8 | 969 | |
| Home2 (Hilton) | 13 | 1519 | |
| Extended Stay America (all) | 19 | 2222 | |
| Sonesta ES + Simply Suites | 6 | 760 | |
| MainStay (Choice) | 1 | 70 | |
| WoodSpring (Choice) | 4 | 480 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 68 | |
| Hyatt House (Hyatt) | 1 | 164 | |
| Total | | 6252 | 54% |

652. **Riverside, CA MSA**. The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Riverside, California MSA as of year-end 2023:

| Riverside, CA MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 4,635 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 5 | 665 | |
| Home2 (Hilton) | 8 | 765 | |
| Extended Stay America (all) | 4 | 458 | |
| Sonesta ES + Simply Suites | 0 | 0 | |
| MainStay (Choice) | 0 | 0 | |
| WoodSpring (Choice) | 4 | 466 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 75 | |
| Hyatt House (Hyatt) | 0 | 0 | |
| Total | | 2429 | 52% |

653.  **San Francisco, CA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the San Francisco, California MSA as of year-end 2023:

| San Francisco, CA MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 7,169 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 7 | 948 | |
| Home2 (Hilton) | 4 | 477 | |
| Extended Stay America (all) | 18 | 2235 | |
| Sonesta ES + Simply Suites | 2 | 244 | |
| MainStay (Choice) | 0 | 0 | |
| WoodSpring (Choice) | 0 | 0 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 2 | 112 | |
| Hyatt House (Hyatt) | 5 | 778 | |
| Total | | 4794 | 67% |

654.  **Detroit, MI MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel

Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Detroit, Michigan MSA as of year-end 2023:

| Detroit, MI MSA | | | |
| --- | --- | --- | --- |
| Total Extended Stay Hotel Rooms - 7,087 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 4 | 438 | |
| Home2 (Hilton) | 4 | 388 | |
| Extended Stay America (all) | 13 | 1433 | |
| Sonesta ES + Simply Suites | 6 | 733 | |
| MainStay (Choice) | 2 | 231 | |
| WoodSpring (Choice) | 5 | 610 | |
| Suburban (Choice) | 2 | 165 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 0 | 0 | |
| Total | | 3998 | 56% |

655. **Seattle, WA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Seattle, Washington MSA as of year-end 2023:

| Seattle, WA MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 7,337 | | | |
| Defendant | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 4 | 561 | |
| Home2 (Hilton) | 2 | 229 | |
| Extended Stay America (all) | 12 | 1308 | |
| Sonesta ES + Simply Suites | 1 | 142 | |
| MainStay (Choice) | 0 | 0 | |
| WoodSpring (Choice) | 5 | 597 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 152 | |
| Hyatt House (Hyatt) | 2 | 332 | |
| Total | | 3321 | 45% |

656. **Tampa, FL MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Tampa, Florida MSA as of year-end 2023:

| Tampa, FL MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 6,023 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 4 | 486 | |
| Home2 (Hilton) | 5 | 552 | |
| Extended Stay America (all) | 13 | 1536 | |
| Sonesta ES + Simply Suites | 1 | 104 | |
| MainStay (Choice) | 0 | 0 | |
| WoodSpring (Choice) | 3 | 367 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 1 | 145 | |
| Total | | 3190 | 53% |

657. **Denver, CO MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel

Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Denver, Colorado MSA as of year-end 2023:

| Denver, CO MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 10,209 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 6 | 696 | |
| Home2 (Hilton) | 6 | 746 | |
| Extended Stay America (all) | 12 | 1453 | |
| Sonesta ES + Simply Suites | 2 | 237 | |
| MainStay (Choice) | 3 | 226 | |
| WoodSpring (Choice) | 4 | 461 | |
| Suburban (Choice) | 3 | 358 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 4 | 534 | |
| Total | | 4711 | 46% |

658.   **Austin, TX MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Austin, Texas MSA as of year-end 2023:

| Austin, TX MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 8,492 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 6 | 655 | |
| Home2 (Hilton) | 5 | 537 | |
| Extended Stay America (all) | 12 | 1338 | |
| Sonesta ES + Simply Suites | 3 | 368 | |
| MainStay (Choice) | 0 | 0 | |
| WoodSpring (Choice) | 6 | 731 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 103 | |
| Hyatt House (Hyatt) | 1 | 190 | |
| Total | | 3922 | 46% |

659. **Boston MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant and Co-Conspirator extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Pittsburgh, PA MSA as of year-end 2023:

| Boston MSA | | | |
|---|---|---|---|
| Total ES rooms (2023) - 8,216 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 12 | 1420 | |
| Home2 (Hilton) | 3 | 348 | |
| Extended Stay America (all) | 9 | 1057 | |
| Sonesta ES + Simply Suites | 4 | 556 | |
| MainStay (Choice) | 1 | 34 | |
| WoodSpring (Choice) | 0 | 0 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 100 | |
| Hyatt House (Hyatt) | 2 | 336 | |
| Total | | 3851 | 47% |

660. **Pittsburgh, PA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel

Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Pittsburgh, PA MSA as of year-end 2023:

| Pittsburgh MSA | | | |
|---|---|---|---|
| Total ES rooms (2023) - 3,569 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 3 | 415 | |
| Home2 (Hilton) | 2 | 226 | |
| Extended Stay America (all) | 5 | 527 | |
| Sonesta ES + Simply Suites | 1 | 123 | |
| MainStay (Choice) | 1 | 85 | |
| WoodSpring (Choice) | 0 | 0 | |
| Suburban (Choice) | 2 | 219 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 2 | 264 | |
| Total | | 1859 | 52% |

661. **Sacramento, CA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Sacramento, California MSA as of year-end 2023:

71

| Sacramento, CA MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 4,149 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 3 | 339 | |
| Home2 (Hilton) | 3 | 327 | |
| Extended Stay America (all) | 7 | 834 | |
| Sonesta ES + Simply Suites | 0 | 0 | |
| MainStay (Choice) | 0 | 0 | |
| WoodSpring (Choice) | 0 | 0 | |
| Suburban (Choice) | 0 | 0 | |
| Hawthorn (Wyndham) | 1 | 60 | |
| Hyatt House (Hyatt) | 3 | 339 | |
| Total | | 1899 | 46% |

662.     **Cincinnati, OH MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Cincinnati, Ohio MSA as of year-end 2023:

| Cincinnati, OH MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 4,639 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 6 | 612 | |
| Home2 (Hilton) | 3 | 316 | |
| Extended Stay America (all) | 10 | 999 | |
| Sonesta ES + Simply Suites | 3 | 373 | |
| MainStay (Choice) | 2 | 191 | |
| WoodSpring (Choice) | 1 | 119 | |
| Suburban (Choice) | 1 | 47 | |
| Hawthorn (Wyndham) | 2 | 166 | |
| Hyatt House (Hyatt) | 0 | 0 | |
| Total | | 2823 | 61% |

663.     **Virginia Beach, VA MSA.** The following table provides the total number of extended stay hotel guest rooms, the number of locations and combined guest rooms of each Extended Stay

Hotel Defendant extended stay hotel brand, and Extended Stay Hotel Defendants' collective market share for the extended stay hotel guest room rental market across segments in the Virginia Beach-Norfolk, Virginia MSA as of year-end 2023:

| Virginia Beach-Norfolk, VA MSA | | | |
|---|---|---|---|
| Total Extended Stay Hotel Rooms - 5,195 | | | |
| Defendant/Co-Conspirator | Locations | Rooms | Market Share |
| Homewood Suites (Hilton) | 3 | 305 | |
| Home2 (Hilton) | 1 | 120 | |
| Extended Stay America (all) | 9 | 921 | |
| Sonesta ES + Simply Suites | 1 | 110 | |
| MainStay (Choice) | 1 | 88 | |
| WoodSpring (Choice) | 4 | 491 | |
| Suburban (Choice) | 3 | 427 | |
| Hawthorn (Wyndham) | 0 | 0 | |
| Hyatt House (Hyatt) | 1 | 156 | |
| Total | | 2618 | 50% |

664.    In addition to the above-referenced Relevant Markets, as of year-end 2023, Extended Stay Hotel Defendants collectively possessed dominant shares of the extended stay hotel guest room rental market across segments in the following of the nation's largest 30 MSAs by population:  Miami, FL (50% market share); Minneapolis, MN (57% market share); Charlotte, NC (46% market share); and St. Louis, MO (46% market share).

665.    Plaintiffs reserve the right to allege additional Relevant Markets and to name class representatives for those markets, including but not limited to the ones identified above, as their investigation continues and this case progresses.

**9. Defendants' Scheme Has Artificially Raised Guest Room Rates and Artificially Suppressed Occupancy Levels Nationally and in the Relevant Markets.**

666.    Defendants' anticompetitive scheme constitutes a common plan and course of conduct whose purpose and effect has been to artificially raise guest room rates and artificially suppress occupancy levels at their extended stay hotels across the nation and in the Relevant Markets.

667.    The G3 RMS-focused anticompetitive scheme that would pay big dividends for Defendants was conceived during, and motivated by, a period of lackluster financial performance they experienced during the Great Recession and its aftermath, between approximately 2008 to 2012.

668.    Defendants' anticompetitive scheme has enabled them to charge supra-competitive rates for their guest rooms while artificially suppressing the supply of these rooms across the nation and in each Relevant Market during the class period. Defendants' admissions, industry analyst statements, and relevant pricing and occupancy data collectively demonstrate this.

669.    IDeaS' marketing materials tout its ability to raise room rates and boost hotel revenue "by up to 15%" by delivering "the most revenue-driving," "automated," and "data-driven decisions"—generated through "the latest advances in technology and analytics" that utilize "your hotel and market data"—that hotels "count on 24/7."

670.    The following advertisement from Hospitality Upgrade's June 2018 edition, released to promote "the latest advances in technology and analytics" IDeaS had made to the G3 RMS, boasted that "clients trust" it "to generate the most revenue-driving decisions" with their "hotel and market data on IDeaS' automated, machine-learning solution that works 24/7:"



671.    This advertisement from Hospitality Upgrade's Spring 2020 edition states "IDeaS delivers revenue management automation you can count on 24/7" to "[c]ontrol the outcome" and "maximize your ROI:"



672.    This IDeaS advertisement from Hospitality Upgrade's Spring 2021 edition market its "automated, data-driven decisions you can count on, anytime, anywhere" for "greater profitability:"



673.    Hospitality Upgrade's Summer 2023 edition includes the following IDeaS ad that tells potential clients to "[m]aximize your hotel's revenue potential and unleash your pricing capabilities" while inviting them to "[d]iscover new pricing freedom and more" at an upcoming conference:



674.    IDeaS also supports its revenue increase claims with specific numbers. For example, Hospitality Upgrade's Spring 2024 edition contains the following full-page IDeaS advertisement:



675.    A March 19, 2022 joint release from IDeaS and PMS partner RMS Cloud referenced "[c]lient studies" that "show a revenue boost of up to 7% when using IDeaS and up to 15% if no revenue management strategy was in place prior to adopting IDeaS."

676.    A chatbot greets visitors to the IDeaS website by promising the generation of "an additional 7-15% in revenue" from using the G3 RMS:



677.    IDeaS' website touts the "15% average uplift over non-RM properties" that clients obtain by relying on the "100M+ pricing and overbooking decisions made daily" by the G3 RMS:



678.    G3 RMS's focus on maximizing revenues is important. Because the software's goal is to optimize subscribers' revenue and profits, and because it uses and was trained on non-public competitor information, the G3 RMS's shared use by competitors leads to increased prices. This is because, at bottom, the algorithm prioritizes profit over other pricing factors, such as occupancy. That means that pricing decisions are set at the highest rate for any given room before the software tries to maximize other datapoints (such as occupancy). And because G3 RMS was trained with proprietary information on how competitors set prices, and it continues to utilize current non-public competitor pricing information, it drives prices up. All of this also applies to the G3 RMS-based ChoiceMAX and

RevIQ. By contrast, if the algorithm's ultimate goal were to maximize occupancy over revenue, prices actually could decrease.

679.    Extended Stay Hotel Defendants and their co-conspirators have recognized publicly the positive impact the use of the G3 RMS or a G3 RMS-based in-house system has had on their revenue.

680.    For example, co-conspirator Choice recognized that "the impact" to its balance sheet from implementing the IDeaS-powered ChoiceMAX has been significant. The company's 2021 year-end financial reporting revealed that ChoiceMAX  caused the RevPAR of its properties, including its extended stay hotel brands, to increase by 2.2% in that year alone.

681.    In Choice's year-end earnings call, President and CEO Patrick Pacious echoed this observation, calling 2021 "a remarkable year" for the company due in large part to its "pricing optimization and merchandising capabilities." On this point, Pacious highlighted Choice's "leading-edge revenue management tool." He further noted that the "tools we have introduced are contributing to the outperformance our brands are experiencing," including "revenue-per-available-room gains."

682.    In an early 2023 Linkedin post discussing Choice's Fourth Quarter 2022 earnings results, IDeaS Area Director for New Ventures Michael Maher sent his "Congratulations to our partner Choice Hotels International who are making smart investments that bring results." He then quoted Choice President and CEO Patrick Pacious, who remarked that "[t]he new capabilities we have built to improve the profitability of each franchisee have resulted in three straight years of RevPAR growth that exceeded the industry, strengthening our competitive position and creating additional runway for growth in 2023 and beyond." The "new capabilities" referenced the G3 RMS-based ChoiceMAX that Choice widely deployed across its portfolio and that all or nearly all of its franchisees, including those operating its extended stay hotels, adopted.

683. Industry observer and analysts also have noted the marked rise in extended stay hotel guest room rental rates and corresponding revenues since the start of the class period.

684. "[E]xtended-stay hotels increased ADR slightly faster than the overall hotel industry from 2016 through 2019," and this market's "[r]elative RevPAR followed a similar trajectory, accelerating gains from 2016 through 2019," according to The Highland Group.

685. This trend continued during the pandemic years of 2020 and 2021. According to The Highland Group, "extended-stay hotels' ADR's relative growth to the overall hotel industry accelerated in 2020 as compared to 2019," and extended stay hotels' "[r]elative RevPAR followed a similar trajectory."

686. In 2021, "extended-stay hotels continue[d] to outpace other hotel types in their recovery from the pandemic," according to a CoStar article discussing statistics contained in a report by The Highland Group. The article quoted Mark Skinner, a partner at The Highland Group who has advised on hotel investments for three decades. Skinner said that during this pandemic-driven downturn, "extended-stay hotels did not discount rate as deeply as the rest of the hotel industry, making it easier to build back rate." The article also stated that the extended stay hotel market's economy and mid-price segments performed better financially than the upscale segment during the pandemic period, yet "[c]ompared to the rest of the hotel industry, upscale extended-stay hotels are recovering more quickly."

687. In 2022, extended stay hotels outperformed the overall hotel industry by a large margin. Relying on "the latest research from The Highland Group," a February 14, 2023 *Business Travel Executive* article noted that "[e]xtended stay hotel room revenues increased $3.2 billion in 2022, the second highest annual increase in 25 years." The article added that "[m]ost of the gain was attributed to average daily rate (ADR) growth, which saw the largest yearly increase on record." "Other milestones achieved in 2022," the article stated, "include new highs for nominal value RevPAR

(revenue per available room) levels for economy and mid-price extended stay hotels." The article continued that the "upscale segment reached its highest ADR on record." The article ended by recognizing the "the strong performance and stability of the extended-stay segment over the past few years" compared to the overall hotel industry.

688.    Extended stay hotels' financial success continued into 2023. According to The Highland Group, "U.S. extended stay hotel room revenues increased by $1.1 billion in 2023, similar to 2018 and 2019," and "[a]ll three extended-stay segments reported record-high room revenues in 2023, with the upscale segment leading despite previously lagging behind the pandemic recovery." "In 2023, room revenues for all extended-stay hotel segments reached a peak," while "[t]he 6.1 percent increase in extended-stay hotel revenues" from 2022 "outpaced the corresponding 5.5 percent gain reported by STR/CoStar for the overall hotel industry." Moreover, "the 4.7 percent increase in total extended-stay hotel ADR exceeded the 4.4 percent gain reported by STR/CoStar for the overall hotel industry," while "RevPAR for the economy and mid-price extended stay hotel segments outperformed their broader hotel industry counterparts" and "the upscale segment recorded the highest RevPAR increase for extended-stay hotels."

689.    Finally, multiple categories of relevant data, taken together, further demonstrate that Extended Stay Hotel Defendants have charged artificially inflated guest room rental rates and artificially suppressed occupancy rates nationally and in the Relevant Markets during the class period.

**<u>Nationwide:</u>**

690.    For the United States as a whole, aggregate annual extended stay hotel guest room rates (ADR) and revenue per available room (RevPAR) have markedly increased while occupancy levels have remained stable during the class period, with the unsurprising exception of the 2020 and 2021 pandemic years.

691.    *First,* the following sets of tables and charts—derived from data contained in reliable industry consultant reports—show that aggregate annual extended stay hotel guest room rates (ADR) and revenue per available room (RevPAR) substantially increased while occupancy levels remained stable during the class period nationally:







692.    *Second*, the following series of tables and charts—derived from available pricing and supply data of certain Extended Stay Hotel Defendants for some of the years they have used the G3 RMS—show that their extended stay hotels' annual ADR, RevPAR, and occupancy numbers moved similarly to one another in the market's mid-price segment nationally during the class period:



| Year | Home2 | Sonesta Simply | MainStay | ESA | ESA Premier |
|------|-------|----------------|----------|-----|-------------|
| 2016 | | | | $66.43 | |
| 2017 | | | | $67.19 | |
| 2018 | $118.18 | | | $68.62 | |
| 2019 | $117.09 | | | $67.97 | |
| 2020 | $100.28 | $67.42 | | $59.83 | |
| 2021 | $114.14 | $72.25 | $80.25 | | |
| 2022 | $134.04 | $86.18 | $87.07 | $75.61 | $101.60 |
| 2023 | $140.57 | $90.63 | | $76.17 | $99.25 |



Mid-price Segment - RevPAR

| Year | Home2 | Sonesta Simply | MainStay | ESA | ESA Premier |
|------|-------|----------------|----------|-----|-------------|
| 2016 | | | | $49.23 | |
| 2017 | | | | $50.09 | |
| 2018 | $91.98 | | | $51.73 | |
| 2019 | $92.03 | | | $52.16 | |
| 2020 | $56.34 | $42.81 | | $43.76 | |
| 2021 | $85.20 | $49.56 | $49.79 | | |
| 2022 | $104.47 | $60.67 | $54.24 | $56.56 | $78.06 |
| 2023 | $110.50 | $61.45 | | $57.49 | $75.02 |



| Year | Home2 | Sonesta Simply | MainStay | ESA | ESA Premier |
|------|-------|----------------|----------|-----|-------------|
| 2016 | | | | 74.10% | |
| 2017 | | | | 74.50% | |
| 2018 | 77.80% | | | 75.40% | |
| 2019 | 78.60% | | | 76.70% | |
| 2020 | 56.20% | 62.20% | | 73.10% | |
| 2021 | 74.60% | 66.90% | 62.10% | | |
| 2022 | 77.90% | 70.40% | 62.30% | 75% | 76.80% |
| 2023 | 78.60% | 67.80% | | 75.50% | 75.60% |

693.   Data for certain Extended Stay Hotel Defendants is not included in the charts above because it either is not publicly available or has not been published in a way that would make its inclusion useful.

694.   Certain mid-price and upscale extended stay hotel brand data is not noted in charts above because it does not exist for a given year or years. Hilton did not provide the relevant data for its individual brands, including Homewood Suites or Home2 Suites, in its annual reports for 2017 or earlier. Extended Stay America did not provide the relevant data company-wide or for its flagship Extended Stay America Suites brand for 2021 (as it went private half-way through that year). Sonesta

84

did not provide the relevant data for its individual brands, including Sonesta ES Suites, in its annual reports for 2018 or earlier. The relevant data for Wyndham's Hawthorn Suites also was not included because it only exists for one year of the class period (2022) but not the other (2023) and thus would not show whether that hotel's annual pricing and supply data moved similarly to that of the other hotels during the class period.

695.    There also is no table or chart for Extended Stay Hotel Defendants' economy segment hotels. Extended Stay America only entered this segment with the launch of its Select Suites in mid-2022, and the only year for which such data exists is 2023. The data for the only other Defendant or co-conspirator affiliated hotels in this segment, Choice's Suburban Studios and WoodSpring Suites, was not included because Choice stopped reporting the relevant data for its individual brands, including those two hotels (as well as its mid-price MainStay Suites brand) starting in 2023.

**Relevant Markets:**

696.    The following series of tables and charts—also compiled from data contained in comprehensive reports from the same sources noted above—similarly show that extended stay hotels' annual average room rates (ADR) and revenue per available room (RevPAR), substantially increased while their occupancy levels remained stable from 2015 through the present, except for the 2020 and 2021 pandemic years, in each Relevant Market:

**Los Angeles, CA MSA:**

| Year | ADR |
|------|--------|
| 2008 | $106.68 |
| 2009 | $91.30 |
| 2010 | $89.68 |
| 2011 | $95.19 |
| 2012 | $102.60 |
| 2013 | $109.35 |
| 2014 | $119.02 |
| 2015 | $128.38 |
| 2016 | $138.23 |
| 2017 | $142.12 |
| 2018 | $143.49 |
| 2019 | $143.81 |
| 2020 | $116.18 |
| 2021 | $134.10 |
| 2022 | $162.90 |
| 2023 | $168.37 |



| Year | RevPAR |
|------|--------|
| 2008 | $77.26 |
| 2009 | $66.31 |
| 2010 | $71.04 |
| 2011 | $76.61 |
| 2012 | $82.31 |
| 2013 | $88.98 |
| 2014 | $97.96 |
| 2015 | $107.45 |
| 2016 | $116.32 |
| 2017 | $119.74 |
| 2018 | $119.71 |
| 2019 | $121.59 |
| 2020 | $77.49 |
| 2021 | $106.77 |
| 2022 | $128.75 |
| 2023 | $131.20 |

| Year | Occupancy |
|------|-----------|
| 2008 | 72.40% |
| 2009 | 72.60% |
| 2010 | 79.20% |
| 2011 | 80.50% |
| 2012 | 80.20% |
| 2013 | 81.40% |
| 2014 | 82.30% |
| 2015 | 83.70% |
| 2016 | 84.10% |
| 2017 | 84.30% |
| 2018 | 83.40% |
| 2019 | 84.50% |
| 2020 | 66.70% |
| 2021 | 79.60% |
| 2022 | 79.00% |
| 2023 | 77.90% |



**Chicago, IL MSA:**

| Year | ADR |
|------|--------|
| 2008 | $85.01 |
| 2009 | $72.36 |
| 2010 | $68.53 |
| 2011 | $71.70 |
| 2012 | $78.80 |
| 2013 | $83.10 |
| 2014 | $87.76 |
| 2015 | $95.04 |
| 2016 | $99.67 |
| 2017 | $100.37 |
| 2018 | $102.15 |
| 2019 | $101.08 |
| 2020 | $75.62 |
| 2021 | $88.36 |
| 2022 | $108.63 |
| 2023 | $112.41 |

Average Daily Rate (ADR)



| Year | RevPAR |
|------|--------|
| 2008 | $57.29 |
| 2009 | $46.50 |
| 2010 | $51.11 |
| 2011 | $54.47 |
| 2012 | $58.25 |
| 2013 | $61.02 |
| 2014 | $65.84 |
| 2015 | $69.21 |
| 2016 | $71.92 |
| 2017 | $73.02 |
| 2018 | $74.83 |
| 2019 | $77.62 |
| 2020 | $44.88 |
| 2021 | $62.00 |
| 2022 | $79.93 |
| 2023 | $82.85 |

Revenue Per Available Room (RevPAR)

| Year | Occupancy |
|------|-----------|
| 2008 | 67.40% |
| 2009 | 64.30% |
| 2010 | 74.60% |
| 2011 | 76.00% |
| 2012 | 73.90% |
| 2013 | 73.40% |
| 2014 | 75.00% |
| 2015 | 72.80% |
| 2016 | 72.20% |
| 2017 | 72.80% |
| 2018 | 73.30% |
| 2019 | 76.80% |
| 2020 | 59.40% |
| 2021 | 70.20% |
| 2022 | 73.60% |
| 2023 | 73.70% |

Occupancy



87

**Houston, TX MSA:**

| Year | ADR |
|------|-----|
| 2008 | $75.15 |
| 2009 | $68.39 |
| 2010 | $61.49 |
| 2011 | $62.09 |
| 2012 | $66.48 |
| 2013 | $73.51 |
| 2014 | $80.10 |
| 2015 | $86.36 |
| 2016 | $80.50 |
| 2017 | $83.75 |
| 2018 | $82.38 |
| 2019 | $78.00 |
| 2020 | $67.21 |
| 2021 | $74.57 |
| 2022 | $78.75 |
| 2023 | $83.65 |



| Year | RevPAR |
|------|--------|
| 2008 | $56.99 |
| 2009 | $44.20 |
| 2010 | $40.17 |
| 2011 | $45.85 |
| 2012 | $51.31 |
| 2013 | $58.28 |
| 2014 | $64.23 |
| 2015 | $63.83 |
| 2016 | $55.24 |
| 2017 | $61.85 |
| 2018 | $57.21 |
| 2019 | $54.70 |
| 2020 | $40.64 |
| 2021 | $52.69 |
| 2022 | $55.39 |
| 2023 | $60.38 |



| Year | Occupancy |
|------|-----------|
| 2008 | 75.80% |
| 2009 | 64.60% |
| 2010 | 65.30% |
| 2011 | 73.90% |
| 2012 | 77.20% |
| 2013 | 79.30% |
| 2014 | 80.20% |
| 2015 | 73.90% |
| 2016 | 68.60% |
| 2017 | 73.90% |
| 2018 | 69.40% |
| 2019 | 70.10% |
| 2020 | 60.50% |
| 2021 | 70.70% |
| 2022 | 70.30% |
| 2023 | 72.20% |

**Occupancy**

**Washington, DC MSA:**



| Year | ADR |
|------|-----|
| 2008 | |
| 2009 | $117.51 |
| 2010 | $114.75 |
| 2011 | $117.31 |
| 2012 | $119.57 |
| 2013 | $116.50 |
| 2014 | |
| 2015 | $121.32 |
| 2016 | $123.00 |
| 2017 | $128.98 |
| 2018 | $130.24 |
| 2019 | $132.25 |
| 2020 | $102.69 |
| 2021 | $104.62 |
| 2022 | $127.71 |
| 2023 | $139.72 |

| Year | RevPAR |
|------|--------|
| 2008 | |
| 2009 | $83.49 |
| 2010 | $86.13 |
| 2011 | $86.50 |
| 2012 | $86.31 |
| 2013 | $80.92 |
| 2014 | |
| 2015 | $90.66 |
| 2016 | $93.93 |
| 2017 | $97.57 |
| 2018 | $99.50 |
| 2019 | $99.14 |
| 2020 | $53.76 |
| 2021 | $67.04 |
| 2022 | $93.56 |
| 2023 | $104.90 |



| Year | Occupancy |
|------|-----------|
| 2008 | |
| 2009 | 71.00% |
| 2010 | 75.10% |
| 2011 | 73.70% |
| 2012 | 72.20% |
| 2013 | 69.50% |
| 2014 | |
| 2015 | 74.70% |
| 2016 | 76.40% |
| 2017 | 75.70% |
| 2018 | 76.40% |
| 2019 | 75.00% |
| 2020 | 52.40% |
| 2021 | 64.10% |
| 2022 | 73.30% |
| 2023 | 75.10% |

89

**Philadelphia, PA MSA:**

| Year | ADR |
|------|--------|
| 2008 | $105.80 |
| 2009 | $91.79 |
| 2010 | $90.31 |
| 2011 | $94.72 |
| 2012 | $102.94 |
| 2013 | $107.74 |
| 2014 | $110.26 |
| 2015 | $115.09 |
| 2016 | $118.06 |
| 2017 | $116.05 |
| 2018 | $117.02 |
| 2019 | $116.92 |
| 2020 | $93.83 |
| 2021 | $106.95 |
| 2022 | $127.51 |
| 2023 | $130.90 |



| Year | RevPAR |
|------|--------|
| 2008 | $74.07 |
| 2009 | $62.82 |
| 2010 | $67.51 |
| 2011 | $73.27 |
| 2012 | $77.28 |
| 2013 | $77.38 |
| 2014 | $82.62 |
| 2015 | $84.93 |
| 2016 | $87.70 |
| 2017 | $84.74 |
| 2018 | $87.13 |
| 2019 | $86.91 |
| 2020 | $57.10 |
| 2021 | $74.93 |
| 2022 | $87.83 |
| 2023 | $90.69 |

| Year | Occupancy |
|------|-----------|
| 2008 | 7.00% |
| 2009 | 68.40% |
| 2010 | 74.80% |
| 2011 | 77.30% |
| 2012 | 75.10% |
| 2013 | 71.80% |
| 2014 | 74.90% |
| 2015 | 73.80% |
| 2016 | 74.30% |
| 2017 | 73.00% |
| 2018 | 74.50% |
| 2019 | 74.30% |
| 2020 | 60.90% |
| 2021 | 70.10% |
| 2022 | 68.90% |
| 2023 | 69.30% |



90

**Phoenix, AZ MSA:**



| Year | ADR |
|------|--------|
| 2008 | $76.93 |
| 2009 | $61.28 |
| 2010 | $58.88 |
| 2011 | $61.91 |
| 2012 | $102.94 |
| 2013 | $107.74 |
| 2014 | $110.26 |
| 2015 | $115.09 |
| 2016 | $82.29 |
| 2017 | $86.51 |
| 2018 | $89.18 |
| 2019 | $94.19 |
| 2020 | $85.63 |
| 2021 | $93.22 |
| 2022 | $112.59 |
| 2023 | $122.07 |



| Year | RevPAR |
|------|--------|
| 2008 | $47.42 |
| 2009 | $35.18 |
| 2010 | $39.03 |
| 2011 | $41.91 |
| 2012 | $42.59 |
| 2013 | $46.31 |
| 2014 | $51.60 |
| 2015 | $58.55 |
| 2016 | $61.13 |
| 2017 | $64.29 |
| 2018 | $67.97 |
| 2019 | $73.15 |
| 2020 | $57.64 |
| 2021 | $73.74 |
| 2022 | $88.93 |
| 2023 | $94.93 |



| Year | Occupancy |
|------|-----------|
| 2008 | 61.60% |
| 2009 | 57.40% |
| 2010 | 66.30% |
| 2011 | 67.70% |
| 2012 | 66.70% |
| 2013 | 70% |
| 2014 | 71.70% |
| 2015 | 74.10% |
| 2016 | 74.30% |
| 2017 | 74.30% |
| 2018 | 76.20% |
| 2019 | 77.70% |
| 2020 | 67.30% |
| 2021 | 79.10% |
| 2022 | 79.00% |
| 2023 | 77.80% |

**Riverside, CA MSA:**

| Year | ADR |
|------|------|
| 2008 | |
| 2009 | $82.87 |
| 2010 | $79.47 |
| 2011 | $85.07 |
| 2012 | $89.19 |
| 2013 | $93.98 |
| 2014 | $100.77 |
| 2015 | $108.04 |
| 2016 | $117.41 |
| 2017 | $120.94 |
| 2018 | $122.48 |
| 2019 | $124.43 |
| 2020 | $107.58 |
| 2021 | $126.81 |
| 2022 | $145.56 |
| 2023 | $143.46 |



| Year | RevPAR |
|------|--------|
| 2008 | |
| 2009 | $55.46 |
| 2010 | $56.55 |
| 2011 | $62.32 |
| 2012 | $66.00 |
| 2013 | $73.35 |
| 2014 | $79.94 |
| 2015 | $88.81 |
| 2016 | $96.90 |
| 2017 | $92.59 |
| 2018 | $96.67 |
| 2019 | $98.47 |
| 2020 | $81.05 |
| 2021 | $108.00 |
| 2022 | $112.58 |
| 2023 | $108.81 |



| Year | Occupancy |
|------|-----------|
| 2008 | |
| 2009 | 66.90% |
| 2010 | 71.20% |
| 2011 | 73.30% |
| 2012 | 74.00% |
| 2013 | 78.00% |
| 2014 | 79.30% |
| 2015 | 82.20% |
| 2016 | 82.50% |
| 2017 | 76.60% |
| 2018 | 78.90% |
| 2019 | 79.10% |
| 2020 | 75.30% |
| 2021 | 85.20% |
| 2022 | 77.30% |
| 2023 | 75.80% |

**San Francisco, CA MSA:**



| Year | ADR |
|------|------|
| 2008 | $96.18 |
| 2009 | $81.71 |
| 2010 | $79.18 |
| 2011 | $87.05 |
| 2012 | $99.17 |
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |
| 2017 | |
| 2018 | $166.46 |
| 2019 | $172.07 |
| 2020 | $123.15 |
| 2021 | $119.63 |
| 2022 | $148.08 |
| 2023 | $152.44 |

| Year | RevPAR |
|------|--------|
| 2008 | $69.65 |
| 2009 | $57.06 |
| 2010 | $61.33 |
| 2011 | $70.06 |
| 2012 | $79.60 |
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |
| 2017 | |
| 2018 | $134.32 |
| 2019 | $135.62 |
| 2020 | $73.16 |
| 2021 | $83.62 |
| 2022 | $111.17 |
| 2023 | $113.27 |



| Year | Occupancy |
|------|-----------|
| 2008 | 72.40% |
| 2009 | 69.80% |
| 2010 | 77.50% |
| 2011 | 80.50% |
| 2012 | 80.30% |
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |
| 2017 | |
| 2018 | 80.70% |
| 2019 | 78.80% |
| 2020 | 59.40% |
| 2021 | 69.90% |
| 2022 | 75.10% |
| 2023 | 74.30% |

**Detroit, MI MSA:**



| Year | ADR |
|------|------|
| 2008 | $69.49 |
| 2009 | $60.22 |
| 2010 | $55.39 |
| 2011 | $56.70 |
| 2012 | $61.10 |
| 2013 | $65.80 |
| 2014 | $71.09 |
| 2015 | $77.46 |
| 2016 | $81.70 |
| 2017 | $85.93 |
| 2018 | $86.42 |
| 2019 | $87.54 |
| 2020 | $74.85 |
| 2021 | $85.79 |
| 2022 | $98.89 |
| 2023 | $100.52 |



| Year | RevPAR |
|------|--------|
| 2008 | $42.54 |
| 2009 | $32.54 |
| 2010 | $37.57 |
| 2011 | $43.22 |
| 2012 | $45.02 |
| 2013 | $49.02 |
| 2014 | $53.33 |
| 2015 | $57.24 |
| 2016 | $61.68 |
| 2017 | $65.01 |
| 2018 | $65.04 |
| 2019 | $62.96 |
| 2020 | $46.16 |
| 2021 | $60.86 |
| 2022 | $68.81 |
| 2023 | $70.39 |



| Year | Occupancy |
|------|-----------|
| 2008 | 61.20% |
| 2009 | 54.00% |
| 2010 | 67.80% |
| 2011 | 76.20% |
| 2012 | 73.70% |
| 2013 | 74.50% |
| 2014 | 75.00% |
| 2015 | 73.90% |
| 2016 | 75.50% |
| 2017 | 75.70% |
| 2018 | 75.30% |
| 2019 | 71.90% |
| 2020 | 61.70% |
| 2021 | 71.00% |
| 2022 | 69.60% |
| 2023 | 70.00% |

**Seattle, WA MSA:**



| Year | ADR |
|------|-----|
| 2008 | $100.92 |
| 2009 | $87.56 |
| 2010 | $84.96 |
| 2011 | $90.46 |
| 2012 | $98.23 |
| 2013 | $102.89 |
| 2014 | $112.69 |
| 2015 | $122.70 |
| 2016 | $129.10 |
| 2017 | $131.62 |
| 2018 | $135.80 |
| 2019 | $134.21 |
| 2020 | $90.81 |
| 2021 | $102.44 |
| 2022 | $139.21 |
| 2023 | $141.69 |



| Year | RevPAR |
|------|--------|
| 2008 | $69.59 |
| 2009 | $58.55 |
| 2010 | $63.79 |
| 2011 | $68.89 |
| 2012 | $74.41 |
| 2013 | $79.95 |
| 2014 | $89.10 |
| 2015 | $97.74 |
| 2016 | $101.57 |
| 2017 | $105.07 |
| 2018 | $105.95 |
| 2019 | $104.42 |
| 2020 | $53.95 |
| 2021 | $72.51 |
| 2022 | $107.15 |
| 2023 | $108.03 |



| Year | Occupancy |
|------|-----------|
| 2008 | 69% |
| 2009 | 66.90% |
| 2010 | 75.10% |
| 2011 | 76.20% |
| 2012 | 76.10% |
| 2013 | 77.70% |
| 2014 | 79.10% |
| 2015 | 79.70% |
| 2016 | 78.70% |
| 2017 | 79.80% |
| 2018 | 78.00% |
| 2019 | 77.80% |
| 2020 | 59.40% |
| 2021 | 70.80% |
| 2022 | 77.00% |
| 2023 | 76.20% |

**Tampa, FL MSA:**



| Year | ADR |
|------|-----|
| 2008 | $81.65 |
| 2009 | $76.09 |
| 2010 | |
| 2011 | $73.29 |
| 2012 | $79.53 |
| 2013 | $79.96 |
| 2014 | $84.32 |
| 2015 | $91.96 |
| 2016 | $97.67 |
| 2017 | $101.80 |
| 2018 | $102.69 |
| 2019 | $104.18 |
| 2020 | $89.79 |
| 2021 | $106.84 |
| 2022 | $130.09 |
| 2023 | $133.88 |



| Year | RevPAR |
|------|--------|
| 2008 | $53.87 |
| 2009 | $48.93 |
| 2010 | $50.37 |
| 2011 | $55.02 |
| 2012 | $59.16 |
| 2013 | $61.09 |
| 2014 | $68.42 |
| 2015 | $76.87 |
| 2016 | $82.30 |
| 2017 | $84.80 |
| 2018 | $83.27 |
| 2019 | $84.85 |
| 2020 | $60.95 |
| 2021 | $83.02 |
| 2022 | $104.30 |
| 2023 | $105.15 |



| Year | Occupancy |
|------|-----------|
| 2008 | 66.00% |
| 2009 | 64.30% |
| 2010 | 71.50% |
| 2011 | 75.10% |
| 2012 | 74.40% |
| 2013 | 76.40% |
| 2014 | 81.10% |
| 2015 | 83.60% |
| 2016 | 84.30% |
| 2017 | 83.30% |
| 2018 | 81.10% |
| 2019 | 81.40% |
| 2020 | 67.90% |
| 2021 | 77.70% |
| 2022 | 80.20% |
| 2023 | 78.50% |

**Denver, CO MSA:**



| Year | ADR |
|------|-----|
| 2008 | $79.18 |
| 2009 | $67.13 |
| 2010 | $64.26 |
| 2011 | $66.60 |
| 2012 | $70.53 |
| 2013 | $78.38 |
| 2014 | $89.92 |
| 2015 | $99.40 |
| 2016 | $104.46 |
| 2017 | $107.25 |
| 2018 | $106.18 |
| 2019 | $107.92 |
| 2020 | $80.46 |
| 2021 | $95.58 |
| 2022 | $111.64 |
| 2023 | $115.81 |



| Year | RevPAR |
|------|--------|
| 2008 | $50.86 |
| 2009 | $43.90 |
| 2010 | $47.15 |
| 2011 | $50.53 |
| 2012 | $53.84 |
| 2013 | $62.00 |
| 2014 | $73.15 |
| 2015 | $79.83 |
| 2016 | $80.96 |
| 2017 | $82.69 |
| 2018 | $81.41 |
| 2019 | $83.27 |
| 2020 | $48.99 |
| 2021 | $69.08 |
| 2022 | $83.71 |
| 2023 | $88.41 |



| Year | Occupancy |
|------|-----------|
| 2008 | 64.20% |
| 2009 | 65.40% |
| 2010 | 73.40% |
| 2011 | 75.90% |
| 2012 | 76.30% |
| 2013 | 79.50% |
| 2014 | 81.40% |
| 2015 | 80.30% |
| 2016 | 77.50% |
| 2017 | 77.10% |
| 2018 | 76.70% |
| 2019 | 77.20% |
| 2020 | 60.90% |
| 2021 | 72.30% |
| 2022 | 75.00% |
| 2023 | 76.30% |

**Baltimore, MD MSA**

| Year | ADR |
|------|--------|
| 2008 | $106.83 |
| 2009 | $94.22 |
| 2010 | $90.34 |
| 2011 | $93.51 |
| 2012 | $99.40 |
| 2013 | $99.72 |
| 2014 | $101.80 |
| 2015 | $105.38 |
| 2016 | $105.99 |
| 2017 | $109.09 |
| 2018 | $105.22 |
| 2019 | $106.22 |
| 2020 | $88.46 |
| 2021 | $96.46 |
| 2022 | $111.70 |
| 2023 | $115.01 |



| Year | RevPAR |
|------|--------|
| 2008 | $73.77 |
| 2009 | $67.90 |
| 2010 | $68.41 |
| 2011 | $73.34 |
| 2012 | $73.37 |
| 2013 | $72.09 |
| 2014 | $78.11 |
| 2015 | $79.89 |
| 2016 | $79.19 |
| 2017 | $77.21 |
| 2018 | $77.77 |
| 2019 | $80.33 |
| 2020 | $56.21 |
| 2021 | $70.12 |
| 2022 | $82.00 |
| 2023 | $83.65 |



| Year | Occupancy |
|------|-----------|
| 2008 | 69.10% |
| 2009 | 72.10% |
| 2010 | 75.70% |
| 2011 | 78.40% |
| 2012 | 73.80% |
| 2013 | 72.30% |
| 2014 | 76.70% |
| 2015 | 75.80% |
| 2016 | 74.70% |
| 2017 | 73.50% |
| 2018 | 73.90% |
| 2019 | 75.60% |
| 2020 | 63.50% |
| 2021 | 72.70% |
| 2022 | 73.40% |
| 2023 | 73.90% |

99

**Austin, TX MSA:**

| Year | ADR |
|------|------|
| 2008 | $75.21 |
| 2009 | $65.91 |
| 2010 | $61.07 |
| 2011 | $64.91 |
| 2012 | $70.70 |
| 2013 | $75.77 |
| 2014 | $85.44 |
| 2015 | $92.77 |
| 2016 | $96.04 |
| 2017 | $100.20 |
| 2018 | $102.37 |
| 2019 | $103.53 |
| 2020 | $75.44 |
| 2021 | $88.67 |
| 2022 | $110.00 |
| 2023 | $111.99 |



| Year | RevPAR |
|------|--------|
| 2008 | $55.88 |
| 2009 | $44.17 |
| 2010 | $45.80 |
| 2011 | $50.22 |
| 2012 | $54.21 |
| 2013 | $62.26 |
| 2014 | $67.49 |
| 2015 | $75.18 |
| 2016 | $74.96 |
| 2017 | $76.69 |
| 2018 | $76.66 |
| 2019 | $78.50 |
| 2020 | $44.28 |
| 2021 | $70.99 |
| 2022 | $85.72 |
| 2023 | $86.05 |

| Year | Occupancy |
|------|-----------|
| 2008 | 74.30% |
| 2009 | 67.00% |
| 2010 | 75.00% |
| 2011 | 77.40% |
| 2012 | 76.70% |
| 2013 | 82.20% |
| 2014 | 79.00% |
| 2015 | 81.00% |
| 2016 | 78.10% |
| 2017 | 76.50% |
| 2018 | 74.90% |
| 2019 | 75.80% |
| 2020 | 58.70% |
| 2021 | 80.10% |
| 2022 | 77.90% |
| 2023 | 76.80% |



100

**Boston, MA MSA:**



| Year | ADR |
|------|------|
| 2008 | N/A |
| 2009 | $96.87 |
| 2010 | $96.43 |
| 2011 | $103.45 |
| 2012 | $113.48 |
| 2013 | N/A |
| 2014 | N/A |
| 2015 | N/A |
| 2016 | N/A |
| 2017 | N/A |
| 2018 | N/A |
| 2019 | N/A |
| 2020 | N/A |
| 2021 | N/A |
| 2022 | N/A |
| 2023 | $179.85 |



| Year | RevPAR |
|------|------|
| 2008 | N/A |
| 2009 | $65.20 |
| 2010 | $75.10 |
| 2011 | $80.87 |
| 2012 | $86.38 |
| 2013 | N/A |
| 2014 | N/A |
| 2015 | N/A |
| 2016 | N/A |
| 2017 | N/A |
| 2018 | N/A |
| 2019 | N/A |
| 2020 | N/A |
| 2021 | N/A |
| 2022 | N/A |
| 2023 | $142.42 |



| Year | Occupancy |
|------|-----------|
| 2008 | N/A |
| 2009 | 67.30% |
| 2010 | 77.90% |
| 2011 | 78.20% |
| 2012 | 76.10% |
| 2013 | N/A |
| 2014 | N/A |
| 2015 | N/A |
| 2016 | N/A |
| 2017 | N/A |
| 2018 | N/A |
| 2019 | N/A |
| 2020 | N/A |
| 2021 | N/A |
| 2022 | N/A |
| 2023 | 79.20% |

**Pittsburgh, PA MSA:**



| Year | ADR |
|------|-----|
| 2008 | #N/A |
| 2009 | $75.83 |
| 2010 | $80.39 |
| 2011 | $88.38 |
| 2012 | #N/A |
| 2013 | $99.38 |
| 2014 | $104.49 |
| 2015 | $108.42 |
| 2016 | $106.72 |
| 2017 | $98.86 |
| 2018 | $98.20 |
| 2019 | $97.06 |
| 2020 | $83.99 |
| 2021 | $95.47 |
| 2022 | $108.69 |
| 2023 | $113.36 |



| Year | RevPAR |
|------|--------|
| 2008 | #N/A |
| 2009 | $53.50 |
| 2010 | $63.49 |
| 2011 | $69.34 |
| 2012 | #N/A |
| 2013 | $73.92 |
| 2014 | $78.40 |
| 2015 | $78.63 |
| 2016 | $70.34 |
| 2017 | $67.84 |
| 2018 | $70.50 |
| 2019 | $73.24 |
| 2020 | $46.68 |
| 2021 | $66.43 |
| 2022 | $76.48 |
| 2023 | $80.91 |



| Year | Occupancy |
|------|-----------|
| 2008 | N/A |
| 2009 | 70.50% |
| 2010 | 79.00% |
| 2011 | 78.50% |
| 2012 | N/A |
| 2013 | 74.40% |
| 2014 | 75.00% |
| 2015 | 72.50% |
| 2016 | 65.90% |
| 2017 | 68.60% |
| 2018 | 71.80% |
| 2019 | 75.50% |
| 2020 | 55.60% |
| 2021 | 69.60% |
| 2022 | 70.40% |
| 2023 | 71.40% |

**Sacramento, CA MSA:**



| Year | ADR |
|------|------|
| 2008 | $91.51 |
| 2009 | $78.26 |
| 2010 | $72.71 |
| 2011 | $73.72 |
| 2012 | $74.89 |
| 2013 | $82.28 |
| 2014 | $89.85 |
| 2015 | $94.03 |
| 2016 | $98.58 |
| 2017 | $105.46 |
| 2018 | $110.67 |
| 2019 | $115.80 |
| 2020 | $98.32 |
| 2021 | $114.07 |
| 2022 | $129.57 |
| 2023 | $137.70 |



| Year | RevPAR |
|------|--------|
| 2008 | $60.19 |
| 2009 | $47.12 |
| 2010 | $49.53 |
| 2011 | $53.08 |
| 2012 | $54.22 |
| 2013 | $59.05 |
| 2014 | $66.18 |
| 2015 | $73.74 |
| 2016 | $79.81 |
| 2017 | $86.26 |
| 2018 | $90.94 |
| 2019 | $92.64 |
| 2020 | $66.00 |
| 2021 | $86.12 |
| 2022 | $97.56 |
| 2023 | $101.25 |

| Year | Occupancy |
|------|-----------|
| 2008 | 65.80% |
| 2009 | 60.20% |
| 2010 | 68.10% |
| 2011 | 72.00% |
| 2012 | 72.40% |
| 2013 | 71.80% |
| 2014 | 73.70% |
| 2015 | 78.40% |
| 2016 | 81.00% |
| 2017 | 81.80% |
| 2018 | 82.20% |
| 2019 | 80.00% |
| 2020 | 67.10% |
| 2021 | 75.50% |
| 2022 | 75.30% |
| 2023 | 73.50% |



**Cincinnati, OH MSA:**

| Year | ADR |
|------|-----|
| 2008 | $61.85 |
| 2009 | $53.94 |
| 2010 | $53.12 |
| 2011 | $57.67 |
| 2012 | $62.49 |
| 2013 | $66.49 |
| 2014 | $70.15 |
| 2015 | $75.47 |
| 2016 | $79.50 |
| 2017 | $83.17 |
| 2018 | $86.43 |
| 2019 | $87.84 |
| 2020 | $73.42 |
| 2021 | $87.01 |
| 2022 | $97.54 |
| 2023 | $104.70 |



104



| Year | RevPAR |
|------|--------|
| 2008 | $41.07 |
| 2009 | $34.96 |
| 2010 | $36.57 |
| 2011 | $41.84 |
| 2012 | $45.26 |
| 2013 | $49.01 |
| 2014 | $51.54 |
| 2015 | $56.14 |
| 2016 | $60.66 |
| 2017 | $63.54 |
| 2018 | $63.94 |
| 2019 | $66.19 |
| 2020 | $48.51 |
| 2021 | $64.51 |
| 2022 | $72.44 |
| 2023 | $77.21 |



| Year | Occupancy |
|------|-----------|
| 2008 | 66.40% |
| 2009 | 64.80% |
| 2010 | 68.90% |
| 2011 | 72.60% |
| 2012 | 72.40% |
| 2013 | 73.70% |
| 2014 | 73.50% |
| 2015 | 74.40% |
| 2016 | 76.30% |
| 2017 | 76.40% |
| 2018 | 74.00% |
| 2019 | 75.30% |
| 2020 | 66.10% |
| 2021 | 74.10% |
| 2022 | 74.30% |
| 2023 | 73.70% |

**Virginia Beach-Norfolk, VA MSA:**



| Year | ADR |
|------|--------|
| 2008 | $65.08 |
| 2009 | $62.69 |
| 2010 | $59.54 |
| 2011 | $60.53 |
| 2012 | $61.69 |
| 2013 | $66.69 |
| 2014 | $65.50 |
| 2015 | $67.38 |
| 2016 | $69.29 |
| 2017 | $72.87 |
| 2018 | $74.86 |
| 2019 | $78.26 |
| 2020 | $72.20 |
| 2021 | $84.20 |
| 2022 | $94.23 |
| 2023 | $96.36 |





697.    Extended Stay Hotel Defendants' ability to charge significantly higher guest room rates consistently throughout the class period nationwide and in the Relevant Markets has allowed their revenues to substantially increase during this period.

698.    The following chart shows the significant and sustained increase in extended stay hotels' combined annual room revenues, driven by Extended Stay Hotel Defendants, during the class period (except for the pandemic years of 2020 and 2021):



699.    Guest room rates and corresponding revenues for the extended stay hotel market generally, and for Extended Stay Hotel Defendants in particular, have increased at a proportionally greater rate than those of the overall hotel industry during the class period.

700.    Extended Stay Hotel Defendants' guest room rate increases and corresponding revenue uplift experienced during the class period cannot be explained by any normal, pro-competitive market forces.

701.    As testament to the sustained outsized returns experienced in the extended stay hotel market, particularly by Extended Stay Hotel Defendants, major hotel chains with existing extended stay brands and large private equity firms alike have increased their investments in and commitment to this sector during the class period.

**F.  Defendants' Conspiracy Has Produced Anticompetitive Effects.**

702.    As a result of the alleged anticompetitive scheme, Extended Stay Hotel Defendants have charged higher guest room rates and supplied fewer guest rooms nationally and in the Relevant Markets than they would have done in a competitive marketplace.

703.     The alleged scheme was intended to and did benefit Defendants. Pricing Algorithm Defendants' revenues and profits have increased as more Extended Stay Hotel Defendant clients have adopted and continued to use the G3 RMS. By the same token, Extended Stay Hotel Defendants' revenues have increased since they began using the G3 RMS to set guest room rates.

704.     The G3 RMS works most effectively by enabling and ensuring that competitors knowingly take the same approach to pricing—*i.e.*, collectively using the same mechanism that relies on the same type of sensitive, confidential data to generate the same type of optimal pricing and occupancy "decisions" for each one to adopt—in markets over which they have collective power. This is not how genuine competitors should make independent pricing decisions in properly functioning markets. But that is what has occurred here.

705.     Starting no later than 2016, a critical mass of Extended Stay Hotel Defendants widely began deploying the G3 RMS at their extended stay hotels to set anticompetitive guest room rates and occupancy levels across the nation and in the Relevant Markets for a sustained period.

706.     Defendants formed, maintained, and operated a hub-and-spoke conspiracy to fix, raise, and stabilize room rates and occupancy levels through their knowing and intentional shared use of the G3 RMS and related reinforcing conduct that has had the purpose and effect of charging guests supra-competitive prices for guest room rentals during the class period.

707.     Pricing Algorithm Defendants acted as the hub of this anticompetitive conspiracy through at least the following acts:

- They created, marketed, promoted, and coordinated Extended Stay Hotel Defendants' knowing and intentional shared use of the G3 RMS pricing algorithm that used their non-public pricing and occupancy data and their confidential STR and Demand360 data to generate supra-competitive pricing and occupancy "decisions;"

- They marketed the fully automated manner in which the pricing algorithm was designed to and did work to set room rates without human intervention for clients including Extended Stay Hotel Defendants;

- They promoted the consistent and widespread adoption of the pricing algorithm's pricing and occupancy "decisions" by clients like Extended Stay Hotel Defendants;

- They communicated each Extended Stay Hotel Defendant's use of the pricing algorithm and best pricing practices and guidelines to each other through various means and settings; and

- They established and coordinated various technological and personal mechanisms that monitored and reinforced Extended Stay Hotel Defendants' consistent and continuous adoption of the pricing algorithm's pricing and occupancy "decisions."

708.    Extended Stay Hotel Defendants acted as spokes of this anticompetitive conspiracy by taking various acts related to the G3 RMS pricing algorithm, including the following:

- They knowingly and intentionally used the same third-party pricing algorithm that each of their co-defendants and co-conspirators were using;

- They communicated with their co-defendants about and otherwise were made aware of their co-defendants' and co-conspirators' use of the same third-party pricing algorithm that they were using;

- They knowingly submitted their own non-public pricing and supply data and their own STR and Demand360 data to the same third-party pricing algorithm to which their co-defendants and co-conspirators were submitting their own corresponding data;

- They knowingly received the same type of supra-competitive pricing and occupancy "decisions" generated by the pricing algorithm that their co-defendants and co-conspirators were receiving;

- They understood that pricing and occupancy "decisions" they were receiving from the pricing algorithm were based on competitors' non-public pricing and occupancy data and the STR and Demand360 data they and their co-defendants and co-conspirators were providing to the algorithm;

- They understood that their co-defendants knew that the pricing and occupancy "decisions" they each were receiving from the algorithm were based on the non-public pricing and occupancy data and STR and Demand360 data they and their co-defendants and co-conspirators were providing to the algorithm;

- They knowingly set their room rates and occupancy levels by accepting the same type of pricing and occupancy "decisions" that their co-defendants and co-conspirators were receiving and accepting;

- They understood that their co-defendants and co-conspirators were knowingly setting their room rates and occupancy levels based on the same type of pricing and occupancy "decisions" that they were receiving;

- They monitored the current room rates and occupancy levels of each co-defendant and co-conspirator through current room rate and occupancy level data feeds provided by the pricing algorithm;

- They understood that their co-defendants and co-conspirators also were monitoring their own current room rates and occupancy levels through current room rate and occupancy level data feeds provided by the pricing algorithm;

- They utilized various technological and personal mechanisms that enabled them to monitor and reinforce their consistent and continuous adoption of the pricing algorithm's pricing and occupancy "decisions;"

- They understood that their co-defendants and co-conspirators utilized various technological and personal mechanisms that enabled them to monitor and reinforce their consistent and continuous adoption of the pricing algorithm's pricing and occupancy "decisions;"

- They knowingly shared their competitively sensitive information, including current pricing and occupancy data, with each other through their shared use of the G3 RMS; and

- They engaged in improper information sharing through meetings and communications they had with personnel from IDeaS and other Extended Stay Hotel Defendants at various venues and times, including at industry conferences and events, to discuss pricing strategies and practices related to the G3 RMS.

709.    In sum, Defendants operated an anticompetitive scheme (a) premised on Extended Stay Hotel Defendants' knowing and intentional use of, and submission of non-public business data to, the same third-party pricing algorithm; and (b) reinforced through other coordinated conduct and communications between and among Defendants. This alleged anticompetitive scheme has had the purpose and effect of setting guest room prices at supra-competitive levels and setting occupancy rates at artificially suppressed levels during the class period nationwide and in the Relevant Markets.

**G.  Defendants' Conspiracy Has Produced No Pro-Competitive Benefits.**

710.    Defendants' anticompetitive scheme was intended to and did benefit Defendants at the expense of competition and consumers alike.

711.    Defendants' anticompetitive scheme has neither benefitted competition nor produced pro-competitive effects in the nation as a whole or in any of the Relevant Markets.

712.    While Defendants' misconduct has benefitted Defendants by artificially increasing their own guest room rates, revenues, and/or profits, it has had the opposite effect on consumers who have subsidized Defendants' windfall by paying artificially inflated rates to rent an artificially restricted supply of guest rooms as well as the competitive process in general.

713.    While Defendants' misconduct may have increased their operational efficiencies by saving them time, labor costs, and other internal resources, it has made it more difficult or impossible for consumers to identify or secure reasonable rates for guest rooms offered by their co-defendants and co-conspirators.

714.    Assuming any pro-competitive benefits from Defendants' misconduct exist (they do not), they would be *de minimis* in nature and could not outweigh the significant and ongoing anticompetitive effects that it has caused across the nation and in the Relevant Markets.

## H. Government Regulators, Academics, and Economists Recognize That Defendants' Conduct Is Blatantly Anticompetitive.

715.    Antitrust regulators, legal scholars, and economists studying the issue have concluded that competitors' use of a shared pricing algorithm to set prices in the manner in which Defendants have done so here produces the same type of anticompetitive effects that have occurred here.

716.    In August 2024, the U.S. Department of Justice ("DOJ"), together with eight state Attorneys General (for California, Colorado, Connecticut, Minnesota, North Carolina, Oregon, and Tennessee), filed a civil antitrust lawsuit against RealPage Inc. for its unlawful and anticompetitive scheme to increase and fix prices of apartment leases. *United States of America v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C.).

717.    The alleged misconduct in *Realpage* is substantially similar to Defendants' alleged anticompetitive and unlawful conduct here. DOJ alleges that RealPage sells revenue management software to landlords that collects nonpublic information from competing landlords, combines that

confidential and competitively sensitive information, and feeds it into an algorithm to make pricing recommendations to landlord users (and their landlord competitors) that are designed to increase prices and minimize price decreases.

718.    DOJ's *Realpage* complaint alleges violations of Sections 1 and 2 of the Sherman Act based on (1) the unlawful sharing of non-public, competitively sensitive data with Realpage with the knowledge that RealPage uses the data to train its software and make pricing recommendations for landlords and their competitors; (2) Realpage's vertical agreements with landlords to price rental apartments through the use of Realpage's revenue management software; (3) Realpage's unlawful monopolization of the commercial revenue management software market; and (4) Realpage's unlawful attempted monopolization of the commercial revenue management software market.

719.    Because the apartment unit pricing algorithm-centered conduct, which bears substantially similarity to Defendants' pricing algorithm-centered conduct, is so nakedly anticompetitive, DOJ's Antitrust Division filed in November 2023 a Statement of Interest and supporting memorandum of law in a pending class action, *In re RealPage Rental Software Antitrust Litigation*, Case No. 3:23-MD-3071 (M.D. Tenn.), that challenges the landlords' conduct to assert that competitors' knowing use of the same pricing algorithm to set prices should be scrutinized under the per se illegal standard.

720.    DOJ's statement addresses plaintiffs' claim that the alleged scheme was per se unlawful and agrees with plaintiffs that the alleged misconduct should be analyzed under this standard. DOJ asserted that the defendants' alleged conduct should be assessed under the per se illegal standard:

> Taking the allegations set forth in the complaints as true, the alleged scheme meets the legal criteria for per se unlawful price fixing. Although not every use of an algorithm to set price qualifies as a per se violation of Section 1 of the Sherman Act, it is per se unlawful when, as alleged here, competitors knowingly combine their sensitive, nonpublic pricing and supply information in an algorithm that they rely upon in making pricing decisions, with the knowledge and expectation that other competitors will do the same.

Dkt. 628 at 15.

721.    DOJ noted that "[p]rice fixing, one of the supreme evil[s] of antitrust, is the prototypical example of per se unlawful conduct," and "[t]he analysis is no different simply because a software algorithm is involved." Dkt. 628 at 15. It further underscored that technological advances, including sophisticated pricing algorithms akin to the Rainmaker platform, are expressly contemplated and covered by the broad language of Section 1 of the Sherman Act:

> As technology has evolved, so too have methods of price fixing. In 1890, a price-fixing conspiracy might have manifested with a formal handshake in a clandestine meeting. The proliferation of fax machines, emails, text messages, and inter-company chat platforms has presented new means of unlawfully acting in concert oceans away. While these methods might have been unimaginable to the robber barons whose conduct necessitated and inspired the Sherman Act, under Section 1, "the machinery employed by a combination for price-fixing is immaterial." Section 1 applies to collaborations that eliminate independent decisionmaking—however they have been brought about.

*Id.* at 1.

722.    Although the *RealPage* court did not adopt the per se standard of analysis at the outset of the case when denying the defendants' motions to dismiss after applying the rule of reason standard, that court cautioned that it was merely holding that "at this phase of the case"—*i.e.*, on the pleadings alone—early application of the per se standard had not yet been established. Dkt. 690 at 45–46. Far from rejecting DOJ's position that the per se standard should attach to a hub-and-spoke conspiracy involving pricing algorithms like the one at issue, the *RealPage* court left the question for a later stage in that litigation. *Id.*

723.    The DOJ and FTC have made similar arguments in joint statements of interest they have filed in similar class actions challenging competitors' knowing use of a common third party pricing algorithm to set prices for apartment units and casino-hotel guest rooms. *See* Statement of Interest of the United States (Dkt. 96), *Cornish-Adebiyi v. Caesars Entertainment, Inc.*, No. 23-cv-02536-

KMW-EAP (D.N.J. Mar. 28, 2024); Statement of Interest of the United States (Dkt. 149), *Duffy v. Yardi*, No. 2:23-cv-01391 (W.D. Wa. Mar. 1, 2024).

724.    Federal regulators similarly sounded the alarm long before the recent swath of pricing algorithm cases were on file. In 2017, Maureen Ohlhausen, the then-acting Chair of the Federal Trade Commission, discussed why multiple competitors who use the same third-party firm to set prices is just as anticompetitive as a prototypical price-fixing conspiracy:

> What if algorithms are not used in such a clearly illegal way, but instead effectively become a clearing house for confidential pricing information? Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information. Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word 'algorithm' appears, please just insert the words 'a guy named Bob.' Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.

725.    Competition law professors Ariel Ezrachi and Maurice Stucke also have written extensively on the subject. In their May 2017 paper titled *Algorithmic Collusion: Problems and Counter-Measures*, they discussed "how in an online environment a hub-and-spoke [price-fixing conspiracy] framework may emerge when sellers use the same algorithm or the same data pool to determine price." In particular:

> An industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes, would result in de-facto hub-and-spoke structure, as the market behavior of the competitors aligns due to the use of a similar "brain" to determine their price strategy. These effects intensify when sellers use the same data pool and are privy to vast volumes of data. Hub-and spoke structures may therefore be observed at the input level (data) and the output level (algorithm).

726.    The law professors went on to note this situation playing out in connection with gas stations using the same third-party analytics provider to determine fuel prices. The professors concluded that "[t]his anecdotal example supports the assertion that as competitors use a single hub – a single provider for algorithmic pricing – one may expect, in markets susceptible to tacit collusion, greater alignment of pricing decisions and higher prices overall."

727.    In addition, economists who have studied competitors' use of shared pricing algorithms in concentrated markets to set pricing confirm the anti-competitive effects that this conduct produces in general and that has occurred here in particular.

728.    In a March 2021 paper titled *Autonomous Algorithmic Collusion: Economic Research and Policy Implications*, a team of economists studied the impact that using pricing algorithms could have on competition. In doing so, they addressed the anticompetitive consequences of competitors using the same third-party algorithm to set prices:

> Algorithmic pricing can also affect competition if a single intermediary software provider sells their product to multiple competitors. Such adoption could lead to hub-and-spoke (where the provider acts as the hub of the sellers, Ezrachi and Stucke 2015) or parallel-use scenarios, with competitors coordinating to higher prices by delegating choices or relaying information to the same third party. These concerns are warranted by the statements and observed behaviour of software providers. Some providers promote their products by suggesting that they optimize for long-term revenues and avoid price wars.

The conduct attributed to the software providers—encouraging competitors to use their algorithms to "optimize" revenue and avoid undercutting each other on price—is what Cendyn has successfully

promoted and enabled Casino-Hotel Defendants to do. It also is conduct frequently observed in traditional horizontal price-fixing conspiracies.

729.    A March 28, 2023 paper titled *Coordinated vs. Efficient Pricing: The Impact of Algorithmic Pricing on Multifamily Rental Market* by two professors at the University of Pennsylvania's Wharton School of Business examined the impact of algorithmic pricing on the U.S. multifamily rental housing market from 2005 to 2019, with a focus on RealPage's apartment unit pricing algorithm software.

730.    In the paper, economist Sophie Calder-Wang and computer scientist Gi Heung Kim began by discussing how this software—which appears to function in a substantially similar way as the G3 RMS—works. The professors "were able to obtain a copy of presentation slides made in 2014 that showcases the inner workings of one of the software, RealPage's YieldStar," and reported what they observed:

> The most notable point is that the software estimates demand elasticity and forecasts dynamic demand at the bedroom-level based on lease length and renewal probability by fully utilizing selected competitors' prices and vacancies…. [The interface] shows the dashboard views for a property manager that displays price recommendations made by the software. All of this information is purely for providing data points to manager and the cognitive burden for a manager to act on this myriad of information is minimal; a manager can simply click either the 'Accept Rates' or the 'Review Rates' (if something seems so out of place) button located on both top and bottom of the table. ProPublica reports that managers accept recommended rents up to 90% of the time.

> The pricing software both reacts to changes in market conditions and heavily utilizes the detailed, high-frequency data of competitors down to the granularity of daily prices for individual units. The question is then, where do they get the data from?…. [I]is almost certain that Yieldstar utilizes its own clients' data to maximize other clients' profits[.]

731.    After conducting an empirical analysis of the relevant data, the economists presented several findings on the effects of algorithmic pricing software adoptions on apartment rents:

- *First*, the algorithm's "adopters exhibit a more responsive pricing function to the changes in local demand conditions," resulting in higher rents and lower occupancy levels "during the boom" periods.

- *Second*, "across markets, higher levels of penetration" of algorithm use "lead to higher rents," a "pattern" that "is robust across time-periods, market definitions, and regression specifications." While they found this to be true for algorithm adopters, they also found this to be the case market-wide, including for non-adopters, in markets where the adopters had sufficiently high market share.

- *Third*, the observed impacts can "be consistent with the pattern of coordinated pricing, shown by the empirical pattern of price increase and quantity restriction of the non-adopters as well as the previous theoretical and empirical work on algorithmic pricing."

732.    Landlords' increasing use of RealPage in certain markets to set pricing and the resulting rise in multi-family unit rents parallels what has happened with extended stay hotels nationally and in the Relevant Markets. While firms in these respective industries have used the respective pricing algorithm for multiple years, the resulting anticompetitive effects in each industry have occurred in the respective markets during periods of relative economic prosperity and when colluding competitors have possessed sufficient collective market power. Further, this conduct has increased prices market-wide, not just those of the participating firms.

733.    The bottom line is that Defendants' scheme has produced anticompetitive effects nationally and in the Relevant Markets by causing Class members to pay artificially inflated prices for rooms rented directly from Extended Stay Hotel Defendants. This misconduct is illegal under both the per se and rule of reason standards.

**I.  Defendants' Anticompetitive Scheme Constitutes Parallel Conduct That Is Facially Anticompetitive.**

734.    Defendants' knowing and intentional use of the same third-party pricing algorithm to govern their respective pricing strategies and set their respective room rates constitutes the sort of common plan and course of action that unreasonably restrains competition and violates the federal antitrust laws.

735.    The type of "plus factor" analysis that courts often conduct to assess the plausibility of claims where the alleged collusion relies on circumstantial evidence is not necessary here. This is because Plaintiffs have alleged direct evidence of an unreasonable agreement or understanding by describing with particularity the common plan and course of conduct centered on the coordinated adoption of the G3 RMS to set prices that Defendants formed and operated.

736.    Indeed, Extended Stay Hotel Defendants' willing entry and continued participation in the alleged anticompetitive scheme represents parallel conduct that is facially anticompetitive without the need to analyze any "plus factors."

737.    But even if the Court determines that a "plus factor" analysis is required in this case, multiple "plus factors" exist that further demonstrate the plausibility of Plaintiffs' claims. These are discussed below.

**J.  The Relevant Markets Possess Characteristics That Make Them Susceptible to the Effective Collusion That Has Occurred.**

738.    The Relevant Markets possesses multiple factual enhancements or "plus factors" that, when considered with Extended Stay Hotel Defendants' consciously parallel conduct described above, render them susceptible to collusion and thus make the formation, maintenance, and efficacy of a cartel more likely.

739.    The Relevant Markets are characterized by at least the following "plus factors:" (1) motive to conspire; (2) actions against interest; and (3) traditional conspiracy evidence.

### 1.  Defendants Had the Motive to Conspire.

740.    Defendants had the motive to conspire given the structural features of the markets and the financial difficulties Extended Stay Hotel Defendants faced in the years immediately preceding the class period.

741.    **Structural Features.** The Relevant Markets possess structural characteristics that are common in industries plagued by collusion: (a) high entry barriers; (b) high market concentration; (c) lack of reasonable substitutes; and (d) product fungibility.

742.    <u>High Entry Barriers</u>. New entrants to the Relevant Markets face high entry barriers.

743.    The most prohibitive cost is the large amount of upfront capital costs and associated fees it takes to open an extended stay hotel property. Capital expenditures exceeding many millions of dollars are needed to acquire or build and maintain a modern property with the necessary amenities to compete for and retain extended stay hotel guests.

744.    According to numerous industry participants, it costs about $120,000 per guest room on average to build an economy extended stay hotel, about $170,000 per guest room on average to build a mid-price extended stay hotel, and about $260,000 per guest room to build on average to build an upscale extended stay hotel. Assuming a 120 room hotel, the costs to build a single property would amount to $14.5 million, $20.5 million, and $31 million, respectively.

745.    Hotel industry consultant HVS' annual U.S. Hotel Development Cost Survey "sets forth averages of development costs in each defined lodging product category," including "midscale extended-stay" and "upscale extended stay."  The 2023 U.S. Hotel Development Cost Survey, which "reports per-room hotel development costs based on data" obtained "from hotel projects proposed or under construction" across the U.S. in 2021 and 2022, provides the following table containing development cost averages for properties in these two segments of the extended stay market:

| | Land | Building & Site Improvements | Soft Costs | FF&E | Pre-Opening & Working Capital | Developer Fee | Total |
|---|---|---|---|---|---|---|---|
| **Extended-Stay Hotels (Midscale)** | | | | | | | |
| Average | $14,712 | $107,364 | $19,454 | $17,248 | $3,417 | $4,912 | $167,107 |
| Median | $12,264 | $102,516 | $16,737 | $17,248 | $3,134 | $4,503 | $156,402 |
| % of Total* | 9% | 66% | 12% | 10% | 2% | 2% | 100% |
| **Extended-Stay Hotels (Upscale)** | | | | | | | |
| Average | $28,277 | $162,276 | $34,373 | $21,485 | $6,694 | $7,327 | $260,431 |
| Median | $23,196 | $130,707 | $29,695 | $21,118 | $5,798 | $6,246 | $216,761 |
| % of Total* | 12% | 64% | 13% | 9% | 2% | 2% | 100% |

746.     If an entrant were to acquire an existing property instead of building one from the ground up, the cost to do so likely would be more expensive than building one.

747.     A large upfront sum of money is not the only significant barrier to entering even a single market that prospective entrants would face. Once open, extended stay hotels face substantial ongoing costs to run the location, including maintenance costs, salaries of workers to staff the property around the clock seven days a week, property, premises liability and general commercial liability insurance, advertising and marketing costs, and taxes to local, state, and federal governments.

748.     Indeed, HVS breaks down the numerous developmental costs associated with opening any type of hotel, including an extended stay hotel, in the following table:



749.    To successfully compete against larger and more established extended stay hotel companies with properties across multiple markets like Extended Stay Hotel Defendants, moreover, a new entrant also would be up against the substantial sales, marketing, management, and operational experience, personnel, and budgets, as well as the reputational advantages, that these bigger competitors would bring to bear.

750.    <u>High Market Concentration</u>. The Relevant Markets are highly concentrated.

751.     Markets in which a relatively small number of firms provide a relevant good or service collectively possess high market shares are ripe for effective collusion to occur. This is because forming, maintaining, enforcing, and concealing a common anticompetitive scheme is easier when fewer firms who are collective ability to impact pricing in a market are involved.

752.     As detailed above, Extended Stay Hotel Defendants collectively possess a dominant share of extended stay hotel guest room rentals nationwide and in each Relevant Market.

753.     Extended Stay Hotel Defendants have supplied over half of extended stay hotel guest rooms across segments nationwide for at least the past year and a half (2023 to present). They have supplied nearly half of all such rooms for each of the two prior years (2021 and 2022).

754.     Extended Stay Hotel Defendants have supplied between 53% and 66% of extended stay hotel guest rooms in the mid-price segment nationwide during the entire class period. Further, they have supplied two-thirds of such rooms for at least the past year and a half (2023 to present).

755.     Extended Stay Hotel Defendants also have supplied almost half of extended stay hotel guest rooms in the economy segment nationwide from 2021 to present.

756.     Extended Stay Hotel Defendants have supplied between 45% and 73% of extended stay hotel guest rooms across segments in each Relevant Market respectively for at least the past year and a half (2023 to present).

757.     Segment-specific market share data at the MSA level does not appear to be publicly available. Given the relationship between Extended Stay Hotel Defendants' collective market shares across segments and their market shares by segment nationally, however, it is both plausible and probable that Extended Stay Hotel Defendants' collective market shares in the mid-price segment in most or all Relevant Markets has approached or exceeded 50% for at least the past year and a half (2023 to present).

758.    Based on publicly available information and counsel's investigation, Plaintiffs currently do not know whether or not additional companies have deployed the G3 RMS for extended stay hotel guest rooms and participated in the alleged conspiracy. If any such companies are revealed during pre-trial discovery—which is certainly plausible given the market penetration and reach of Pricing Algorithm Defendants and the G3 RMS in the hospitality industry generally and the extended stay hotel market specifically—then the above-referenced market share numbers commensurately will increase and be updated at the appropriate time.

759.    <u>Lack of Reasonable Substitutes</u>. No reasonable substitutes are available to consumers in the Relevant Markets. This makes the demand for extended stay hotel guest room rentals in these markets relatively inelastic and the consumers' ability to escape the effects of an anticompetitive conspiracy in such markets more difficult than otherwise.

760.    Inelastic demand means that when the price for a product or service increases, consumers' buying habits stay about the same, and when the price for a product or service decreases, consumers' buying habits also remain relatively unchanged.

761.    Extended stay hotel guests in each Relevant Market have limited, if any, low-cost alternatives to renting extended stay hotel guest rooms from Extended Stay Hotel Defendants or other lodging providers due to the unique product offering that extended stay hotels offer. Consequently, Extended Stay Hotel Defendants can impose, and have imposed, small yet significant non-transitory increases (of 5% for at least one year) for guest room rentals without losing a meaningfully number of guests to other types of lodging. Consequently, no reasonable substitutes exist to effectively discipline Extended Stay Hotel Defendants' anticompetitive scheme.

762.    <u>Product Fungibility</u>. Guest rooms that Extended Stay Hotel Defendants offer for rent to consumers are relatively interchangeable with each other within each segment. In markets where a

product is relatively interchangeable across different producers, producers compete for consumers' business largely or primarily on the basis of price.

763.    When controlling for guest room and hotel features across extended stay hotels like size, features, and amenities within a given segment (i.e., economy, mid-price, and upscale), the relevant product is relatively fungible. Guests choose to stay at extended stay hotels that provide comparable offerings within these general categories.

764.    **Incentive to Collude.** Extended Stay Hotel Defendants experienced disappointing financial returns in the years immediately preceding the class period that incentivized them to form and operate their anticompetitive scheme that has continued to this day.

765.    Extended Stay Hotel Defendants' financial downturn coincided with, and largely was caused by, the Great Recession. The sub-prime mortgage crisis plunged the U.S. economy into a full-blown recession from 2007 through 2010, the country's GDP did not start to return to pre-recession levels until around 2012, and the national economy did not completely recover until 2014.

766.    Extended Stay Hotel Defendants experienced a meaningful downturn in revenue and profitability per available room that started in 2007 and did not reach pre-Recession levels until 2014, as illustrated by the following chart from STR Analytics:



767.    Even as the hotel industry began to recover its footing in 2014, costs associated with running extended stay hotels (a type of "limited-service" hotel) were increasing at a proportionally higher rate than full-service hotels, as shown by the following STR Analytics chart:



768.    Between 2007 and 2014, important developments occurred that were motivated by and meant to remedy the financial difficulties that Extended Stay Hotel Defendants were experiencing. Pricing Algorithm Defendants jointly developed and refined the G3 RMS. IDeaS and Hilton executed a development partnership for the G3 RMS in which Hilton would exclusively pilot the new product across parts of its portfolio, including its extended stay hotel brands. And IDeaS and Hilton jointly announced and promoted the release of the G3 RMS to the other Extended Stay Hotel Defendants.

769.    These developments served as the foundation for the anticompetitive scheme that would bring sustained improvement to Extended Stay Hotel Defendants' financial fortunes in the extended stay hotel market in the years to come.

770.    By the start of the class period, the U.S. economy had regained its financial footing, a critical mass of Extended Stay Hotel Defendants had fully deployed the G3 RMS across their extended stay hotels, and the extended stay hotel guest room rates and revenues of these companies and the

Extended Stay Hotel Defendants that would join them had begun a period of sustained uplift nationally and in the Relevant Markets.

771.    Thus, Defendants had the financial motive, sufficient collective market power, and economic tailwinds to take full advantage of the G3 RMS pursuant to their common plan to charge supra-competitive guest room rates to customers just as IDeaS had promised.

## 2.  Defendants Acted Against Their Independent Self-Interests.

772.    By raising guest room rates in accordance with the G3 RMS' pricing "decisions," Extended Stay Hotel Defendants and their co-conspirators took actions that would have been against their individual economic self-interests in the absence of coordination.

773.    Fundamental principles of economics, which a critical mass of Extended Stay Hotel Defendants abandoned in pricing their guest rooms once the class period started and which the remaining Extended Stay Hotel Defendants later would abandon after joining the scheme, support this conclusion. If only one or two Extended Stay Hotel Defendants would have used the G3 RMS to set their guest rooms' rental rates in the Relevant Markets in the but-for world, then the critical mass of non-G3 RMS extended stay hotels who continued to set their prices independently would have undercut the G3 RMS-affiliated hotels on guest room rates, filled a proportionately higher share of their guest rooms, and received greater overall revenue than the G3 RMS-affiliated competitors. This is how the market would have worked during the class period but for Defendants' conspiracy.

774.    In addition, a rational Extended Stay Hotel Defendant would not have shared its properties' sensitive pricing and occupancy data with a third party to use in generating pricing "decisions" for that defendant's competitors unless that defendant knew that they were doing the same thing and understood that it also would benefit from such information sharing.

775.    There are no pro-competitive market factors that can explain and justify the increase in guest room rates and revenues that Extended Stay Hotel Defendants each have obtained from their extended stay hotels during the class period.

### 3.    Multiple Forms of Traditional Conspiracy Evidence Exist.

776.    Finally, numerous categories of facts exist tending to show collusion: (a) the conspirators' adoption of a common course of action; (b) a radical change in business practice by the conspirators; (c) opportunities for the conspirators to conspire; (d) exchange of competitively sensitive information among conspirators; and (e) a pending governmental investigation into similar conduct.

777.    **Common Plan and Course of Conduct.** Extended Stay Hotel Defendants adopted a common plan and course of conduct involving the same use of the same pricing algorithm product to set their respective guest room rates and occupancy levels during the class period.

778.    Extended Stay Hotel Defendants knew that they each were doing the same thing. Pricing Algorithm Defendants made it known within the industry that each Extended Stay Hotel Defendant used their pricing algorithm products like the G3 RMS during the class period. Pricing Algorithm Defendants did so with their own marketing materials targeting the hospitality industry and the extended stay hotel market, in industry publications that they knew Extended Stay Hotel Defendants' executives, managers, and revenue management staff regularly read, and at industry conferences and client summits that Extended Stay Hotel Defendants attended. Certain Extended Stay Hotel Defendants also touted their use of the G3 RMS, as well as other IDeaS and SAS revenue management products, through customer testimonials that Pricing Algorithm Defendants then used to market to other hotel companies like Extended Stay Hotel Defendants.

779.    Furthermore, Extended Stay Hotel Defendants knew that their collective use of the same pricing algorithm would be effective. In addition to receiving statements from Pricing Algorithm Defendants that increased revenue would come to a hotel clients following their implementation of

the G3 RMS, Extended Stay Hotel Defendants have had access to and reviewed each other's regulatory filings and financial reports, earnings and investor calls, and industry analyst and consultant commentaries, articles, and reports. These communications and documents contained information on key financial data points, such as guest room rates, occupancy levels, and revenues of Extended Stay Hotel Defendants as well as the broader market, that Defendants reviewed to receive confirmation that their scheme was working.

780. **Change in Business Practice.** Extended Stay Hotel Defendants' knowing shared use of the G3 RMS to price extended stay hotel guest rooms, with the encouragement and assistance of Pricing Algorithm Defendants, represents a marked change from the "heads in beds" strategy they previously employed to price extended stay hotel guest rooms.

781. Defendants' anticompetitive conduct—collectively using a single third-party pricing algorithm product to set their extended stay hotel properties' guest room rates while keeping their sub-optimal occupancy rates stable despite increased consumer demand—has turned the industry's well-established business model on its head.

782. By adopting this new cooperative pricing approach, Extended Stay Hotel Defendants eliminated a major competitive tool. They risked that any single Extended Stay Hotel Defendant would either continue to offer cheaper guest room rental rates or substantially cheat after joining the conspiracy by cutting guest room rental rates to increase occupancy levels. Either outcome would render the conspiracy ineffective.

783. The most reasonable explanation for Extended Stay Hotel Defendants' radical business strategy change and resulting impact on the market is collusion.

784. **Opportunities to Conspire.** Defendants had ample opportunity to implement, maintain, and enforce their anticompetitive scheme during the class period.

785.    Pricing Algorithm Defendants discussed Extended Stay Hotel Defendants' common pricing strategies and revenue practices with individual Extended Stay Hotel Defendants through their respective relevant personnel. Defendants' key employees also attended various relevant industry gatherings, and conferences where the topics of revenue management and particular products like the G3 RMS were discussed. And Extended Stay Hotel Defendants are members of multiple relevant trade associations where issues of common concern impacting finances and profitability are discussed outside of public view.

786.    *First*, each Extended Stay Hotel Defendant's relevant executives, managers, and other employees with revenue management duties regularly met and communicated with multiple members of their respective IDeaS client teams during the class period. On these occasions, IDeaS staff discussed with the respective Extended Stay Hotel Defendant's employees best practices and guidelines for using the G3 RMS to optimize guest room prices and maximize revenue. Each Extended Stay Hotel Defendant received substantially similar instruction and advice from its respective assigned IDeaS Client Care Team staff and Success Manager.

787.    *Second*, Defendants' relevant personnel attended numerous private industry meetings during the class period where the topics of revenue management in general and IDeaS and SAS revenue management products and pricing practices in particular were discussed at length.

788.    IDeaS tells clients like Extended Stay Hotel Defendants to "[m]eet with your IDeaS partners in person at one of the many events we sponsor or attend each year." Two major events that IDeaS holds each year for clients are the IDeaS Converge Hospitality Revenue Summit and the Discover Live IDeaS User Conference. The purpose of these "two client events," IDeaS states, is "to foster [its] user community."

789.    The IDeaS Converge Hospitality Revenue Summit is multi-day summit attended by hundreds of global hospitality executives and revenue leaders and sponsored by IDeaS business

partners including Amadeus and STR. According to IDeaS, the summit delivers networking opportunities, education, and business growth strategies, all of which are focused on revenue management technology. Discussion topics include trends, insights and best practices on optimizing pricing and revenue and advanced forecasting and analytics. The summits also feature detailed discussions about how Pricing Algorithm Defendants' own products and services, including the G3 RMS, can be used to generate maximal revenue.

790.    The 2022 Converge Hospitality Revenue Summit was held in New York City in late July. This event featured speakers from some of the top innovators in the hospitality industry and client discussion panels moderated by IDeaS' leaders, according to an IDeaS press release. "Selected IDeaS clients shared their own unique success stories and provided the audience with testimonials about how they have leveraged IDeaS to assist them throughout the challenges of the past several years," the release noted. Attendees "were also provided with insights and best practices on optimizing multi-unit revenue management performance; the power of analytics and how best prices are determined; [and] advanced forecasting beyond rooms[.]"

791.    The IDeaS press release discussing the 2022 Converge Hospitality Revenue Summit also contained quotes from its personnel praising the summit for enabling attendees to gather and discuss how they collectively would "continue to shape the future of hospitality." IDeaS Chief Client Officer David Warman said:

> We couldn't be prouder to host such an influential group of hospitality leaders for our annual client summit, including the incredible keynote speakers who shared their expertise with our audience. We appreciate the opportunity to provide insight into IDeaS' ongoing innovations and new service offerings and directly engage with our clients as we continue to shape the future of hospitality—together.

792.    The 2023 Converge Hospitality Revenue Summit was a "sold-out event" that occurred in London in late July. This event "was attended by more than 200 global hospitality executives and delivered two days of networking opportunities, education, and strategies for business growth and a

look at the future of revenue management (RM) technology," as an IDeaS press release carried by industry outlets noted. The release quoted one hotel client representative attendee, who stated that "I love the intimacy, the quality of the attendees and partners, and the networking opportunities are a great way to connect on the future of hospitality."

793.    At the 2023 Converge Hospitality Revenue Summit, the IDeaS press release further noted that "IDeaS' revenue technology leaders spoke about the value of moving toward a holistic approach to total revenue management and profit optimization" and gave "practical examples of how clients use" particular features of the G3 RMS. On this topic, IDeaS President, Co-Founder, and Chief Scientist Ravi Mehrotra said:

> Our mission has been, and always will be, to challenge ourselves, our partners and the industry to innovate forward. The feedback from our clients and the revenue community we have created is critical to that innovation. The evolution of our software is dependent on the valuable feedback we receive from our community. We are very grateful to have had the opportunity to converse and share insights with these leaders and look forward to seeing them next year at Converge 2024.

IDeaS Co-Founder, Chief Operating Officer and Chief Technology Officer Sanjay Nagalia highlighted the "strong showing of global hospitality leaders at this event," while commenting on IDeaS' "significant investments in our foundational software solutions with an eye of the ever-changing market requirements of our industry."

794.    Two Converge Hospitality Revenue Summits have been scheduled for 2024. One recently convened in Miami, Florida at the Mandarin Oriental from July 23-24, 2024, and another will occur in Bangkok, Thailand at The Peninsula Bangkok from November 4-5, 2024. IDeaS has told its clients to "join 300+ global hospitality executives to discuss the future of revenue management" at these summits, where it will "show [attendees] how unified strategies and empowered teams can unlock unprecedented revenue growth."

795.    The agenda for the 2024 Converge Hospitality Revenue Summit in Miami states that this event kicked off with a a "popular networking event" for "IDeaS clients" to "[e]njoy cocktails" and honor various IDeaS "client innovators and partners." Interspersed with "networking breaks," various presentations included: "Partner Perspectives: The State of the Industry;" "New Frontiers in Advanced Optimization," which promised that attendees would "gain valuable insights into how hotels "can effectively optimize pricing to maximize revenue, enhance profitability, and navigate uncertain market conditions with confidence;" and "The Power of Precision Forecasting: Elevating Profitability One Percentage Point at a Time," which promised to "explore the state of hotel forecasting, why focusing on rooms revenue is not enough, and how hotels are improving total revenue forecasting practices." The event finished with a "closing reception" on the final evening.

796.    IDeaS provides a "Business Justification Letter" for those interested in attending its Converge Hospitality Revenue Summits. The letter states that the "event will bring together a global community of top hotel leaders, hospitality technologists," and others that "will help me expand my knowledge in these areas to help elevate my expertise and increase our total revenue and profit potential." "As an intended outcome," the letter adds, "I will be better equipped to present strategies and plans that will facilitate productive change to influence transformation within our organization."

797.    The Discovery Live IDeaS User Conference is an annual gathering held over multiple days that hundreds of IDeaS hotel clients attend. IDeaS states that the event provides "opportunity for participants to learn from each other, explore new platform capabilities, share ideas, and ask questions of the IDeaS expert user community and industry thought leaders."

798.    The 2022 Discovery Live IDeaS User Conference was held virtually from October 18-20, 2022. As an IDeaS press release noted, the conference brought "together nearly 800 users, representing more than 9,100 properties" from across the globe "to foster a sense of community, discuss best practices, and engage with experts." At this conference, "IDeaS' leadership shared a vision

for how to turn data insights into action," and "[i]ndustry thought leaders spoke about the evolving scope of revenue management and its expanded impact on commercial success." IDeaS "partners" including Amadeus "provided key insights during Q&A panels and focused sessions," and "IDeaS' power users shared their experiences, key viewpoints, and successes in adopting and leveraging IDeaS technology." Various "industry RM Experts" also presented.

799.    Discussing the 2022 Discovery Live IDeaS User Conference, IDeaS Chief Client Officer David Warman said that "[b]ringing together our users for three days of learning, sharing, and problem-solving was enlightening to both participants and speakers alike." A "sampling of Discover Live participant feedback" from IDeaS client attendees follows:

- I was able to broaden my system knowledge and skills by getting to know more from the IDeaS experts, seeing best practices, and seeing things from other revenue professionals' perspectives.

- Very good sessions, fantastic presenters sharing great content. Focused a lot on 'expanded RM' responsibilities e.g. total revenue management, focus on profitability, etc. Ideal to share how IDeaS application will/can help to support this learning journey and execution of those.

- This year's event was very much focused on real-life experiences and examples which will help me in my role. I gained very useful knowledge and insights. Well done, IDeaS team.

800.    Defendants also had the opportunity to collude at smaller IDeaS-sponsored gatherings that their personnel attended, such as IDeaS Thought Leadership Roundtables. At these meetings, IDeaS leaders, including those with client marketing duties, and IDeaS clients and technology partners discussed topics of purportedly common industry concern like revenue and profitability.

801.    One IDeas Thought Leadership Roundtable convened on June 17, 2022, in New York City. Attendees included IDeaS President and Co-Founder Ravi Mehrotra, IDeaS Chief Evangelist and Business Development Officer Klaus Kohlmayr, STR Vice President Isaac Collazo, Sonesta Executive Vice President and President of Franchise and Development Keith Pierce, Wyndham Chief

Marketing Officer Lisa Checchio, and Choice Chief Marketing Officer Robert McDowell. STR's Collazo gave a presentation on the industry's financial health from a statistical perspective. Wyndham's Checchio highlighted franchisees' "expectations that we're going to help them control costs," and Choice's "McDowell said it is up to brands to help owners and operators cut costs." Drilling down on hotels' common costs, Checchio noted that "the most expensive thing is labor," and that "[o]n a percentage basis, the rates we are paying for housekeepers and front desk (staff) have gone up compared to some other industries[.]"

802.    Another Thought Leadership IDeaS Roundtable occurred on June 27, 2023, in New York City. Attendees included IDeaS Chief Sales and Growth Officer Russ Stanziale, Wyndham Global Head of Revenue Vikram Pradhan, Sonesta Chief Development Officer Brian Quinn, Aimbridge Hospitality Chief Financial Officer Thomas Song, and American Hospitality & Lodging Association President and Chief Executive Officer Chip Rogers. The panelists discussed "current hospitality statistics," including occupancy, ADR and other performance metrics as well as labor costs.

803.    Defendants had additional opportunity to discuss and maintain their anticompetitive scheme at various trade association meetings that their relevant personnel attended during the class period, including ones convened by the Extended Stay Lodging Association, the American Hotel & Lodging Association, and Hospitality Sales and Marketing Association International.

804.    All Extended Hotel Defendants are members of the Extended Stay Lodging Association ("ESLA").

805.    According to the ESLA website, this trade association is "one of its kind focusing on extended stay properties within the United States." Its "membership consists of owners/operators and vendors," and  its "focus is to bring everyone together doing business together within the hospitality and tourism industries."

806. All Extended Stay Hotel Defendants are members of the American Hotel & Lodging Association ("AHLA"), and IDeaS technology partners STR and Amadeus are among the association's Partner sponsors.

807. AHLA calls itself "the singular voice representing every segment of the hotel industry including major chains, independent hotels, management companies, REIT's, bed and breakfasts, industry partners and more." The association hosts events throughout the year at locations across the country.

808. All Defendants are members of the Hospitality Sales and Marketing Association International ("HSMAI").

809. HSMAI is a global trade association "committed to growing business for hotels and their partners, and is the industry's leading advocate for intelligent, sustainable hotel revenue growth." HSMAI "provides hotel professionals & their partners with tools, insights, and expertise to fuel sales, inspire marketing, and optimize revenue." HSMAI has various regional divisions, including HSMAI Americas.

810. HSMAI Americas' Board Member roster includes: IDeaS Managing Director of Americas Garth Peterson; Hilton Vice President of Sales Operations, Americas Jeff Patton; Wyndham Vice President for Digital Commerce & Guest Engagement Michael Shiwdin; and Hyatt Vice President of Global Revenue Management Michael Klein.

811. HSAI Americas has a handful of Advisory Boards that "connect members with common interests," including the Revenue Optimization Advisory Board.

812. The Revenue Optimization Advisory Board "advance[es] the revenue optimization discipline by providing leading education, a best practices exchange, thought leadership and networking for revenue professionals, other sales and marketing professionals, and senior management in the hospitality industry." The Board's Members include Hilton Director of Revenue

Management Dan Reeder; Choice Senior Director of Revenue Management, Upscale Jennifer Schneider; Wyndham Vice President of Franchise Revenue Management Services Darryl Neser; and Hyatt Vice President of Revenue Management Matt Schalk.

813. Relevant conferences and gatherings that the aforementioned trade associations convened during the class period include the AHLA's Hospitality Show and HSMAI Americas' Commercial Strategy Conference (previously the Revenue Optimization Conference ("ROC")).

814. The Hospitality Show, which AHLA co-organizes with the owner of *Hotel Management*, "brings together the industry's leading minds to elevate their hotel operations and drive profitability." "[D]elegates from across the entire hospitality ecosystem," including "hotel brand senior executives," "owners," "operators," "investors," "management companies," and "leading service providers,'" attend this multi-day event.

815. IDeaS and each Extended Stay Hotel Defendant attended the inaugural Hospitality Show held in late June 2023 at The Venetian Las Vegas. "In addition to the trade show and networking opportunities, attendees heard from the leaders of many of the world's top hotel companies on the main stage," including Wyndham President & CEO Geoff Ballotti, Hyatt President & CEO Mark Hoplamazian, and Sonesta President & CEO John Murray. Other "Featured Speakers" included Hilton Chief Financial Officer and President of Global Development Kevin Jacobs, Extended Stay America Chief Operations Officer Liz Uber, and Wyndham Executive Vice President and Chief Information Officer Scott Strickland. "Speakers" included IDeaS Vice President for Global Marketing Mike Chuma, Amadeus Executive Vice President for Commercial North America, Hospitality Joe Ahmed Youssef, Amadeus Vice President for Business Intelligence Go-To-Market and Commercial Strategy Sara Duggan STR Senior Vice President for Sales & Marketing Vail Ross, Hyatt Technology and Innovation Lab Manager Daryl Corral, and Sonesta Chief Development Officer Brian Quinn.

816.    For the upcoming October 2024 Hospitality Show in San Antonio, Texas, Extended Stay America is one of the "Sponsors." Slated exhibitors and attendees include IDeaS, STR, Extended Stay America and Sonesta. The event's schedule includes "13+ hours of networking opportunities, from evening receptions to 1:1 meetings, back-of-house tours, and more," in addition to presentations titled "The Profitable Stay: Leveraging Technology in Hotel Ownership" and "Intentional Innovation: AI Meets ROI."

817.    HSMAI Americas' "Commercial Strategy Conference"—purportedly representing the evolution of HSMAI's Marketing Strategy Conference and HSMAI ROC—reflects the "convergence of marketing, revenue optimization, sales, and other commercial functions into new and evolving commercial strategy organizations inside many hotel companies." Further, the association notes, "[t]he conference—and pre- and post-conference workshops, trainings, and roundtables—will equip commercial professionals and leaders with the skills, knowledge, and strategic vision necessary to navigate the ever-evolving landscape of hotel commercial strategy while driving profit throughout the customer journey."

818.    The 2024 HSMAI Americas' Commercial Strategy Conference was held in Charlotte, North Carolina from June 24-27. IDeaS was its sole "Preferred Partner." The conference offered two "main conference days," and one day each of "pre-" and "post-conference workshops, trainings, and roundtables."

819.    The HSMAI ROC, renamed the Commercial Strategy Conference in 2023, was "where hotel revenue leaders unite for education, collaboration and innovation at the world's largest gathering of revenue professionals in the travel industry." For almost two decades," the "ROC has delivered the most compelling and comprehensive event for the hotel revenue optimization discipline, with more than 650 leading professionals coming together to address the most critical trends affecting hotels today."

820.    The 2022 HSMAI ROC was held in Orlando, Florida from June 28-29. Numerous representatives from nearly all Defendants and their co-conspirators attended the conference according to the following excerpted post-conference attendee list:

| | |
|---|---|
| **Choice Hotels** | Revenue Manager |
| **Choice Hotels** | Revenue Manager |
| **Choice Hotels** | Vice President, Revenue Management |
| **Choice Hotels** | Revenue Manager |
| **Extended Stay America** | VP, Sales Strategy & Operations Planning |
| **Hyatt Hotels Corporation** | Senior Manager |
| **Hyatt Hotels Corporation** | VP, Global Revenue Management Operations |
| **Hyatt Hotels Corporation** | Regional Director Of Revenue |
| **Hyatt Hotels Corporation** | Vice President, Global Revenue Management |
| **Hyatt Hotels Corporation** | Area Director of Revenue Managment |
| **Hyatt Hotels Corporation** | Director, Distribution |
| **Hyatt Hotels Corporation** | Corporate Revenue Senior Analyst |
| **Hyatt Hotels Corporation** | VP Revenue Management |
| **Hyatt Hotels Corporation** | Assistant Director of Global RMS Support |
| **Hyatt Hotels Corporation** | Director Revenue Management Systems |
| **Hyatt Hotels Corporation** | Corporate Director of Revenue Management |
| **Hyatt Hotels Corporation** | RDRM, West |
| **IDeaS Revenue Solutions** | Director - Global Enterprise Sales |
| **IDeaS Revenue Solutions** | Director, Account Management, Americas |
| **IDeaS Revenue Solutions** | VP, Marketing and Enablement & Engagement |
| **IDeaS Revenue Solutions** | Principal Solution Engineer |
| **IDeaS Revenue Solutions** | Director, Product Management and Product Success |
| **IDeaS Revenue Solutions** | Territory Account Executive |
| **IDeaS Revenue Solutions** | Manager. Solution Engineering |
| **IDeaS Revenue Solutions** | Sr. Solution Consultant |
| **IDeaS Revenue Solutions** | Director of Sales, Western Region |
| **IDeaS Revenue Solutions** | Vice President, Global Account Management |
| **IDeaS Revenue Solutions** | Chief Evangelist & Development Officer |
| **IDeaS Revenue Solutions** | Director Industry Consulting |
| **IDeaS Revenue Solutions** | Product Marketing Manager |
| **IDeaS Revenue Solutions** | Director, Account Management |
| **IDeaS Revenue Solutions** | Principal Industry Advisor |
| **IDeaS Revenue Solutions** | Senior Director, Enterprise Account Management |
| **IDeaS Revenue Solutions** | Market Development Rep |
| **IDeaS Revenue Solutions** | President & Founder |
| **IDeaS Revenue Solutions** | Chief Operating Officer |
| **IDeaS Revenue Solutions** | Area Manager, Americas |
| **IDeaS Revenue Solutions** | Account Executive |
| **IDeaS Revenue Solutions** | Managing Director - Americas |
| **IDeaS Revenue Solutions** | Director of Sales, Mid-Atlantic |
| **IDeaS Revenue Solutions** | Regional Solutions Engineer |
| **IDeaS Revenue Solutions** | Director of Sales, |
| **IDeaS Revenue Solutions** | Area Manager, East |

| IDeaS Revenue Solutions | Director, Account Management |
|---|---|
| IDeaS Revenue Solutions | Sr. Director, Product Integrations |
| IDeaS Revenue Solutions | Regional Solutions Engineer |
| IDeaS Revenue Solutions | VP of Growth and Sales |
| IDeaS Revenue Solutions | Director, Account Management |
| IDeaS Revenue Solutions | Sr. Strategic Alliances Manager |
| IDeaS Revenue Solutions | Field Marketing Manager, Americas |
| IDeaS Revenue Solutions | Sales Development Rep |
| SAS | |
| SAS | |
| Sonesta Hotels | VP, Revenue & Distribution |
| Sonesta International | Chief Commercial Officer |
| Sonesta International | Senior Manager, Distribution & Channel Management |
| Sonesta International | Vice President, Channel Management & Strategic Initiatives |
| Sonesta International | Vice President, Revenue Management |
| Wyndham Hotel Group | VP, Franchise Revenue Management Services |
| Wyndham Hotels & Resorts | VP, Revenue Optimization |

821.   Defendants' personnel attended additional relevant conferences like the Northwest Hotel Investment Forum that provided further opportunity to collude.

822.   Northwest Hotel Investment Forum ("NHIF") "has the support of the industry's major hotel brands, who serve as NHIF's brand sponsors."

823.   NHIF purports to be "an invitation-only, semi-annual forum for principals and executives of hotel owners, brands, management companies, developers, investors and lenders." Its "purposes" include "provid[ing] a select-group setting for high-level industry discussions" through recurring meetings.

824.   One NHIF meeting was held in October 2023. Attendees included Hilton's Homewood Suites Global Leader Rick Colling, Ian McClure, CEO of Gulf Coast Hotel Development, a management company for various Choice MainStay Suites and WoodSpring Suites properties, and extended stay industry expert Mark Skinner of The Highland Group.

825.   A November 2023 CoStar Insight article reported on the prior month's NHIF meeting. Gulf Coast's McClure discussed specific "average length of stay" and "occupancy" rates for extended stay hotels "if done well," while providing his company's managed properties' "gross

operating profit margin" range. Hilton's "Colling said that the average length of stay for a Homewood Suites is 3.2 nights, and 44% of available suites are booked by guests staying five consecutive nights or longer," while discussing how this brand's "average daily rates" compared to those of "economy-class extended-stay hotels." While industry consultant Skinner conveyed that "the near-term risk of extended-stay hotel oversupply nationally is very low," Colling cautioned potential market entrants, "Don't jump in because you think you should. Jump in because you have the discipline to do it correctly."

826.    **Information Exchange**. IDeaS, with the technological assistance and support of SAS, enabled the exchange of competitively sensitive business information among Extended Stay Hotel Defendants through the submission of their respective internal company business data and STR and Demand360 data to the G3 RMS and the G3 RMS' use of this data to generate pricing and occupancy "decisions" for these Defendants.

827.    Extended Stay Hotel Defendants know that they each continuously submit their respective current, proprietary pricing and occupancy data to the same pricing algorithm. They know that the pricing algorithm collects this and other types of relevant data, including STR data and Demand360 data, from their internal management systems to develop a "complete picture of unconstrained demand and market conditions." And they know that the pricing algorithm applies sophisticated machine learning and predictive analytics to this "comprehensive dataset" to generate optimal pricing and occupancy "decisions" that they each adopt for their extended stay hotel guest rooms.

828.    This conduct, separately and at a minimum, constitutes improper information sharing among competitors through a common hub. The purpose and effect of this information exchange is to raise guest room rates to levels that would not be possible absent collusion without providing any

countervailing benefit to the guests paying those rates. This information exchange therefore serves as another category of evidence demonstrating collusion.

829.    **Related Government Investigation.** Finally, federal antitrust regulators are criminally investigating substantially similar conduct in a related industry involving a similar set of pricing algorithm products.

830.    A November 23, 2022 article from non-profit investigative news outfit *ProPublica* reported that the DOJ's Antitrust Division "has opened an investigation into whether rent-setting software made by a Texas-based real estate tech company is facilitating collusion among landlords."

831.    The DOJ investigation, the *ProPublica* article noted, followed letters from Congressional leaders to antitrust regulators. The letters "raised concerns that RealPage's pricing software could be pushing rents above competitive levels and allowing big landlords to coordinate their pricing in violation of federal antitrust laws." A letter from Senator Amy Klobuchar, who chairs the Senate Subcommittee on Competition Policy, Antitrust and Consumer Rights, conveyed the "concern[] that the use of this rate setting software essentially amounts to a cartel to artificially inflate rental rates in multifamily residential buildings."

832.    The *ProPublica* article, which followed its initial October 15, 2022 piece on large property managers' use of RealPage and the impact on rents in some markets, noted that RealPage's pricing algorithm "software works by collecting information from property managers who are the company's clients, including what rents they are able to charge tenants." The article then stated that this "information is fed into an algorithm that then recommends prices daily for each available apartment," and that landlord clients accepted RealPage's recommended rents 80-90% of the time. The article went on to note that "some experts have said using private data from competitors to set rents could run afoul of antitrust laws, allowing property managers to illegally coordinate their pricing."

833.    The article then explained that the government's current scrutiny of RealPage was driven by the relatively recent surge in apartment rents. Noting that "RealPage did not have the same reach then as it does today," the article stated that landlords using RealPage's algorithm have obtained increasingly high collective market shares in some markets that have coincided with their imposition of significant rent increases.

834.    More recently, the Federal Bureau of Investigation raided a national corporate apartment landlord's offices as part of the DOJ's ongoing criminal investigation into apartment rent price-fixing through the RealPage software. According to a June 5, 2024 *Entrepreneur* article, the FBI conduced an unannounced raid of Cortland Management's Atlanta headquarters as "part of a criminal antitrust investigation by the U.S. Department of Justice (DOJ) into RealPage, a $9 billion software company that recommends rent raises on millions of housing units across the U.S." "Per RealPage blog posts," the article added, Cortland "used RealPage's algorithm to 'ensure consistent vendor pricing for their communities from Arizona to Georgia.'"

835.    Pricing Algorithm Defendants' G3 RMS and related services operate substantially similarly to RealPage's pricing algorithms and related services in various important ways, as discussed above, that enable their respective users to operate the similar alleged anticompetitive schemes.

836.    The DOJ's pending investigation into price-fixing in the apartment rental industry is premised on conduct that is substantially similar to that at issue here. This ongoing governmental investigation therefore constitutes additional evidence supporting the inference of an antitrust violation here.

## V.    FRAUDULENT CONCEALMENT AND TOLLING

837.    Plaintiffs and other Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief. They did not discover, nor could have discovered through

the exercise of reasonable diligence, the existence of Defendants' anticompetitive scheme until shortly before filing this Complaint.

838.    Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiffs and other Class members on inquiry notice.

839.    Defendants intentionally conducted their anticompetitive scheme outside of public scrutiny. For example:

(a) Extended Stay Hotel Defendants have privately submitted their current, non-public pricing and supply data to Pricing Algorithm Defendants, who in turn have used the proprietary G3 RMS pricing algorithm, the technical details of which remain private, to generate confidential optimal pricing and occupancy "decisions" for each Extended Stay Hotel Defendant that they adopted;

(b) Defendants regularly attended invitation-only industry events, including ones IDeaS held and sponsored, where revenue management, best pricing strategies and practices, and use of products like the G3 RMS, were discussed behind closed doors; and

(c) Pricing Algorithm Defendants and individual Extended Stay Hotel Defendants had private communications and meetings to discuss revenue management and pricing practices through the use of IDeaS and SAS products like the G3 RMS.

840.    Extended Stay Hotel Defendants intentionally hid from Plaintiffs and absent Class members that they set their guest room rates pursuant to pricing "decisions" generated for them by a common third-party pricing algorithm that collected and used their respective private pricing and occupancy data.

841.    Extended Stay Hotel Defendants also affirmatively misrepresented to Plaintiffs and absent Class members, through omissions, half-truths, and misrepresentations, how they determined guests' room rates.

842.    Extended Stay Hotel Defendants have not informed Plaintiffs and absent Class members that the prices they have paid to rent guest rooms are based on "optimal" pricing and occupancy "decisions" set by a third-party algorithm that they all use and to which they all submit sensitive business data.

843.    In addition, Extended Stay Hotel Defendants have given Plaintiffs and absent Class members the false and misleading impression that they receive the "best" and "lowest" rates and enjoy significant "savings" when they book guest rooms at their extended stay hotels.

844.    Hilton's Homewood Suites' website tells visitors looking to reserve a guest room that "[w]e're showing the best available price per room for" the selected number of nights "based on the number of guests" selected."

845.    Extended Stay America invites website visitors interested in booking a stay at any of its hotels to obtain the "Best Available Rate." It also tells guests that "[y]our savings increase the longer you stay" and that its "already affordable nightly rates get even lower the longer you stay with us."

846.    Sonesta website visitors interested in renting rooms at its Simply Suites or ES Suites hotels are asked to select one of various "Rates," the most expensive of which is titled the "Lowest Regular Rate." The site also notes that guests "[e]njoy 7 or more nights with us at discounted rates."

847.    Wyndham's Hawthorn Suites tells website visitors that "[w]hen you book direct" as a Wyndham Reward member, "you'll get the lowest price at thousands of hotels worldwide." Wyndham similarly states elsewhere on its website that "members enjoy savings on our Best Available Rate" when reserving a guest room at its properties like Hawthorn Suites.

848.    Hyatt boasts a "Best Rate Guarantee" for guests of all its hotels, including Hyatt House. Hyatt tells guests that "[w]hen you book direct on hyatt.com, you know you're getting the best rates at any participating Hyatt hotel or resort worldwide. We guarantee it."

849.    Through Defendants' knowing and active concealment of their misconduct from their guests, Plaintiffs and other Class members did not receive information that should have put them, or any reasonable consumer standing in their shoes, on sufficient notice of potential collusion worthy of further investigation.

850.    The extended stay hotel guest room rental market, as well as the broader hotel industry, are not exempt from antitrust regulation. Indeed, in January 2024, the Federal Trade Commission served an expansive 40-page and 65-topic "Second Request" on Wyndham in connection with Choice's since-abandoned unsolicited proposed acquisition of the company. Wyndham stated that it would fully comply with the FTC's Second Request as required by law, according to an early January 2024 *Hotel Management* article reporting on the development.

851.    When Choice announced its unsolicited bid, Wyndham stated that regulators would seriously scrutinize the proposed deal on antitrust grounds. The FTC's subsequent decision to issue a Second Request thus came as "no surprise" to Wyndham, Chairman Stephen Holmes noted. Commenting on the proposed transaction, Holmes said that the "Second Request, which is issued in only around 1 percent of deals reviewed by the FTC, marks the start of a complex, lengthy process as both parties provide the FTC with the terabytes of data and documents it has requested, with an uncertain outcome and no guarantee of closing,"

852.    The earliest possible date on which Plaintiffs and absent Class members arguably could have been placed inquiry notice of Defendants' anticompetitive scheme was on or around October 15, 2022, the date of *ProPublica*'s first article discussing landlords' use of RealPage to fix rental prices through the use of a shared third-party pricing algorithm. The article, however, did not mention the parties, market, or anticompetitive practices that are the subject of this lawsuit. And an ordinary layperson acting reasonably diligently would not have had the time, resources, or specialized training

to investigate and uncover the misconduct that Plaintiffs, through counsel highly experienced in antitrust class actions, have alleged in this Complaint.

853.    Plaintiffs exercised reasonable diligence. Plaintiffs and absent Class members could not have discovered Defendants' alleged misconduct at an earlier date by the exercise of reasonable diligence because of the deceptive, misleading, and secretive conduct taken by Defendants and their co-conspirators to conceal their misconduct.

854.    Due to Defendants' fraudulent concealment of their wrongful conduct, the running of the statute of limitations has been tolled and suspended with respect to the claims and rights of action of Plaintiffs and the other Class members as a result of the conspiracy, including all parts of the class period earlier in time than the four years immediately preceding the date of this Complaint.

## VI.    CONTINUING VIOLATION

855.    Plaintiffs' Sherman Act claims, which are subject to a four-year statute of limitations period, are also timely under the continuing violations doctrine. This Complaint against Defendants was filed in mid-July 2024. The alleged conspiracy began no later than January 1, 2016, and continued into the non-time-barred part of the class period, starting in late July 2020, and beyond.

856.    Plaintiffs allege that Extended Stay Hotel Defendants set prices pursuant to recommendations from Pricing Algorithm Defendants' pricing algorithm, which has received, analyzed, learned from, and generated pricing and occupancy "decisions" for Extended Stay Hotel Defendants based on confidential and competitively sensitive data within the four-year statutory period.

857.    As a result of the alleged anticompetitive conduct, throughout the class period and to the present, Extended Stay Hotel Defendants were able to and did inflate prices for extended stay hotel guest room rentals nationally and in the Relevant Markets.

858.    Plaintiffs and members of the Class purchased extended stay hotel guest room rentals directly from Extended Stay Hotel Defendants at artificially inflated prices caused by the conduct challenged in this complaint throughout the class period.

859.    Each time Extended Stay Hotel Defendants renewed their respective contracts or other agreements with Pricing Algorithm Defendants governing the use of and payment for the relevant pricing algorithm products and services pursuant to the anticompetitive scheme constitutes a new overt act causing injury to Class members.

860.    Each Extended Stay Hotel Defendant's rental of an extended stay hotel guest room at a supra-competitive price also constitutes a new overt act causing injury to Class members.

861.    Defendants' unlawful acts and practices described herein continue to this day.

862.    Accordingly, Plaintiffs and members of the Class were injured and may recover for damages suffered at any point during the class period.

## VII.    CLASS ACTION ALLEGATIONS

863.    Plaintiffs brings this action on behalf of themselves and the following Class of all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons and entities in the United States and its territories who have directly purchased an extended stay hotel guest room for rent in any of the Relevant Markets from one or more Extended Stay Hotel Defendants or co-conspirators, or from any division, subsidiary, predecessor, agent, or affiliate of any Extended Stay Hotel Defendant or co-conspirators from no later than January 1, 2016, until Defendants' unlawful conduct and its anticompetitive effects stop.

864.    Excluded from the Class are: Defendants and identified co-conspirators; officers, directors, or employees of any Defendant or identified co-conspirator; any entity in which any Defendant or identified co-conspirator has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant or identified co-conspirator; any federal, state, or local governmental entity;

any judicial officers presiding over this action and their staff; members of any presiding judicial officer's immediate family; and any juror assigned to this action..

865.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens if not hundreds of thousands of geographically dispersed Class members.

866.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of Extended Stay Hotel Defendants.

867.    Plaintiffs' claims are typical of those of the Class. Plaintiffs and all members of the Class claim that Defendants' alleged misconduct violates Section 1 of the Sherman Antitrust Act. Plaintiffs and all Class members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that caused them to pay Extended Stay Hotel Defendants more for guest rooms than they otherwise would have paid in the absence of their collusive conduct.

868.    Plaintiffs fairly and adequately will protect and represent the interests of Class members. The interests of Plaintiffs and Plaintiffs' counsel are fully aligned with, and not antagonistic to, the interests of the other Class members. Plaintiffs are willing and able to dispatch the duties incumbent upon a class representative to protect the interests of all Class members.

869.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust class actions. Plaintiffs' counsel possesses the necessary resources to vigorously prosecute the case to the greatest extent necessary for the Class.

870.    There are multiple questions and issues of law and fact that are common to the Class and that the Class can prove with common evidence, including the following ones:

(a)    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, maintain, or stabilize prices for extended stay hotel guest room rentals in the United States, including the Relevant Markets;

(b)  The duration of the alleged conspiracy and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(c)  Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act;

(d)  Whether Defendants' alleged misconduct, in the alternative, constitutes a violation of Section 1 of the Sherman Antitrust Act pursuant to a quick look analysis or a full-blown rule of reason analysis;

(e)  Whether Defendants' alleged misconduct caused Class members to pay artificially high prices for extended stay hotel guest room rentals;

(f)  The proper measure of Class-wide damages;

(g)  The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged misconduct going forward; and

(h)  Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled.

871.    Questions of law and fact common to Class members will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

872.    In cases like this one that allege price-fixing among competitors, including those with a hub-and-spoke component, the common question of law and fact regarding the existence of the alleged conspiracy by itself has been held to predominate over any possible individualized issues. The same holds true here.

873.    Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow for the scores of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and

efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VIII.  ANTITRUST INJURY

874.    Defendants' anticompetitive conduct has had at least the following effects:

   (a)   Competition among Defendants has been restrained or eliminated with respect to extended stay hotel guest room rentals nationwide, including in the Relevant Markets;

   (b)  The prices of extended stay hotel guest room rentals have been fixed, stabilized, or maintained at artificially high levels;

   (c)  The supply of extended stay hotel guest room rentals has been fixed, stabilized, or maintained at artificially low levels; and

   (d)  Consumers have been deprived of free and open competition.

875.    Defendants' violations of the antitrust laws have caused Plaintiffs and the Class to pay higher prices for extended stay hotel guest room rentals in the United States, including the Relevant Markets, than they would have in the absence of Defendants' anticompetitive scheme, and as a result, they have suffered damages in the form of overcharges paid for their guest room rentals.

876.    Defendants' anticompetitive scheme has caused the type of harm to consumers and competition that the federal antitrust laws are designed to prevent and remedy.

IX.    **CAUSES OF ACTION**

<u>**COUNT ONE**</u>

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Horizontal Hub-and-Spoke Conspiracy in Restraint of Trade**

877.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

878.    Plaintiffs seek monetary and injunctive relief on behalf of themselves and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

879.    Beginning no later than January 1, 2016, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

880.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants for Extended Stay Hotel Defendants to knowingly and collectively use the G3 RMS pricing algorithm and engage in related conduct to fix, stabilize, or maintain at artificially high levels the price of extended stay hotel guest rooms rented directly to guests. This conspiracy has caused Plaintiffs and the other Class members to pay artificially inflated prices directly to Extended Stay Hotel Defendants and their co-conspirators for extended stay hotel guest room nationwide including in the Relevant Markets during the class period.

881.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal hub-and-spoke conspiracy in which Pricing Algorithm Defendants serve as the hub and the individual Extended Stay Hotel Defendants serve as spokes.

882.    In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

(a)  Extended Stay Hotel Defendants and their co-conspirators provided their own sensitive, non-public historical, current, and future pricing and supply data and other confidential business data, including STR benchmark report data and Demand360 data, to a common agent, IDeaS, for use in the G3 RMS;

(b)  IDeaS, with active involvement, support, and know-how of SAS, developed, operated, and sold the G3 RMS that has generated guest room rental pricing and occupancy "decisions" for each Extended Stay Hotel Defendant and co-conspirator;

(c)  Extended Stay Hotel Defendants and their co-conspirators knowingly and intentionally used the same pricing algorithm product (the G3 RMS), which has been developed and trained on the same categories of sensitive, non-public business data they each provide it, to generate guest room rental pricing and occupancy "decisions" that each one adopts;

(d)  Extended Stay Hotel Defendants and their co-conspirators automatically, systematically, and continuously priced and supplied their guest rooms pursuant to these "decisions" the G3 RMS generated;

(e)  Defendants exchanged the above-referenced types of competitively sensitive and non-public pricing and supply information with each other indirectly through Pricing Algorithm Defendants, including through their intentional and knowing collective use of the G3 RMS;

(f)  Defendants have promoted and enforced compliance with their anticompetitive conspiracy by using various technological features of the G3 RMS and by following the guidelines, strategies and processes recommended by their assigned IDeaS team members that have the purpose and effect of causing Extended Stay Hotel Defendants and their co-conspirators to adopt "decisions" continuously and consistently;  and

(g)  Defendants engaged in various forms and methods of communication concerning guest room rental rates, occupancy levels, and revenue that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

883.  Extended Stay Hotel Defendants and their co-conspirators possess market power for extended stay hotel guest room rentals nationally and in the Relevant Markets.

884.  Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the forms of higher prices that Plaintiffs and the other Class members have paid directly to Extended Stay Hotel Defendants and their co-conspirators for a lower supply of guest room rentals nationally and in the Relevant Markets.

885.  As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for fewer extended stay hotel guest room rentals than would have occurred in the absence of the conspiracy.

886.  There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

887.  Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act.

888.  In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick look or full-blown rule of reason analysis.

## COUNT TWO

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Unlawful Information Sharing for Use in Competitors' Pricing**

889.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

890.    Plaintiffs seek monetary and injunctive relief on behalf of themselves and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

891.    Each Extended Stay Hotel Defendant and co-conspirator using the G3 RMS has agreed with IDeaS to provide IDeaS daily nonpublic, competitively sensitive data. IDeaS invites each Extended Stay Hotel Defendant and co-conspirator to share this information so that it can be pooled to generate pricing and supply "decisions" for that hotelier and its competitors. Each such Extended Stay Hotel Defendant and co-conspirator uses the G3 RMS, knowing or learning that IDeaS, with the active involvement, support, and know-how of SAS, will use this data to inform, train and refine its AI-based algorithms and models and to provide pricing and supply "decisions" not only for that extended stay hotel company but for its competitors also. Extended Stay Hotel Defendants and co-conspirators are thus joining together in a way that deprives the market of fully independent centers of decision-making on pricing and supply of extended stay hotel guest rooms.

892.    Each Extended Stay Hotel Defendants and co-conspirator has agreed with IDeaS to provide it with daily nonpublic, competitively sensitive data. IDeaS requires each participant to share this information with it through a property management system or other internal system. Each participant understands that IDeaS, IDeaS, with the active involvement, support, and know-how of SAS, will use this data in the G3 RMS and related revenue management products.

893.    The transactional data these participants agree to provide to IDeaS, and indirectly to each other, includes sensitive, non-public business information, including historical, current, and forward-looking rate and occupancy data, as well as sensitive, non-public business information in the form of STR benchmark reporting data and Demand360 data.

894.    Extended Stay Hotel Defendants and co-conspirators, including those that compete with each other in the Relevant Markets, have agreed with each another, through IDeaS and directly,

to exchange nonpublic, competitively sensitive data, both through the G3 RMS and by other means. Other means include the exchange and discussion of best practices and guidelines for using the G3 RMS to maximize profit, which has occurred during regular meetings between participants and their assigned IDeaS client teams and IDeaS-sponsored client events and summits, among other meetings and discussions.

895.    IDeaS, with the active involvement, support, and know-how of SAS, uses participants' nonpublic, competitively sensitive data to develop, train, and refine its G3 RMS models and algorithms, and to generate fully automated and continuously updated pricing and supply "decisions" for each participant. The G3 RMS is designed to increase extended stay hotel guest room rental prices as much as possible.

896.    IDeaS engages in a variety of conduct to ensure participants' consistent and continuous compliance with the fully automated pricing and supply "decisions" it generates and the corresponding objectives it promotes.

897.    The sharing of nonpublic, competitively sensitive data with IDeaS, and its use in the G3 RMS, is anticompetitive. It harms renters of the relevant guest hotel rooms as well as the competitive process nationally including in Relevant Markets.

898.    In each Relevant Market, Pricing Algorithm Defendants and participating Extended Stay Hotel Defendants and co-conspirators have sufficient market power to harm guests renting their rooms as well as the competitive process.

899.    The contract, combination, or conspiracy alleged herein has caused Plaintiffs and Class members to incur damages in the form of paying artificially inflated prices for extended stay hotel guest rooms rentals nationally including in the Relevant Markets.

900.    There are no procompetitive justifications for the Defendants' contract, combination, or conspiracy, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

901.    By way of example, the G3 RMS does not need to use competitors' nonpublic, competitively sensitive data or the non-public, sensitive data gleaned from competitors' STR benchmark reports and Demand360 data in order to develop, train and refine this product's algorithms and models.  Nor does the G3 RMS need to use this sensitive, non-public data by digesting, pooling, and analyzing it in order to generate pricing or supply recommendations for each Extended Stay Hotel Defendant or co-conspirator.

902.    Defendants' combination violates Section 1 of the Sherman Act under either a either a quick look or full-blown rule of reason analysis.

## COUNT THREE

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### Use of Vertical Agreements to Align Pricing

903.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

904.    Plaintiffs seek monetary and injunctive relief on behalf of themselves and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

905.    Beginning no later than January 1, 2016, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

906.    The contract, combination, or conspiracy alleged herein has consisted of a set of vertical agreements between IDeaS and each Extended Stay Hotel Defendant or co-conspirator

whereby each Extended Stay Hotel Defendant or co-conspirator will use the G3 RMS to set the prices and supply for extended stay hotel guest room rentals nationally including in the Relevant Markets.

907.    Each vertical agreement has been memorialized in a private and confidential written contract executed between IDeaS and each Extended Stay Hotel Defendant or co-conspirator. This contract is renewed on an annual basis or other periodic and recurring timeframe. Each vertical agreement grants the respective Extended Stay Hotel Defendant or co-conspirator the license and ability to use the G3 RMS to generate pricing and supply "decisions" that it continuously and automatically delivers to the respective hotel property through its property management system or other internal system. Each vertical agreement gives IDeaS permission to continuously and automatically access the private and confidential business information, including pricing and occupancy data, of the respective hotel property through its property management system or other internal system.

908.    The written contracts between IDeaS and each Extended Stay Hotel Defendant or co-conspirator regarding the license and use of the G3 RMS are protected from public disclosure by confidentiality provisions that prohibit the disclosure to any external parties of the confidential information and data sent or received by the parties without advance written authorization.

909.    Under each vertical agreement, the Extended Stay Hotel Defendant or co-conspirator has agreed with IDeaS to use the G3 RMS. This agreement includes providing sensitive, non-public business information, including pricing and occupancy data, to Pricing Algorithm Defendants, but more broadly is an agreement to use the G3 RMS as a means to set the prices and supply of that hotel company's extended stay guest room rentals.

910.    The G3 RMS is designed to raise extended stay hotel guest room rental rates for all Extended Stay Hotel Defendants and co-conspirators. The G3 RMS's purpose and effect is to align the pricing strategy and decision-making of Extended Stay Hotel Defendants and co-conspirators.

911.    Extended Stay Hotel Defendants and co-conspirators understand the purpose and effect of the G3 RMS. It is a reason why they each have adopted and deployed this software widely across their owned, operated, managed, and franchised extended stay hotel properties and discuss strategies and best practices for their optimal profit-maximizing use at various conferences, meetings, and events, including at IDeaS' regularly recurring client summits.

912.    Each individual agreement between an Extended Stay Hotel Defendant or co-conspirator and IDeaS in isolation has had the anticompetitive effect of artificially inflating prices and artificially lowering occupancies for that Defendant or co-conspirator's extended stay hotel guest rooms.

913.    In the aggregate, the set of vertical agreements between IDeaS and Extended Stay Hotel Defendants or co-conspirators have resulted in anticompetitive effects in the form of artificially inflated prices and artificially suppressed supply for extended stay hotel guest room rentals nationally including in the Relevant Markets. In particular, as a result of these vertical agreements, competitor Extended Stay Hotel Defendants or co-conspirators each delegated pricing and supply strategy and decision-making to a common, centralized third party, IDeaS, with the understanding that the G3 RMS would inflate the rents and lower the occupancies of their guest rooms collectively.

914.    In each Relevant Market, IDeaS and participating Extended Stay Hotel Defendants and co-conspirators have sufficient market power to harm guests renting their rooms as well as the competitive process.

915.    The contract, combination, or conspiracy alleged herein has caused Plaintiffs and Class members to incur damages in the form of paying artificially inflated prices for extended stay hotel guest rooms rentals nationally including in the Relevant Markets.

916.     There are no procompetitive justifications for the Defendants' contract, combination, or conspiracy, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

917.     By way of example, the G3 RMS does not need to use competitors' nonpublic, competitively sensitive data or the non-public, sensitive data gleaned from competitors' STR benchmark reports and Demand360 data in order to develop, train and refine this product's algorithms and models.  Nor does the G3 RMS need to use this sensitive, non-public data by digesting, pooling, and analyzing it in order to generate pricing or supply recommendations for each Extended Stay Hotel Defendant or co-conspirator.

918.     Defendants' combination violates Section 1 of the Sherman Act under either a either a quick look or full-blown rule of reason analysis.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A.   The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and Plaintiffs' counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.   The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate of Section 1 of the Sherman Act;

C.   Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiffs and the

members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.  Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.  Plaintiffs and the members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.  Plaintiffs and the members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and

G.  Plaintiff and the members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

161

Dated:  November 15, 2024                    Respectfully submitted,

                                             */s/ Shawn Raymond*
                                             Robert A. Clifford
                                             Shannon M. McNulty
                                             CLIFFORD LAW OFFICES, P.C
                                             120 North LaSalle Street
                                             36th Floor
                                             Chicago, IL 60602
                                             Telephone: (312) 899-9090
                                             rclifford@cliffordlaw.com
                                             smm@cliffordlaw.com

                                             Christopher J. Cormier (*pro hac vice*)
                                             Spencer Cox (*pro hac vice*)
                                             Matt Strauser (*pro hac vice*)
                                             Ian Baize (*pro hac vice*)
                                             BURNS CHAREST LLP
                                             4725 Wisconsin Avenue, NW, Suite 200
                                             Washington, DC 20016
                                             Telephone: (202) 577-3977
                                             ccormier@burnscharest.com
                                             scox@burnscharest.com
                                             mstrauser@burnscharest.com
                                             ibaize@burnscharest.com

                                             Warren T. Burns (*pro hac vice*)
                                             Quinn Burns (*pro hac vice*)
                                             BURNS CHAREST LLP
                                             900 Jackson Street, Suite 500
                                             Dallas, TX 75202
                                             Telephone: (469) 904-4550
                                             wburns@burnscharest.com
                                             qburns@burnscharest.com

                                             Matthew Tripolitsiotis (*pro hac vice*)
                                             Barbara Bates (*pro hac vice*)
                                             BURNS CHAREST LLP
                                             757 Third Ave, 20th Floor
                                             New York, New York 10017
                                             Telephone: (469) 895-5269
                                             mtripolitsiotis@burnscharest.com
                                             bbates@burnscharest.com

Stephen E. Morrissey (*pro hac vice*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 373-7380
smorrissey@susmangodfrey.com

Vineet Bhatia (*pro hac vice*)
Shawn Raymond (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

Rohit D. Nath (*pro hac vice*)
Jesse-Justin Cuevas (*pro hac vice*)
Connor Cohen
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
rnath@susmangodfrey.com
jcuevas@susmangodfrey.com
ccohen@susmangodfrey.com

William V. Reiss (*pro hac vice* forthcoming)
Ellen G. Jalkut (*pro hac vice* forthcoming)
Laura Song (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: (212) 980-7400
wreiss@robinskaplan.com
ejalkut@robinskaplan.com
lsong@robinskaplan.com

*Counsel for Plaintiffs and the Proposed Class*